# In The Matter Of:

*Weams, Jr. vs.*
*FCA USA, LLC*

*William J. Vigilante, Ph.D., CPE*
*May 23, 2018*

*Media Court Reporting*
*216 West Front Street*
*Media, PA 19063*
*610.566.0805  fax 610.566.0318*
*www.mediacourtreporting.com*

Original File William Vigilante_Ph.D._CPE 052318.txt
Min-U-Script® with Word Index

FCA Ex D.0001

6

1  A    It's okay.
2       For example, I help manufacturers in the
3  design and development of their warning systems that
4  could be used -- I've been asked to assess the noise
5  levels for different environments.
6       They're probably the two types of
7  assignments that I've been tasked with since forming
8  my own company.
9  Q    And when did you form your own company?
10 A    Officially I started Vigilante Forensic on
11 October 1st, 2015. The LLC was formed a little bit
12 earlier than that.
13 Q    And with respect to the warning systems
14 work that you've done for manufacturers, have you
15 done any of that for car manufacturers?
16 A    I have not.
17 Q    What manufacturers have you done work for
18 in the context of the warning systems? We can put
19 aside noise levels for now.
20 A    Yeah, so I only have two clients currently.
21 One manufactures nylon lifting slings. The other
22 one manufactures specialty hand tools.
23 Q    And what is the manufacturer of specialty
24 hand tools?
25 A    I'm not at liberty to provide the names of

1   litigation"?  Because I'm not talking about
2   criticizing a warning that's already been issued.
3           My question, I guess -- let me rephrase it.
4           Have you ever designed or participated in
5   the design of a warning for an automobile that did
6   indeed become part of the automobile's warning?
7       A   Not that I'm aware of.
8       Q   What is your understanding of why the
9   airbag deployed?
10      A   It was my understanding, at the time I
11  wrote the report, that there was an issue with tin
12  whiskers in the OCR, and that the other plaintiff
13  experts were -- in fact, found a defect with the way
14  it was either manufactured in or designed, that
15  caused the airbag to inadvertently deploy when
16  Mr. Weams turned the ignition key.
17      Q   Is that still your understanding?
18      A   Based upon their depositions, they have not
19  been able to identify a specific defect, so my
20  understanding has changed.
21      Q   So your understanding today is that no
22  specific explanation has been identified for the
23  deployment; is that fair?
24      A   I believe that the other experts, plaintiff
25  experts, have not been able to identify or --

1  Q    But your first report doesn't list it as an
2  example.  Your first report says, "Chrysler should
3  have presented the suggested warning decals on the
4  side of the sun visors opposite the required airbag
5  and rollover warnings," correct?
6  A    I do state in my initial report that that
7  was the location that it should have been presented.
8  Q    Is it fair to say that, if you had done a
9  thorough review of the article that you cited --
10 what is that, a Foley article?
11 A    It was a book chapter by Foley, Jim Foley.
12 Q    Is it fair to say, if you had done a
13 thorough review of those materials before rendering
14 that first report, that you would not have made that
15 recommendation that Chrysler include an on-the-visor
16 warning related to inadvertent airbag deployment?
17 A    Yes.  If I didn't make the oversight in my
18 review of the chapter, I wouldn't have had
19 specifically stated on the visor.  I would have
20 picked another location in the vehicle as an example
21 of where Chrysler could have and should have
22 provided it.
23 Q    And what -- so now we're talking about
24 something not in the owner's manual, but some other
25 on-the-vehicle location; is that correct?  Is that

1  your recommendation?
2       A    That's what the findings state, yes.
3       Q    Your findings?
4       A    Yes.
5       Q    All right.  What other locations might
6  there be that you think are appropriate?  Tell us
7  specifically where you think Chrysler should have
8  placed an on-the-vehicle warning related to the
9  possibility of inadvertent airbag deployment.
10      A    Yeah.  So, as noted in my supplemental
11 report, they should have placed it where they found
12 it to be appropriate and effective in communicating
13 the information to users and operators of the
14 vehicle.
15           So that's my opinion.  As particular
16 examples, they could have put it on the headliner
17 above the visor.
18      Q    I want to be sure I understand your opinion
19 on that.
20           Your opinion is that FCA should have placed
21 it where FCA found it to be appropriate?  Or are you
22 making a specific recommendation today as to where
23 such a label, an on-the-product warning, should be
24 included?
25      A    It's my opinion that it was Chrysler FCA's

Case 3:17-cv-00004-RLB   Document 31-5   07/02/18   Page 6 of 12

58

1  responsibility to identify and mitigate the hazard
2  associated with it.
3          And if they chose to rely upon a warning to
4  mitigate that hazard, it was their responsibility to
5  develop and employ an effective method in which to
6  communicate that safety information to users and
7  passengers of its 2004 Jeep liberty.
8          As an example, they could have chosen to
9  place it on the headliner above the visor. That
10 would be in the vehicle, it would remain in the
11 vehicle, it would be visible while the occupant was
12 in the vehicle, particularly to occupants who didn't
13 have or didn't read the manual.
14      Q   And had you offered or formed any other
15 suggestions or examples for locations for such an
16 on-the-product warning?
17      A   I haven't come up with any others, as I sit
18 here.
19      Q   And with respect to the headliner location,
20 I just want to be sure that we're clear. I think
21 you and I know exactly what we're talking about, but
22 different people, perhaps laypersons, might use
23 different technology.
24          Headliner is the roof of the vehicle, the
25 ceiling of the vehicle?

**Media Court Reporting**
610.566.0805  fax 610.566.0318

FCA Ex D.0006

```
 1    injury.  The hazard was the inadvertent deployment
 2    of the airbag.
 3        Q    So the hazard is not the cause; the hazard
 4    is the outcome?
 5        A    The hazard is the event that is likely to
 6    cause injury or property damage.
 7        Q    And as we sit here today, one of the items
 8    that I believe you also said is important is
 9    frequency, correct?
10        A    Yes.
11        Q    And as we sit here today, you are not aware
12    of another instance, in the history of the world,
13    where a stationary vehicle experienced an
14    inadvertent deployment of an airbag; is that
15    correct?
16        A    Yeah.  I did not research any and all
17    manufacturers' vehicles through the history of
18    vehicle manufacturing to determine whether or not
19    there was another inadvertent airbag activation
20    while the vehicle was stationary.
21             I'm aware of only, for the 2004 model year,
22    of only one event that's been reported involving an
23    inadvertent deployment while the 2004 Jeep Liberty
24    was stationary.
25        Q    And that's the Weams incident?
```

```
 1   and is not involved in a collision."
 2           Did I read that correctly?
 3      A    Yes.
 4      Q    Are you aware of any on-vehicle, on-product
 5   warnings that are intended to alert users to the
 6   possibility of a product malfunction?
 7      A    Not offhand.
 8      Q    Would you agree with me that this seems to
 9   be an instance of a product malfunction?
10      A    I'm not rendering an opinion regarding
11   whether it's a product malfunction or not.
12      Q    What could Mr. Weams have done differently
13   to avoid injury in this instance?
14      A    It would be my understanding he could have
15   been seated squarely in the seat at arm's length
16   when he turned the ignition key, as opposed to
17   reaching through the window or door.  I don't
18   remember offhand which he was doing.
19      Q    Moving on to page 9 of your report, sort of
20   toward the middle there's a paragraph, an excerpt
21   that reads, "Also the orc."
22           Do you see that?  O-R-C.
23      A    Yes.
24      Q    And toward the end of that paragraph, it
25   reads, "If the orc detects a malfunction in any part
```

1   developing the message text for their warning, that
2   they have a resource to reference to understand how
3   to do a more reasonable evaluation of the message
4   text to ensure comprehension and understanding of
5   what they intended to communicate.
6       Q   I think I get it a little better now.
7   Thank you.
8       A   Sure.
9       Q   I apologize if I've asked this before, but
10  in preparing your initial report in this matter, did
11  you review the text of FMVSS 208?
12      A   I did not review the entire text of it.  I
13  don't recall if I looked at the sections related to
14  the airbag or the warnings related to the airbag.  I
15  don't recall at this point.
16      Q   You don't recall whether you reviewed FMVSS
17  208 before you prepared your report or in preparing
18  your report in this matter?
19      A   Again, I know that I did not review the
20  entire section.  I don't recall if I reviewed parts
21  related to the airbag or airbag warning or not.
22      Q   Earlier we were discussing warnings for
23  product malfunctions, and I understood you to say
24  that you were not aware of any warnings, any
25  on-the-product warnings, related to product

```
 1   hazard associated with the design and/or
 2   manufacturing of the subject vehicle and subject
 3   vehicle model year --
 4        Q    Do you --
 5        A    -- not airbags and what should and should
 6   not be provided consistently across all
 7   manufacturers.
 8        Q    Do you accept that it is one of the NHTSA's
 9   goals, to standardize airbag warnings across makes
10   and models of vehicles?
11        A    I do.  And again, that is not the issue
12   relevant to my analysis or report, so I don't know
13   why Mr. Dorris is bringing that up in his critique
14   of my report.
15        Q    All right.  What's next?
16        A    I note, at the bottom of page 8, I think in
17   response to the last sentence on this page, that I
18   am not aware of any standard designs that allow an
19   airbag to inadvertently deploy.
20        Q    Is it your understanding -- I'm sorry.
21        A    So there would be no reason for a
22   manufacturer -- other manufacturers to provide a
23   similar warning.
24        Q    Is --
25        A    Again, my analysis and report and my
```

1            Prior to ANSI Z535.6, the .4 standard was
2   used for guidance for design presentation of
3   warnings and collateral material such as owner's
4   manuals.
5       Q    So that it's your testimony that ANSI Z535
6   applied to owner's manuals before Z535.6 was
7   published?
8       A    Z535.4 was applicable and was used for
9   warnings presented in manuals prior to the Z535.6
10  standard.
11      Q    All right.  What else?
12      A    I think that's all of the comments I have
13  on his report.
14      Q    As part of its review of airbag warnings,
15  have you investigated or studied, at all, the NHTSA
16  record?
17      A    For this specific case, I did not study the
18  NHTSA record for airbag warnings.  For other
19  projects in the past, I have studied NHTSA records
20  for airbag warnings.
21      Q    Do you dispute that NHTSA specifically
22  sought to avoid overload by providing too many
23  messages in the context of its review of the airbag
24  warnings issue?
25      A    I am aware that was an issue that NHTSA was

1 concerned about and addressed when dealing with
2 airbag warnings.
3         THE WITNESS:  So we need to take another
4     break because we've been going about an hour
5     and a half.
6         MR. HEBERT:  I think I have like three or
7     four minutes left.
8         THE WITNESS:  Three or four minutes left?
9         MR. HEBERT:  Lawyers always say that,
10     but --
11         THE WITNESS:  I know you do.
12         So do you want to go off the record to
13     discuss this?
14         MR. HEBERT:  We can, all right.
15         THE VIDEOGRAPHER:  We're now going off the
16     record.
17                 (Recess taken.)
18         THE VIDEOGRAPHER:  We're back on the
19     record.
20   Q    We really -- that was really the last
21 subject matter that I had intended to cover on my
22 outline.
23         But tell me, sir, over these last several
24 hours, have we now identified and discussed all of
25 the opinions that you have formed in this matter?