

# In The Matter Of:

*Weams, Jr. vs.*
*FCA USA, LLC*

---

*William J. Vigilante, Ph.D., CPE*
*May 23, 2018*

---

*Media Court Reporting*
*216 West Front Street*
*Media, PA  19063*
*610.566.0805  fax 610.566.0318*
*www.mediacourtreporting.com*

Original File William Vigilante_Ph.D._CPE 052318.txt

Min-U-Script®

Page 1

```
 1  UNITED STATES DISTRICT COURT
 2  MIDDLE DISTRICT OF LOUISIANA
 3  - - - - - - - - - - - - - - - - - - - -x
 4  CURTIS RAY WEAMS, JR.,
 5                          Plaintiff,
 6          versus
 7  FCA USA LLC,
 8                          Defendant.
 9  - - - - - - - - - - - - - - - - - - - -x
10
11          Videotaped deposition of WILLIAM J.
12  VIGILANTE, PH.D., CPE, taken pursuant to Notice, was
13  held at the Offices of MEDIA COURT REPORTING, 216
14  West Front Street, Media, Pennsylvania, commencing
15  May 23, 2018, 10:09 a.m., on the above date, before
16  Amanda McCredo, a Court Reporter and Notary Public
17  in the Commonwealth of Pennsylvania.
18                      - - -
19
20
21
22
23          MEDIA COURT REPORTING
            216 West Front Street
24             Media, PA  19063
            610.566.0805  fax 610.566.0318
25           mcr@mediacourtreporting.com
            www.mediacourtreporting.com
```

Page 2

```
 1  A P P E A R A N C E S :
 2
 3      SMITH SHANKLIN SOSA
        Hillside Oaks Square
        16851 Jefferson Highway, Suite 7C
 4      Baton Rouge, Louisiana 70817
        BY: JOHN H. SMITH, ESQ.
 5      john@smithshanklin.com
        (225)223-6333
 6      Attorneys for Plaintiff
 7
 8
 9      McGLINCHEY STAFFORD, PLLC
        601 Poydras Street, 12th Floor
10      New Orleans, Louisiana 70130
        BY: GARY G. HEBERT, ESQ.
11      ghebert@mcglinchey.com
        (504)586-1200
12      Attorneys for Defendant
13
14
15      ALSO PRESENT:
16      Mitch Berger - videographer
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1      THE VIDEOGRAPHER: We're now on the record.
 2      This is the videotaped deposition of
 3  Dr. William J. Vigilante, Jr., taken by the
 4  defendant, in the case of Curtis Ray Weams, Jr.
 5  versus FCA US LLC, filed in the U.S. District
 6  Court for the Middle District of Louisiana,
 7  case number 17-4-SDD-RLB.
 8      Counsel for the defendant is Gary Hebert,
 9  Esquire; counsel for the plaintiff is John
10  Smith, Esquire.
11      This deposition is being held at 216 West
12  Front Street in Media, Pennsylvania, on May 23,
13  2018.
14      My name is Mitch Berger, and I'm the video
15  specialist.  Our court reporter is Amanda
16  McCredo from Media Court Reporting, and she
17  will now swear in the witness.
18  W I L L I A M  V I G I L A N T E, the witness
19      herein, after having been first duly sworn
20      by a Notary Public of the Commonwealth of
21      Pennsylvania, was examined and testified
22      as follows:
23  EXAMINATION BY
24      MR. HEBERT:
25  Q   Good morning, sir.
```

Page 4

```
 1      My name is Gary Hebert.  We met briefly
 2  before the deposition.  I represent FCA US LLC in
 3  this matter.
 4      I'm here to ask you some questions today
 5  about your work in the case.
 6      What is your full name, please, sir?
 7  A   William John Vigilante, Jr.
 8  Q   And what is your professional address?
 9  A   200 Pembrooke Circle, Phoenixville,
10  Pennsylvania 19460.
11  Q   By whom are you employed?
12  A   I'm self-employed.
13  Q   And what is the -- do you work under your
14  own name or is there an entity that you have formed?
15  A   The legal entity is Vigilante Consulting,
16  LLC.  I do business as Vigilante Forensic with
17  related -- with regards to forensic and
18  litigation-related matters.
19  Q   And that's -- my next question, is:  What
20  is the business of Vigilante Forensic?
21  A   So, Vigilante Forensic provides forensic
22  investigative services.
23  Q   Which means what?
24  A   Typically I'm called to investigate an
25  incident that has occurred, determine what happened,
```

Page 5

1  why it happened, things that could have been done to
2  avoid it. Oftentimes it's in conjunction with a
3  lawsuit, so I'll be asked to provide expert
4  testimony to explain scientific principles and facts
5  and how they relate to the incident at issue.
6  Q  And do you provide services, as well,
7  outside of the context of litigation?
8  A  I do.
9  Q  And explain to us how that might come
10  about?
11  A  So, under Vigilante Consulting, I provide
12  traditional human factors consulting services.
13  Q  To whom?
14  A  Typically it's manufacturers.
15  Q  And I believe -- I hope I wrote it down
16  correctly.
17     Typical human factors consulting, did I say
18  that right?
19  A  Correct.
20  Q  And what is typical human factors
21  consulting?
22  A  I should say it's traditional human
23  factors --
24  Q  I did write down "traditional" and I said
25  "typical." I apologize.

Page 6

1  A  It's okay.
2     For example, I help manufacturers in the
3  design and development of their warning systems that
4  could be used -- I've been asked to assess the noise
5  levels for different environments.
6     They're probably the two types of
7  assignments that I've been tasked with since forming
8  my own company.
9  Q  And when did you form your own company?
10  A  Officially I started Vigilante Forensic on
11  October 1st, 2015. The LLC was formed a little bit
12  earlier than that.
13  Q  And with respect to the warning systems
14  work that you've done for manufacturers, have you
15  done any of that for car manufacturers?
16  A  I have not.
17  Q  What manufacturers have you done work for
18  in the context of the warning systems? We can put
19  aside noise levels for now.
20  A  Yeah, so I only have two clients currently.
21  One manufactures nylon lifting slings. The other
22  one manufactures specialty hand tools.
23  Q  And what is the manufacturer of specialty
24  hand tools?
25  A  I'm not at liberty to provide the names of

Page 7

1  the companies.
2  Q  Why is that? Do you have some sort of
3  nondisclosure or something?
4  A  Confidentiality. I haven't asked them if
5  it's okay to disclose the names during litigation in
6  matters that are not related to them.
7  Q  And they have said, "No, you can't"?
8  A  I haven't asked them.
9  Q  Oh, you haven't asked, okay.
10  A  So until I get confirmation, I don't think
11  it's appropriate.
12  Q  With respect to the work that you've done
13  for the manufacturers to which you've alluded
14  related to warning systems, is any of that work
15  related to the opinions that you are offering in
16  this matter today?
17  A  Other than applying the same types of
18  principles for the design, development of product
19  warnings, it's not related.
20     MR. HEBERT: Before we get into the
21  substance of the deposition, I'll just confirm
22  on the record that plaintiff's counsel and I
23  typically agree in these matters to reserve all
24  objections except as to the form of the
25  question and responsiveness of the answer until

Page 8

1  the time of trial in this matter.
2     MR. SMITH: That's correct. That is
3  correct.
4  Q  Before we assemble today, you were kind
5  enough to provide to us your file materials and I
6  want to review those and identify those, if we
7  might.
8     And I'm going to start with what I received
9  electronically and then, perhaps, you can tell us
10  after how the disc that you handed me differs.
11     So, I'm hoping that the folders are going
12  to look exactly the same to you as they do to me.
13     The first one that I see says "Admin." Is
14  that the first folder that you see?
15  A  Yes.
16  Q  And when I scroll through that, let's
17  see -- why don't you tell us what's in there
18  generally, and then we can discuss the specific
19  items as needed?
20  A  There's 10 PDFs. The first one is entitled
21  "23 Order," and that looks like it's an order from
22  the court in this matter regarding deadlines, it
23  appears.
24     The second is the Notice of Deposition that
25  was provided to me. I think the -- I don't have the

Page 9

1 date of this particular notice.
2 Q  I think it's April 26th, that's just our
3 convention and I can tell from that.
4 A  Okay.  So it's a Notice of Deposition and
5 there's a request for document production by the
6 18th of May, I believe.
7    Next is my -- a copy of my CV.
8    That's followed by my retention agreement
9 that was signed by Mr. Smith.
10    A copy of my case inquiry form when I spoke
11 to -- it's a document that I fill out when I first
12 contact or have contact with the client regarding a
13 particular assignment.
14    The next is the deposition agreement that I
15 sent down to Mr. Smith's office to be passed to
16 yours.  I think there was an earlier one, but this
17 one's dated May 15th.
18    Two invoices that I have generated to
19 Mr. Smith's office in this matter.
20    And then the original retention agreement
21 that was sent out to Mr. Smith's office upon being
22 contacted regarding the case.
23 Q  I'm going to hand you an exhibit that I've
24 identified as Vigilante 1.
25    (Notice of Deposition was marked

Page 10

1    as Exhibit Vigilante 1 for
2    identification, as of this
3    date.)
4 Q  That appears, to me, to be the same
5 deposition notice as the one that's on the file, and
6 ask you if that looks familiar to you and if you've
7 seen that before.
8 A  Yes, it appears to be a paper, hard copy of
9 the document I have in my file.
10 Q  And just looking at page 2 of that, have
11 you indeed brought with you today all of your file
12 materials related to this matter, as well as your
13 CV, résumé, and publication list?
14 A  I believe so.
15 Q  Why the qualifier?
16 A  I'd have to reread it again to make sure
17 that there's nothing that I didn't provide, but it
18 was my intention to provide my file.
19 Q  That, I suppose, is what we need to know.
20 It certainly was your intention today to bring your
21 entitle file with you?
22 A  Yes.  So, for example, letter B each and
23 every document reviewed.  There were a number of
24 website documents that reviewed that I did not save
25 or specifically refer to or rely upon for my report.

Page 11

1 But because I didn't save them, I didn't have an
2 opportunity to produce them.  So that would be a
3 reason why I qualified my answer.
4 Q  Item C requests all reports submitted at
5 any time by you.  It's my understanding that you had
6 generated but one report in this matter; is that
7 correct?
8 A  That is incorrect.
9 Q  That's incorrect?
10 A  Yes.
11    MR. HEBERT:  Oh.  I have but one report
12 from the witness.
13    MR. SMITH:  What do we have, a
14 supplemental?
15    THE WITNESS:  A supplemental report dated
16 March 15, 2018.
17    MR. HEBERT:  Let's go off the record.
18    THE VIDEOGRAPHER: We're now going off the
19 record.
20    (Recess taken.)
21    THE VIDEOGRAPHER:  We're back on the
22 record.
23    BY MR. HEBERT:
24 Q  So just before the break, I think that the
25 question that had been put to you is whether you had

Page 12

1 issued but one report in this matter, and you
2 indicated that you had issued a supplemental report;
3 is that correct?
4 A  Correct.
5    (Notice of Video Deposition was
6    marked as Exhibit Vigilante 2
7    for identification, as of this
8    date.)
9 Q  Before we get off track in terms of
10 exhibits, I'm just going to show you what I marked
11 as Vigilante 2, which is the notice of video
12 deposition.  It's otherwise the same, it's just that
13 it says video.
14    And I understand from your comments before
15 the deposition, that you had not seen that before
16 today?
17 A  That's correct.
18    (Expert Report of Vigilante
19    Forensic dated February 15, 2018
20    was marked as Exhibit Vigilante
21    3 for identification, as of this
22    date.)
23 Q  And then I'm going to hand you what I
24 marked as Vigilante 3 and ask you if you can
25 identify that for us.

Page 13

1  A   It appears to be a copy of my February 15,
2  2018 report in this matter.
3      (CV of William J. Vigilante,
4      Jr., Ph.D., CPE, dated October
5      11, 2017 was marked as Exhibit
6      Vigilante 4 for identification,
7      as of this date.)
8  Q   And just to keep the numbering straight,
9  I'll hand you what I've marked as Exhibit 4 and ask
10 you to identify that.
11 A   It looks like an older copy of my CV.
12 Q   An older copy?
13 A   Yes.
14 Q   Is there a newer copy on the system here?
15 A   There should be.  It should be dated
16 February 25, 2018.
17 Q   Where will I find that amongst these --
18 A   In the admin folder.
19 Q   I'm assuming you didn't go back and get any
20 other degrees since the last --
21 A   No.  There was some -- I believe the
22 changes were related to grammatical issues and
23 editing.  I don't think anything additional was
24 added.
25 Q   Any substantive changes that come to mind

Page 14

1  as we sit here?
2  A   I don't believe so.  I think there's just
3  editing, general editing.
4      (William J. Vigilante, Jr.
5      Ph.D., CPE History of Expert
6      Testimony by Deposition or Trial
7      was marked as Exhibit Vigilante
8      5 for identification, as of this
9      date.)
10 Q   I'm going to give you what I've marked as
11 Vigilante 5 and ask you if you can identify that.
12 A   This looks like my four-year testimony
13 history spanning January 2017, so it was probably
14 produced with my February report.
15 Q   And then, although I don't have a hard copy
16 with me here today, I'm going to introduce
17 Exhibit 6 to the deposition, Vigilante 6, the -- I'm
18 trying to figure out a good way to identify the
19 updated CV because it just says CV.
20     Does it have a date on it, do you know?
21 MR. SMITH: February --
22 Q   Oh, it says 2/25/18.
23 A   The CV itself has a date.
24 MR. SMITH: Exhibit 6.
25 MR. HEBERT: So that will be Exhibit 6, the

Page 15

1  CV dated 2/25/18.
2      (CV of William J. Vigilante,
3      Jr., Ph.D., CPE, dated 2/25/18
4      was marked as Exhibit Vigilante
5      6 for identification, as of this
6      date.)
7  MR. HEBERT: And then Exhibit 7 will be the
8  supplemental report.  And the file on here says
9  WJV Supp Report.  And it's dated 3/15 -- that's
10 March 15 -- of 2018.
11 Q   Is that correct?
12 A   Correct.
13     (Supplemental Report date March
14     15, 2018 was marked as Exhibit
15     Vigilante 7 for identification,
16     as of this date.)
17 Q   And when was that produced, as far as you
18 know -- well, let me ask this, let me ask it this
19 way.
20     When was it generated by you?
21 A   I sent it to Mr. Smith's office on
22 March 15, 2018.
23     MR. HEBERT: And I will just state for the
24 record that I was not aware until this morning
25 of a supplemental report.

Page 16

1  Q   But you pointed out to me that it was
2  contained in the DropBox materials; is that right?
3  A   Yes.
4  Q   And when were the DropBox materials
5  provided?
6  A   I think the subpoena for documents was due
7  the 18th, so I think I provided it on the 17th, at
8  the latest.  So, 17th or 18th.  That's when I
9  provided it.  I have no idea when Mr. Smith's office
10 provided it to you.
11 Q   All right.  And we'll come back to that.  I
12 want to go back to identifying the various items in
13 your file.
14     MR. HEBERT: We'll identify as Vigilante 8
15 the Case Intake Form, which is identified
16 "VFCIF Copy."
17     (Case Intake Form was marked as
18     Exhibit Vigilante 8 for
19     identification, as of this
20     date.)
21     MR. HEBERT: And then as Vigilante 9, "VF
22 Invoice," looks to be dated 2/17 of 2018.
23     (Vigilante Forensic Invoice
24     dated 2/17/18 was marked as
25     Exhibit Vigilante 9 for

Weams, Jr. vs.
FCA USA, LLC

William J. Vigilante, Ph.D., CPE
May 23, 2018

Page 17

1    identification, as of this
2    date.)
3 Q   Did I say that right?
4 A   Yes. It's invoice 315.
5     MR. HEBERT: And then Vigilante 10 would be
6  the invoice dated 3/20/2018.
7 Q   Did I read that correctly?
8 A   I believe it's dated March 30th, 2018.
9 Q   You're right.
10    (Vigilante Forensic Invoice
11    dated 3/30/18 was marked as
12    Exhibit Vigilante 10 for
13    identification, as of this
14    date.)
15 Q   And those are the only two invoices that
16  have been issued in this matter; is that correct?
17 A   Correct.
18 Q   Have you worked with Mr. Smith before?
19 A   I have.
20 Q   And on how many occasions?
21 A   I'd say at least two.
22 Q   What types of cases, if you recall?
23 A   I believe one was a consumer product case
24  involving failure to warn.
25 Q   What was the product?

Page 18

1 A   It was a gel fuel, I believe.
2 Q   Gel fuel?
3 A   Gel fuel, I believe.
4 Q   Okay.
5 A   The second case was a motor vehicle
6  collision where a vehicle collided with a train.
7 Q   And what was the nature of the testimony
8  that you provided with respect to the motor
9  vehicle-train collision?
10 A   I don't recall providing any testimony in
11  that case.
12 Q   You just provided consulting work?
13 A   I don't recall if I generated a report, but
14  I don't know that I was ever deposed. I know I
15  didn't testify in trial.
16 Q   All right. Let's go back to your file. It
17  looks to me that the next file is defense expert
18  reports, and I see three items in there.
19    That would be Dorris, Livernois, and
20  Raphael; is that correct?
21 A   Yes.
22 Q   The next file looks to be depos.
23    I see the depositions of Angela Weams and
24  Curtis Weams; is that correct?
25 A   In your copy it is, that you have from the

Page 19

1  DropBox. On the CD that you're holding, it contains
2  three more depositions.
3 Q   And those would be the depositions of
4  Misters Berrian, B-E-R-R-I-A-N; Hille, H-I-L-L-E;
5  and Hanneman; is that right?
6 A   Yeah. But technically I believe they're
7  the rough draft of the transcripts, so I don't know
8  when the formal, final version will be produced and
9  if they'll be different or not.
10 Q   And I was handed, as we walked in this
11  morning, a DVD which I'll identify for the
12  deposition as Vigilante 11.
13    (DVD was marked as Exhibit
14    Vigilante 11 for identification,
15    as of this date.)
16 Q   Other than -- well, let me say this first.
17  Vigilante 11, which is the DVD, indeed contains the
18  rough drafts of the depositions that we just
19  discussed; is that correct?
20 A   Yes.
21 Q   Is there anything else that's contained on
22  this DVD that is not contained in the file materials
23  that were provided by DropBox -- I guess, I'm sorry,
24  we also have the supplemental CV, right?
25 A   The supplemental CV?

Page 20

1 Q   The updated CV.
2 A   That's on the DropBox, that was in the
3  DropBox.
4 Q   All right.
5 A   So I know that those three depositions were
6  added and I think there was one other file I added
7  but I can't remember what it is.
8 Q   What would be the most efficient way to
9  identify that?
10 A   I'm looking at the dates and the only thing
11  that's dated 5/22 -- or dated after 5/17 is the
12  deposition, so I very well may be mistaken.
13    So based upon the Date Modified, I would
14  say that only those three depositions were added.
15 Q   Okay. The next folder is 'Discovery' --
16 A   But I will tell you, if I see it, I will
17  let you know immediately.
18 Q   Because we're going to go through it and
19  certainly if you see something else that's been
20  added.
21    The next folder, as I read it, is entitled
22  discovery documents. Is that your -- "Discovery
23  Docs."
24    Is that yours?
25 A   Yes.

Page 21

1  Q   Your next folder?
2  A   Yes.
3  Q   And the first folder within that seems to
4  be 2004 Jeep Liberty.
5       Did I read that correctly?
6  A   Yes.
7  Q   And what's contained in that folder?
8  A   These are all compliance reports related to
9  the 2004 model year Jeep Liberty.
10 Q   Is it fair to say that the contents of 2004
11 Jeep Liberty are all items that were produced by
12 Chrysler in this matter, at least as far as you
13 understand it?
14 A   I wouldn't make that assumption.
15      Everything in this particular folder under
16 Discovery Docs are documents that were provided to
17 me.  I don't -- I don't know necessarily whether it
18 came from defense or plaintiff, but they were all
19 discovery documents provided to me.
20 Q   With respect to the compliance-related
21 materials, the 208 materials that we were just
22 discussing inside of 2004 Jeep Liberty, does any of
23 that relate to your work in this matter?
24 A   Offhand, I don't recall any that do.
25 Q   The next folder is entitled "Change

Page 22

1  Orders."
2  A   I will say -- to correct that last
3  answer -- that there may be some tangential
4  relationship between some of the telltale lights
5  requirements and my opinions, because I do reference
6  the airbag light in my report.
7  Q   Are you talking about the light on the
8  instrument panel?
9  A   Correct.
10 Q   And in preparing your report, did you
11 review that specific portion of the compliance
12 report?
13 A   That's what I'm saying.  I don't recall
14 specifically offhand if it was part of one of these
15 compliance reports or not.  But I didn't want to
16 completely dismiss all of them as being completely
17 irrelevant.
18 Q   Will you be rendering an opinion in this
19 matter that this vehicle fails to comply with any
20 FMVSS?
21 A   I'm not aware of it not complying with any
22 of the FMVSSs -- or it wasn't my intent to opine
23 that it was not in compliance with any of the
24 Federal Motor Vehicle Safety Standards.
25 Q   And then let's now go on to the folder

Page 23

1  entitled "Change Orders."  And just -- I'm happy to
2  give as much time as is required for the various
3  folders and documents, but I can ask sort of a
4  general question this way and you can tell me if
5  it's fair or not.
6       Did you find anything related -- in this
7  folder entitled Change Orders -- that relates to
8  your work in the file?
9  A   I don't recall all of the change orders,
10 but there wasn't anything that I specifically
11 referenced in my report.
12 Q   The next folder is entitled "Chrysler"; is
13 that right?
14 A   That's correct.
15 Q   What, if anything, from this folder, did
16 you -- do you consider relevant to the opinions that
17 you are going to offer in this matter?
18 A   Offhand, I don't recall.  To try to make
19 this a little bit easier, if there was something
20 specific I was going to rely upon for my opinions, I
21 would have cited it in my report.
22      So there's dozens of documents in here and
23 I don't recall what's in all of them offhand.
24 Q   And then the next folder is "D Photos taken
25 for 4/27/2017"; is that right?

Page 24

1  A   That's what it's called, yes.
2  Q   It seems to be folders that are sequential
3  beginning with DSCN1973 and going through DSCN2119.
4       Did I read that off correctly?
5  A   Yeah.  They're the bookmarks for the
6  photographs.
7  Q   Do you know the source of these
8  photographs, who took them?
9  A   I don't know who took them.  It's my --
10 based upon the title, I can only assume it was taken
11 on behalf of the defense on April 20, 2017, and
12 they're photographs of the Weams vehicle.
13      It looks to be photographs of the
14 diagnostic tool used to pull information from the
15 Weams vehicle.
16 Q   And then the next folder is entitled
17 "Drawings" and seems to have four files in there.
18      Is that what your file shows?
19 A   Yes.
20 Q   Anything amongst these four drawings that
21 is related to the opinions that you will be
22 rendering in this matter?
23 A   Specifically, no.  Generally there's a
24 drawing of the steering wheel hub where the airbag
25 deployed from.  So that would be, you know,

Page 25

1 tangentially related but nothing specifically
2 related.
3 Q  "E-files," what's in there?  That's the
4 next folder.
5 A  This looks like they're related to various
6 pleadings and motions and orders generated in the
7 case.
8 Q  Nothing would have been added to this
9 folder, correct?
10 A  I don't see anything added, no.
11 Q  The next folder is entitled "FMVSS."
12    Did I read that correctly?
13 A  Yes.
14 Q  Is this the same as the -- if you know --
15 the contents of the 2004 Jeep Liberty folder in any
16 respect?
17 A  I would have to go back and compare them.
18 But just looking at one of the documents I pulled
19 up, I don't know that it's an exact copy of what was
20 in the 2004 Jeep Liberty folder.
21 Q  I'm scrolling through --
22 A  For example, document 04-203-CP-354I, in
23 the 2004 Jeep Liberty folder, is titled
24 "04CR208KJCB3541," and the documents have different
25 formatting, at least.

Page 26

1 Q  It looks to me is that all of the documents
2 that appear in 2004 Jeep Liberty, like all of the
3 documents that appear in FMVSS, bear a heading that
4 says that this document is subject to a protective
5 order in Weams versus FCA US LLC.
6    Is that your understanding?
7 A  The two documents, the one from each
8 folder, the corresponding one for each folder have
9 that heading.  I can assume the rest of them do.  I
10 don't know offhand without looking.
11 Q  I just was thinking that would be a
12 shorthand way for is to confirm these are indeed
13 materials that were produced in this matter.
14    Is that a fair --
15 A  Oh, absolutely, yes.  Absolutely.
16 Q  All right, all right.  And then the next --
17 I'm sorry?
18 A  I was going to say, they have different
19 Bates numbers so I don't know why -- they have
20 similar titles, but they appear to have somewhat
21 different documents with different Bates numbers.
22 Q  Anything from the FMVSS folder, any
23 documents in there on which you specifically rely
24 that would not have been referenced in your reports?
25 A  I don't believe so.

Page 27

1 Q  And then the next item that I see is not a
2 folder, but a document entitled "Inspection Photos."
3    Do you see that?
4 A  There should be a folder called "Install
5 Guides."
6 Q  I have that, but it's just not next.  I
7 have it all, I guess, in alphabetical order.
8 A  Oh, okay.
9    So there is -- the next -- the document
10 would be Inspection Photos.
11 Q  And what do you understand to be the source
12 of this document?
13 A  You're asking me who took them?
14 Q  Yes.
15 A  If I understand who took them?  I don't
16 know that I know offhand who took them.  It looks
17 like they're all Bates-numbered from FCA, so I would
18 imagine that it's likely to be a defense product,
19 but I don't know for sure.
20 Q  Let me just direct your attention, if I
21 might, to what appears to be within the Inspection
22 Photos document, on my page 12 of 141-page PDF, I
23 see something that says "FCA Weams," Bates 433.
24    Do you see that?
25 A  Yes.

Page 28

1 Q  It has a circle that appears to be added to
2 the photograph.
3    Do you see that?
4 A  I do see a circle, yes.
5 Q  And I see that the next photo, for example,
6 has some verbiage and arrows and a star.
7    Do you see that on 434?
8 A  Yes.
9 Q  With respect to the verbiage and other
10 markings that appear on these photos, do you know
11 who added that in?
12 A  I do not.
13 Q  And I will just tell you that, to my
14 understanding, these were not indeed provided by
15 FCA, they were provided by plaintiff.
16    So I ask you, do you know who took these or
17 who provided them specifically?
18 A  I do not.
19 Q  Okay.  And then we go into the next folder
20 is which is called "Install Guides."
21 A  Okay.
22 Q  Anything in this folder that is related to
23 or relevant to the opinions that you intend to offer
24 in this matter?
25 A  Not specifically.

Page 29

1  Q  "Photos From Client" looks to be a series
2  of JPEGs beginning with 63280, and numbered
3  sequentially to 63312; is that right?
4  A  I think so. I didn't follow the first
5  number. The last number I have.
6  Q  63280.
7  A  63280 is the first.
8  Q  The last 63312?
9  A  Correct.
10  Q  And the last folder is called "Recalls"?
11  A  Yes.
12  Q  And within that folder is another folder
13  called "Recall Comm Guide," and my question to you
14  with respect to the Recalls folder is whether there
15  is anything in this folder that's relevant to the
16  opinions that you will be offering in this matter?
17  A  Specifically, no. Just tangentially with
18  regard to background information and other issues,
19  other issues related to other inadvertent activation
20  of airbags in Chrysler or FCA vehicles.
21  Q  Are you aware of any inadvertent
22  deployments of airbags involving the stationary 2004
23  Jeep Libertys other than this matter?
24  A  I'm not aware of another stationary one. I
25  think there's records in here regarding the one

Page 30

1  involving the owner where the inadvertent airbag
2  deployed while traveling at a relatively low speed.
3  Q  Are you talking about the BOQ record that
4  we saw?
5  A  I don't know that we saw that yet.
6  Q  I'm sorry, you're right, we didn't see it
7  here today, but was -- that has been produced in
8  this matter?
9  A  I don't recall if it was produced or not,
10  but I did review it, so...
11  Q  Where would we find it on your file -- in
12  your file?
13  A  Give me one moment.
14    So under the file "Research," there's a
15  subfolder called "Other Incidents," and that's
16  where, that's where I have it.
17  Q  I don't have a folder called Research. Is
18  it within another folder, Research?
19  A  No, it should be in the root file, so WJV
20  Depo File, then Research.
21    I would be happy to take a look at your
22  directory if you'd like.
23  Q  Yeah.
24    I see it here, I do see it --
25  A  You have to go up one from Discovery Docs,

Page 31

1  right?
2  Q  I do see it, I apologize.
3    MR. HEBERT: I'm trying to figure out why I
4  didn't find it on the way before.
5  Q  Let's go back to the question that was
6  pending, though.
7    Are you aware of, other than the Weams
8  incident, are you aware of any other reported
9  incident of an inadvertent deployment involving a
10  stationary 2004 Jeep Liberty?
11  A  Yeah, no, Weams is the only one that I know
12  involving a stationary. And then the one I just
13  mentioned was the only other one that I'm aware of,
14  but that one involved a moving vehicle.
15  Q  Right. And I want to ask the question
16  again because, at the beginning of the answer you
17  said "Yeah, no," and I just want to be sure that the
18  record is clear.
19    As we sit here today, sir, are you aware of
20  any other incident, other than Weams, where it was
21  alleged that a 2004 Jeep Liberty that was stationary
22  experienced an inadvertent frontal airbag
23  deployment?
24  A  Yes, I'm not -- let me start over.
25    I am not aware of any other inadvertent

Page 32

1  airbag deployment involving a 2004 Jeep Liberty
2  while the vehicle was stationary.
3  Q  Thank you. Are you aware of any other
4  vehicle that has been involved in an inadvertent
5  deployment of a frontal airbag when the vehicle was
6  stationary?
7  A  Other than a 2004 Jeep Liberty?
8  Q  Yes.
9  A  I don't recall if any of the other
10  incidents that were reported involved a stationary
11  vehicle or not offhand.
12  Q  As we sit here today, are you able to
13  identify another incident, other than Weams,
14  involving any vehicle at all that was stationary and
15  experienced an inadvertent deployment of a frontal
16  airbag?
17  A  Not offhand.
18  Q  As we sit here today -- well, I'll rephrase
19  that question when we get to that portion.
20    And then just to round out what we were
21  discussing previously, in terms of other incidents
22  involving the 2004 Jeep Liberty, the only one of
23  which you are aware is the one that is contained in
24  your folder that's entitled "Research." And within
25  that, it's a folder called "Other Incidents."

Weams, Jr. vs.
FCA USA, LLC

William J. Vigilante, Ph.D., CPE
May 23, 2018

Page 33

1   Is that right?
2   A   That's correct.
3   Q   And this would appear to relate to a NHTSA
4   complaint -- I'll just, for the sake of
5   identification, reference the consumer location as
6   Marriottsville, Maryland -- which involved a moving
7   vehicle, correct?
8   A   Yes.
9   Q   Let's go back to the review of your file
10  materials, and I think we had gotten as far as -- I
11  think the next one up -- or maybe we had just begun
12  speaking of Install Guides; is that right?
13  A   I thought we did that one.
14  Q   No, you're right.  We went through Photos
15  from Client.
16  A   And now we're on "Recalls."
17  Q   Now we're on "Recalls," that's right.
18      And I think that you answered the question
19  that I had put before you on that one, which is,
20  whether anything in this folder relates specifically
21  to your work in this matter and your answer is no?
22  A   Yeah, I don't recall anything specifically
23  in that particular folder that I relied upon in my
24  report.
25  Q   The next item, as I see it, is the

Page 34

1   Registration Certificate?
2   A   Okay.
3   Q   Again, I'm going -- my organization is
4   alphabetical.
5   A   I can't, I can't -- not to be difficult,
6   but when I do it by name, it lists all the folders
7   first and then all the files.  So alphabetical --
8   Q   There is only one folder after this one.
9   A   So Registration, I do have Registration
10  Certificate.
11  Q   All right.  The next folder is "Rich Hille
12  Photos"; is that right?
13  A   Yes.
14  Q   And those are sequential photos starting
15  with IMG2158 running through 2192, and then there's
16  a subfolder that is entitled "Nikon Photos," and
17  that is sequential from DSC0001 through DSC0021; is
18  that correct?
19  A   Correct.
20  Q   The next item I see is entitled "Sales
21  Brochure"?
22  A   Yes.
23  Q   That's the brochure for the 2004 Jeep
24  Liberty?
25  A   That appears to be a brochure.  I don't

Page 35

1   know if that is the only one.
2   Q   And is that relevant to the opinions that
3   you will be offering in this matter?
4   A   Other than background information with
5   regard to an example of the information that FCA
6   Chrysler was providing with the jeep, that's the
7   only way it would be relevant to me, to me at least.
8   Q   Did Mr. Weams or his wife ever see this
9   brochure before they purchased the vehicle or before
10  this incident?
11  A   I don't know that they were ever asked that
12  question.  I don't know personally, but I don't
13  believe they were ever asked that question.
14  Q   As we sit here today, are you able to say
15  whether Mr. and Mrs. Weams ever viewed this sales
16  brochure before the incident?
17  A   Yeah, I do not know.
18  Q   The next item is entitled "Sun Visor
19  Warning."
20      Did I read that correctly?
21  A   I believe it's "Sun Visor Warning Label,"
22  and then there's a whole bunch of part numbers
23  associated with it.
24  Q   You're right, I didn't read the whole thing
25  off but you're right.

Page 36

1   And that I understand to be the sun visor
2   warning label that appears in the vehicle.
3   Is that your understanding?
4   A   Yeah, this is the part number for the
5   airbag warning that was in the vehicle.  This isn't
6   a copy of the one that was actually in the vehicle,
7   I believe it's a drawing.
8   Q   That's right, that's right.
9   And what is the next item?  I show it as
10  "TSB."  Is that at all relevant to your work in this
11  matter?
12  A   This is a service bulletin for airbag
13  control module and/occupant classification module
14  service dated 3/19/2005.
15  I don't know that, offhand, that this is
16  related to the Weams vehicle as opposed to -- well,
17  it is for 2004 to 2004 Liberty [sic].
18  At this point, I don't recall if this was
19  relevant to the specific model of the Weams vehicle
20  or not.
21  Q   As we sit here today, are you able to say
22  that this document is relevant to the work that
23  you've done in this case?
24  A   Other than background information, it is
25  not.

Page 37

1 Q   And then the next item is the "VIDR.pdf,"
2 correct?
3 A   Yes.
4 Q   And then the "Warranty Booklet," correct?
5 A   Yes.
6 Q   And then the Warranty Claim Summer [sic]
7 Report, correct?
8 A   Yes.
9 Q   I don't know if I said that correctly.
10     Warranty Claim Summary Report?
11 A   Yes.
12 Q   With respect to the Warranty Booklet, do
13 you -- did the Weams ever see this before the
14 accident?
15 A   I don't recall whether they were asked that
16 or not.  So, at this point, I don't know.
17 Q   Will you be rendering an opinion in this
18 matter that the vehicle is defective for failure to
19 conform to an express warranty?
20 A   I wasn't asked to address that.
21 Q   And you have not?
22 A   I have not.
23 Q   So then I think, if we go back, that will
24 bring us to Example Warning.
25     Now we're back into sort of the main

Page 38

1 directory of your file materials; is that right?
2 A   Yes.
3 Q   And here we have three files; one's a JPEG,
4 one's a PowerPoint, and then another one, actually,
5 is a JPEG, and these are part of work that you
6 created in this matter; is that fair?
7 A   Yes.
8 Q   The next folder is entitled "Internal
9 Standards."  These appear to be materials produced
10 by FCA in this matter, correct?
11 A   That's my understanding.
12 Q   Will you be rendering an opinion that the
13 Weams vehicle failed to comply with any, any
14 internal standard of Chrysler's?
15 A   It wasn't my intention to.
16 Q   So that you will not be rendering such an
17 opinion; is that fair?
18 A   It wasn't my intention to.
19 Q   I understand that.  But I need to know
20 whether -- when we get to trial -- actually, just
21 tell me as of today, have you formed an opinion that
22 the Weams vehicle fails to conform to the internal
23 standards of Chrysler?
24 A   I have not.
25 Q   The next folder is "Interog" and "RPD"

Page 39

1     Those appear to be discovery documents
2 related to this case; is that your understanding?
3 A   Yes.  They're different interrogatories and
4 responses and requests for production of documents
5 and so forth.
6 Q   And then the next folder, "Med Records,"
7 contains but two items, both from St. Elizabeth's
8 Hospital, one dated 7/12/17 and another dated
9 12/15/16.
10     Did I read that correctly?
11 A   I believe so.
12 Q   The next item, the next folder is, is
13 entitled "References."
14     Did I read that correctly?
15 A   Yes.
16 Q   And what is this folder, you tell me?
17 A   It's a copy of the references that I cite
18 in section, I believe it's G of my report -- F.
19 Q   So this is a folder that -- essentially
20 your bibliography folder?
21 A   Sure.
22 Q   And these are all items that you reviewed
23 before citing them in your report?
24 A   Yes.
25 Q   And then the next folder is entitled

Page 40

1 "Research," as I see it?
2 A   Yes.
3 Q   And other -- I think we've already
4 identified that folder.
5     And then the next folder is entitled "Weams
6 Veh"; is that right?
7 A   Yes.
8 Q   What's contained in that folder?
9 A   These are documents that are, I think, more
10 related to Mr. Weams' specific vehicle.
11 Q   Is there anything in this folder, any
12 document in this folder, that is relevant to your
13 work in this matter?
14 A   Yes.
15 Q   What specifically?
16 A   So, for example, the first document is a
17 letter from Chrysler to Mrs. Weams, and it's just
18 dealing with acknowledging that they contacted them
19 regarding this incident.  The next --
20 Q   Just for the sake of the record, that would
21 be the document entitled "285880921-1 pdf"?
22 A   Correct.
23 Q   And then the next document is entitled
24 CAIR, customer assistant inquiry record.
25 Q   Yes.

Page 41

1  A   So that just provides some background
2  information related to the Weams' contact to
3  Chrysler regarding the incident.
4  Q   Uh-huh.
5  A   The next is a CarFax for the vehicle.  So I
6  looked at that to see what type of history it had
7  and whether or not it was involved in any collisions
8  and so forth -- reportable, I guess technically the
9  term should be, reportable collisions.
10     The next document is --
11 Q   I'm sorry, what did you say about report?
12 A   Reportable.
13 Q   Oh, "reportable," okay.
14 A   Yes.
15     The next document is, I think I pulled it
16 out of one of the other files, and it's just
17 information related to the design of the airbags and
18 some other -- of the other work related to their
19 design, Chrysler's design, of this particular model
20 year vehicle.
21 Q   And are we talking now about Jeep Liberty
22 Airbag Recall.pdf?
23 A   No, this is DC10699, multiple dashes, 1-03.
24 Q   Oh, I see, all right.
25 A   The next is the Jeep Liberty Airbag Recall.

Page 42

1  And I think this is for the 2002 to 2004 Jeep Grand
2  Cherokee -- Jeep Grand Cherokees and the 2002, 2003
3  Jeep Libertys.
4     The next one is the multi-VIN summary
5  report, and just giving some history of the vehicle.
6     The next document is the owner's manual,
7  and I do reference the owner's manual specifically
8  in my report.
9     Photos From Client, these are photographs
10 of the incident vehicle, or the subject vehicle.
11    The next document is entitled PVIR28588092.
12 And this is -- I believe it's Chrysler's preliminary
13 vehicle investigative report for the subject vehicle
14 in the incident.
15    And then the last document is entitled
16 "Research from Client," and this has a list of
17 incidences that were recorded or reported to NHTSA.
18 And, at this point, I don't recall if "client"
19 refers to the Weams or to Mr. Smith's office.  It
20 was a document that was provided to me.
21 Q   And with respect to -- I'll go back to a
22 question that I asked previously.
23    Now that you have this document before you,
24 is it still true and accurate that, as we sit here
25 today, you're not aware of another incident, other

Page 43

1  than Weams, involving the unwanted or inadvertent
2  deployment of a stationary 2004 Jeep Liberty; is
3  that correct?
4  A   That's correct.
5  Q   All right.  And then does that -- I know
6  that there are other documents, but does that
7  complete the folders?
8  A   Yes.
9  Q   And so, the next thing up, I think, is
10 "M35.pdf"?
11 A   There should be an answer, right, an
12 "Answer.pdf"?
13 Q   Yes, and I skipped over that.  You're
14 right, you're right.
15     So that the next item after the Answer is
16 M35.pdf?
17 A   Correct.
18 Q   And what is that?
19 A   It's a Chrysler Safety Recall, numbered
20 M35.
21 Q   And that looks like it pertains to other
22 vehicles, other than the 2004 Jeep Liberty; is that
23 fair?
24 A   It looks like it pertains to the 2002-2003
25 Jeep Liberty.

Page 44

1  Q   As we sit here today, are you aware of any
2  recall related to the restraint system applicable to
3  the 2004 Jeep Liberty?
4  A   I don't believe so.  I don't -- I didn't
5  see anything related to an inadvertent airbag
6  deployment scenario recall.  I know there were other
7  recalls on the vehicle, I just don't recall what
8  they were offhand.
9  Q   As we sit here today, are you able to
10 identify any recall pertaining to the supplemental
11 restraint system on the 2004 Jeep Liberty?
12 A   Not offhand, no.
13 Q   All right.  And it looks like the next
14 document is identified as "teleconf.pdf."
15     What is that?
16 A   These are my notes from a teleconference
17 that I had on February 9, 2018 with Rich Hille and
18 John Smith.
19 Q   And these are notes taken contemporaneously
20 with the call?
21 A   Yes.
22 Q   And were these notes updated or changed at
23 all since the call, if you know?
24 A   I can't guarantee that, after the call
25 ended, I didn't go back and kind of edit the

Page 45

1 spelling and grammar for some of them. But as far
2 as adding to or subtracting to the points that we
3 discussed, it has not been changed.
4 Q   And then the next document looks to be
5 the -- your report in this matter, which we
6 identified as -- I apologize, I don't remember the
7 exhibit number for the report, the original report.
8 A   It's Vigilante 3.
9 Q   Is that the same thing as the Weams
10 "wjvrptweams.pdf" that appears on here?
11 A   It should be.
12 Q   That was your intention?
13 A   Well, the file on your folder is correct.
14 What's printed out, I didn't print it out, so I'm
15 assuming it's correct.
16 Q   All right.  And then the last item is "WJV
17 Supp Report," correct?
18 A   Correct.
19 Q   And that we have identified as Exhibit 7 to
20 the deposition.
21     Have we now reviewed all of the file
22 materials that you have collected for this case?
23 A   Yes.
24 Q   Or been provided, I should say?
25 A   And/or provided.

Page 46

1     THE WITNESS: So, you guys mind if we take
2 a break for a few minutes?
3     MR. HEBERT: No, not at all.  Of course.
4     THE VIDEOGRAPHER: We're now going off the
5 record.
6     (Recess taken.)
7     THE VIDEOGRAPHER: We're now back on the
8 record.  This commences tape number 2.
9     MR. HEBERT: In case I didn't do it
10 previously, I'm marking Vigilante 11, the DVD
11 you provided this morning.
12     And ask you to copy that and drop it in a
13 sleeve in the back of the transcript folder.
14 Q   Have you ever done any professional work
15 for an automotive manufacturer?
16 A   I don't believe so.
17 Q   Have you ever done any forensic work for an
18 automotive manufacturer?
19 A   I don't know that I've ever been retained
20 on behalf of an automotive manufacturer, no.
21 Q   Have you ever designed or participated in
22 the design of a warning for a vehicle?
23 A   Outside of litigation, I don't believe so.
24 Q   I want to be really clear on that.
25     What do you mean when you say "outside of

Page 47

1 litigation"?  Because I'm not talking about
2 criticizing a warning that's already been issued.
3     My question, I guess -- let me rephrase it.
4     Have you ever designed or participated in
5 the design of a warning for an automobile that did
6 indeed become part of the automobile's warning?
7 A   Not that I'm aware of.
8 Q   What is your understanding of why the
9 airbag deployed?
10 A   It was my understanding, at the time I
11 wrote the report, that there was an issue with tin
12 whiskers in the OCR, and that the other plaintiff
13 experts were -- in fact, found a defect with the way
14 it was either manufactured in or designed, that
15 caused the airbag to inadvertently deploy when
16 Mr. Weams turned the ignition key.
17 Q   Is that still your understanding?
18 A   Based upon their depositions, they have not
19 been able to identify a specific defect, so my
20 understanding has changed.
21 Q   So your understanding today is that no
22 specific explanation has been identified for the
23 deployment; is that fair?
24 A   I believe that the other experts, plaintiff
25 experts, have not been able to identify or --

Page 48

1 identify a specific defect.
2 Q   And I'm not trying to put words in your
3 mouth, I'm just trying to understand the assumptions
4 that you bring to the table today and the extent to
5 which you will rely on the others.
6     Do you have an understanding as to whether
7 this deployment was related to a design defect or a
8 manufacturing defect or does it matter to your
9 opinions?
10 A   At this point, I don't know, and I don't
11 have an opinion as to whether it was a design defect
12 or a manufacturing defect.
13 Q   Having identified the initial report that
14 you issued in this matter as Exhibit 3 and then the
15 supplemental report dated March 15 as Exhibit 7, do
16 we now have all of the opinions that you have
17 authored in connection with this matter?
18 A   Other than, you know, specific issues I
19 take with Mr. Dorris's report, these are all my
20 opinions.
21 Q   And we'll talk about the specific issues
22 that you take with respect to Mr. Dorris's report.
23     Let me just confirm, though, that the
24 specific issues that you take with Mr. Dorris's
25 report have not been previously articulated by you

Page 49

1  in the form of a report; is that correct?
2  A  I did not write a report to articulate
3  those particular objections I have to his report.
4  Q  But you did prepare a report after your
5  review of Mr. Dorris's -- or Dr. Dorris's report; is
6  that correct?
7  A  I did.
8  Q  Why did you not include those additional
9  opinions in this supplemental report related to
10  Dr. Dorris?
11  A  I wasn't asked to.
12  Q  Were you asked to cover the issues that are
13  contained in this supplemental report that we've
14  identified as Exhibit 7?
15  A  Yes.  I was asked to, asked to draft a
16  supplemental report.
17  Q  And in sum, what's the point of the
18  supplemental report identified as Exhibit 7?
19  A  I think there's two points.
20      Number one is that I was provided with
21  additional material since the drafting of my initial
22  report, and to state that I have reviewed them and
23  that they have not changed my opinions as stated in
24  that initial report.
25      The second is to reflect my understanding

Page 50

1  of the NHTSA requirement for the sun visors, and the
2  statement that I made in my report that the warning
3  that I suggested could be provided on the opposite
4  side of the sun visor as being inconsistent with the
5  NHTSA regulation.
6  Q  What is your understanding with respect to
7  the applicable NHTSA regulations would permit any
8  additional labeling on the sun visor?
9  A  Other than the -- I think there's one
10  required and one optional, depending upon whether
11  it's an SUV or not.
12      Other than those two, NHTSA does not allow,
13  based upon the regulation, an additional warning to
14  be placed on the visor.
15  Q  So that your initial recommendation that a
16  warning be placed on the visor of the type that you
17  called out in that report, you no longer hold that
18  opinion; is that correct?
19  A  Correct.
20  Q  What was your methodology in forming the
21  opinion that Chrysler should have included the
22  additional warning related to the inadvertent
23  deployment on the visor?  What was your methodology
24  in thinking that that was a good idea?
25  A  Well, (A), my methodology was the

Page 51

1  scientific method.  I looked at the facts of the
2  case.  I analyzed them with respect to my purpose.
3      Understanding, at the time, that there was
4  a design or manufacturing defect in the vehicle that
5  created a hazard, understanding the responsibilities
6  of a manufacturer and how to address hazards
7  associated with a product based upon the safety
8  design hierarchy, opining that the appropriate steps
9  for Chrysler FCA to have taken were to have
10  eliminated the hazard through fixing the defect.
11  And if they weren't going to do that, at least they
12  could have provided a warning.
13      So I came up with an alternative warning
14  based upon the ANSI Z535.2 standard which was the
15  American National Standard that was contemporary for
16  the design and manufacturing of the vehicle, and
17  then offered a convenient location to place the
18  standard -- excuse me, the warning.
19      I had, I had actually edited the book
20  chapter I referenced in my report and knew, based
21  upon my editing of the book chapter, what NHTSA
22  required partly.  I had forgotten, at the time, that
23  their exclusion from warning on the sun visor on
24  both sides applied.  So when that was pointed out in
25  Mr. Dorris's report, I updated my opinion in the

Page 52

1  supplemental report.
2      So, in the supplemental report, I note that
3  because NHTSA does not provide for or allow for the
4  addition of a warning unrelated to the two that they
5  allow, that it was up to Chrysler and/or FCA to find
6  an adequate alternative location for the on-product
7  warning, given their failure to fix the defect in
8  the first place.
9  Q  Your initial report states, unequivocally,
10  that you think that the vehicle was defective for
11  not including an on-the-visor warning related to
12  inadvertent deployment; is that correct?
13  A  Can you point me to the page you're reading
14  from, please?
15  Q  Sure.  It's all over that report.  And
16  we're looking at Exhibit 3.
17      Just an example, why don't we look to
18  page 11 of 15 in your report, this is section D2,
19  "Defective Warning."
20      Are you there?
21  A  Yes.
22  Q  And I'm looking at the third paragraph
23  which reads, in part, "Chrysler should have
24  presented the suggested warning decals on the side
25  of the sun visors opposite the required airbag and

Page 53

1 rollover warnings."
2     Did I read that correctly, sir?
3 A  Yes. Well, there was a precursor clause to
4 that, but you did read that part of the sentence
5 correct.
6 Q  And was, was it not your intention, by this
7 sentence, to convey your opinion that Chrysler
8 should have presented the suggested warning decals
9 on the side of the sun visors opposite the required
10 airbag and rollover warnings?
11 A  So, my intent for section E2 was to --
12 Q  D2?
13 A  I'm sorry, D2, was to describe and opine
14 that Chrysler should have provided on-product
15 warning given the hidden and latent hazards
16 associated with the inadvertent airbag deployment.
17    In the example that I provided was to put
18 it on the visor, on the opposite side of the visor
19 than the airbag and rollover warning.
20 Q  You're not suggesting, today, that your
21 first report doesn't say that you should -- that
22 Chrysler should have included an on-the-visor
23 warning, are you?
24 A  I'm not suggesting it did not say that.
25 Q  But that opinion was drafted and was

Page 54

1 included without your having recently reviewed the
2 applicable Federal Motor Vehicle Safety Standards;
3 is that fair?
4 A  Yes. I relied, instead, on a partial
5 review of the chapter I cited.
6 Q  But if you had done a complete review of
7 the chapter you cited, you would have learned that
8 such an on-the-visor warning, in fact, violates the
9 Federal Motor Vehicle Safety Standards, correct?
10 A  Yes, I'm aware of that.
11 Q  But you weren't when you drafted the first
12 report, correct?
13 A  Well, technically, I knew it, I just forgot
14 it when I wrote the report. So there was an
15 oversight on my part when I wrote the report, and
16 that was part of the reason why I addressed it in my
17 supplemental report.
18 Q  And the supplemental report says that --
19 and I'm looking at, I guess the second paragraph
20 because the first just lists what you reviewed. But
21 it says that, "After reviewing the above-referenced
22 reports, my opinions, as stated in February -- in my
23 February 15, 2018 report have not changed."
24    Did I read that correctly?
25 A  Yes.

Page 55

1 Q  I thought that we just covered the fact
2 that your recommendation, your opinion, related to
3 an on-the-label visor has changed?
4 A  Well, no. So my opinions as provided in my
5 report is that it would have been reasonable for
6 Chrysler to provide an effective warning system,
7 including a conspicuous, specific, and explicit
8 on-the-product warning with the subject Jeep Liberty
9 cost in terms of money, effort, and time to do so
10 would have been minimal and insignificant. And that
11 had an effective warning system been provided,
12 including a conspicuous, explicit, and specific
13 in-vehicle warning, Chrysler would have ensured that
14 owners and operators of the Jeep Liberty were
15 provided with the information they needed to
16 identify the hazard and how to avoid it and Curtis
17 Weams would not have been injured.
18    What has changed, since I wrote my report,
19 is the example as to where Chrysler could have
20 provided the warning in the vehicle.
21    As noted in my supplemental report, there
22 are multiple other places in the cabin of the
23 vehicle that Chrysler had to choose from if, as
24 noted in the NHTSA regulation, they couldn't provide
25 it on the visor.

Page 56

1 Q  But your first report doesn't list it as an
2 example. Your first report says, "Chrysler should
3 have presented the suggested warning decals on the
4 side of the sun visors opposite the required airbag
5 and rollover warnings," correct?
6 A  I do state in my initial report that that
7 was the location that it should have been presented.
8 Q  Is it fair to say that, if you had done a
9 thorough review of the article that you cited --
10 what is that, a Foley article?
11 A  It was a book chapter by Foley, Jim Foley.
12 Q  Is it fair to say, if you had done a
13 thorough review of those materials before rendering
14 that first report, that you would not have made that
15 recommendation that Chrysler include an on-the-visor
16 warning related to inadvertent airbag deployment?
17 A  Yes. If I didn't make the oversight in my
18 review of the chapter, I wouldn't have had
19 specifically stated on the visor. I would have
20 picked another location in the vehicle as an example
21 of where Chrysler could have and should have
22 provided it.
23 Q  And what -- so now we're talking about
24 something not in the owner's manual, but some other
25 on-the-vehicle location; is that correct? Is that

Weams, Jr. vs.
FCA USA, LLC

William J. Vigilante, Ph.D., CPE
May 23, 2018

Page 57

1  your recommendation?
2  A   That's what the findings state, yes.
3  Q   Your findings?
4  A   Yes.
5  Q   All right.  What other locations might
6  there be that you think are appropriate?  Tell us
7  specifically where you think Chrysler should have
8  placed an on-the-vehicle warning related to the
9  possibility of inadvertent airbag deployment.
10 A   Yeah.  So, as noted in my supplemental
11 report, they should have placed it where they found
12 it to be appropriate and effective in communicating
13 the information to users and operators of the
14 vehicle.
15     So that's my opinion.  As particular
16 examples, they could have put it on the headliner
17 above the visor.
18 Q   I want to be sure I understand your opinion
19 on that.
20     Your opinion is that FCA should have placed
21 it where FCA found it to be appropriate?  Or are you
22 making a specific recommendation today as to where
23 such a label, an on-the-product warning, should be
24 included?
25 A   It's my opinion that it was Chrysler FCA's

Page 58

1  responsibility to identify and mitigate the hazard
2  associated with it.
3      And if they chose to rely upon a warning to
4  mitigate that hazard, it was their responsibility to
5  develop and employ an effective method in which to
6  communicate that safety information to users and
7  passengers of its 2004 Jeep liberty.
8      As an example, they could have chosen to
9  place it on the headliner above the visor.  That
10 would be in the vehicle, it would remain in the
11 vehicle, it would be visible while the occupant was
12 in the vehicle, particularly to occupants who didn't
13 have or didn't read the manual.
14 Q   And had you offered or formed any other
15 suggestions or examples for locations for such an
16 on-the-product warning?
17 A   I haven't come up with any others, as I sit
18 here.
19 Q   And with respect to the headliner location,
20 I just want to be sure that we're clear.  I think
21 you and I know exactly what we're talking about, but
22 different people, perhaps laypersons, might use
23 different technology.
24     Headliner is the roof of the vehicle, the
25 ceiling of the vehicle?

Page 59

1  A   The interior ceiling of the vehicle.
2  Q   The interior ceiling of the vehicle.
3      With respect to the specific labeling that
4  would be used, what do you propose?
5  A   Well, I provided an example in the report.
6      So again, it's just an example based upon
7  the ANSI Z535.4 standard, version 2002.  Certainly,
8  again, it would be Chrysler's responsibility to use
9  a similar type of warning with the features and
10 formatting requirements of that particular standard.
11 Q   And I understand that this is an example
12 warning.
13     My question is:  For the purposes of today,
14 are you making a specific recommendation for a
15 specific warning that you think that should have
16 been included as an on-the-product warning for this
17 vehicle?
18 A   Yes.  My report provides an example warning
19 of the type and information, the formatting,
20 presentation, that Chrysler should have used on the
21 vehicle warning.
22 Q   And what --
23 A   In-vehicle warning.
24 Q   And still talking about that in-vehicle
25 warning that appears on page --

Page 60

1  A   Twelve?
2  Q   -- 12, thank you, of your report, your
3  first report, what would be the appropriate coloring
4  of that?
5  A   I apologize, because my version is in
6  color, yours is in black and white.  So I don't know
7  if, on the computer, it will show up in color, but
8  basically what I show, or what I depict, is that the
9  signal word panel would be in safety orange,
10 consistent with the ANSI Z535.4 standard.
11     The signa word "Warning" would be --
12 Q   (Indicating)?
13 A   Yes.  The signal warning would be in black
14 print.  The safety alert icon would be a black
15 triangle with an orange exclamation point.
16     And then the message panel and pictograph
17 panel would be in black print on a white background.
18     MR. HEBERT:  And I think we're up to
19 Exhibit 12, that would be the next one.  So
20 what I'll do is, I'll provide you with a color
21 copy of the, of just page 12 of the report, of
22 the first report.
23     MR. SMITH:  That's Exhibit 12?
24     MR. HEBERT:  Exhibit 12 is page 12 of the
25 first report.

Page 61

1    (Page 12 of initial expert
2    report was marked as Exhibit
3    Vigilante 12 for identification,
4    as of this date.)
5  Q  And what would be an appropriate font size
6  for that label?
7  A  Well --
8  Q  I'm using the word "label," but
9  on-the-product -- are you contemplating a label?
10  A  Yeah, it would be a label, similar to the
11  airbag label, that would be an example of one way to
12  present the information.
13      Again, there are multiple different ways to
14  present an in-vehicle warning.  Using a label is one
15  way to do that.  So that's the example I provided.
16      With regard to text size, at least a
17  12-point font I think would be appropriate.  If
18  Chrysler decided to use a larger font for the
19  message text, certainly that would be, that would be
20  fine, as well.
21  Q  Do you have a specific recommendation as to
22  font size?
23  A  I believe 12 or larger would be fine for
24  the message text.
25  Q  I understood you to say 12.5 before?

Page 62

1  A  I'm sorry, 12-point font.
2  Q  Oh, 12-point font?
3  A  Correct.
4  Q  I probably wrote that down wrong.
5      And what is the font style?
6  A  Typically it's one that does not have -- a
7  sensory font would be appropriate, like Helvetica.
8      I typically like to use -- let me think of
9  the name of the font style.  I prefer, myself,
10  Calibrie, it's C-A-L-I-B-R-I-E -- C-A-L-I-B-R-I.
11  That's the font that's used in the example warning
12  that's provided on page 12 of my report.
13      Certainly other fonts can be used and are
14  used in on-product warnings.
15  Q  What is the fabric or the material that is
16  the -- that provides the interior ceiling, the
17  headliner, for the 2004 Jeep Liberty?
18  A  I don't have a specific recommendation as
19  to what the material is, but it could be the same as
20  the actual airbag warning; the same size, the same
21  style, the same material that they're using for the
22  airbag warning on the vehicle already.  That would
23  be an appropriate material and size for the warning.
24  Q  And I'm sorry, that was a bad question.
25      I'm talking about the material that exists

Page 63

1  in the Weams vehicle.  When a person purchased a new
2  2004 Jeep Liberty, what was the fabric that was the
3  headliner, the interior ceiling of the vehicle?
4  A  Yeah, I don't know that I know what that
5  fabric is.  If it's a particular nylon or what have
6  you, I don't know.
7  Q  Have you explored or considered whether
8  labels stick to that type of fabric, whatever it is,
9  that's on the headliner of the vehicle as they do to
10  the sun visor?
11  A  Well, of course I haven't surveyed every
12  vehicle ever manufactured.  But typically the sun
13  visor material is -- or, commonly, the sun visor
14  material is the same as the headliner.
15      And I've also seen other vehicles that have
16  warnings or labels placed on the headliner above the
17  visor.  So I know it's been done, and I've seen it
18  done before.
19  Q  Have you ever encountered a vehicle that
20  contains a warning related to the possibility of
21  inadvertent airbag deployment?
22  A  I don't recall seeing that particular
23  warning in a vehicle.
24  Q  So, of course, you've never seen an
25  on-the-vehicle warning either, because you haven't

Page 64

1  seen one whether it relates to the owner's manual or
2  in the vehicle related to the inadvertent deployment
3  of an airbag; is that correct?
4  A  I have not.  And I'm not aware of other
5  vehicle manufacturers or style -- or models that
6  require it.
7  Q  Well, what is it -- I mean, you're aware --
8  let me ask you, maybe you're not.
9      Are you aware of other manufacturers having
10  experienced inadvertent airbag deployment in their
11  vehicles?
12  A  I am aware of that.
13  Q  Are you aware that the National Highway
14  Traffic Safety Administration is aware of
15  inadvertent airbag deployment in motor vehicles?
16  A  Specifically, I don't know what NHTSA is
17  aware of, but I can't imagine that they're not.
18  Typically things like that been to be reported to
19  NHTSA.
20  Q  What's unique about the 2004 -- well, let
21  me back up.
22      Is it your recommendation that a warning of
23  the type that you proposed be placed on the
24  headliner for every vehicle that's on the road?
25  A  No.

Weams, Jr. vs.
FCA USA, LLC

William J. Vigilante, Ph.D., CPE
May 23, 2018

Page 65

1  Q   Well, which vehicles do you think need this
2  warning?
3  A   This was specific to the 2004 Jeep Liberty
4  of the make and model that Mr. Weams was operating.
5  Q   And how is it that you identified the 2004
6  Jeep Liberty as needing this warning, but no other
7  vehicle on the road requires this warning?
8  A   It was based upon the opinions of the other
9  plaintiff experts, that there was a design defect or
10 manufacturing defect that resulted in the
11 inadvertent airbag deployment.
12     And again, from a -- my opinion is that
13 Chrysler FCA should fix the defect.
14     But consistent -- if they chose not to,
15 that's when the warning would need to be employed.
16     If you have a defect with your vehicle
17 that's going to create or cause a hazardous
18 condition, it's incumbent upon the manufacturer to
19 inform the users of that particular hazard.
20     So, if they had fixed the defect, then it
21 is my opinion that the warning wouldn't be needed.
22 So that's why my opinions were that, if they were
23 not going to address the defect, that the least they
24 could have is provid an effective warning.
25     And in this case, an effective warning

Page 66

1  would require an in-the-vehicle warning because of
2  the limitations associated with the use and
3  availability of manuals.
4  Q   As we sit here today, what is your
5  understanding of the vehicle manufacturer -- and I'm
6  talking about the manufacturer of the 2004 Jeep
7  Liberty.
8     What did the manufacturer know or
9  anticipate with respect to the prospect of
10 inadvertent deployment in the 2004 Jeep Liberty when
11 it left its care, custody, and control?
12 A   I don't know.  I don't recall offhand when
13 they would start receiving reports of inadvertent
14 airbag deployments for the 2004.  I think the first
15 recorded one was December 2003 and I don't recall --
16 I know Weams's vehicle was a December 2003
17 manufacturer date, so I don't know how or if they
18 overlap.
19 Q   You lost me for a second there.
20     You made reference to another inadvertent
21 deployment in that answer?  Is that the one that we
22 had discussed previously?
23 A   Yes.  I believe that was dated December
24 2003.
25 Q   Let's go back to your record because, when

Page 67

1  I go into the research folder, under "Other
2  Incidents," I show a date complaint filed of
3  4/1/2004.  I'm looking at the document that says
4  NHTSA complaint.pdf.
5  A   There is a document called NHTSA
6  complaint.pdf that has a date complaint filed
7  4/1/2004.  But in the actual VOQ, the dated received
8  is December 23rd, and I can't make out exactly if
9  it's a '10 or a '16 or an '18.
10 Q   Which of the documents are you looking at
11 there because there are two?
12 A   EQ10051584-5461.
13 Q   5461.
14 A   And it's also on the document entitled
15 EQ10051584-6750.  And that one is a little bit
16 clearer, and it looks like a 16 December 2003 date
17 received.
18 Q   And I want to be sure that I'm looking at
19 the right entry.  This is the 6750, is this the
20 entry to which you're referring?
21 A   Yes.
22 Q   Which has a stamp across it that reads
23 something else?
24 A   Well, there is a stamp across it.  It looks
25 like, if I had to guess, 2004 March 23, and then

Page 68

1  some other numbers.
2  Q   And then, if we scroll down a little bit on
3  that page where it says "Signature of the owner,"
4  the signature's blocked out, but there is a date
5  there that says 3/17 of '04; is that correct?
6  A   I can't make out the 3.  It looks like a
7  zero and another digit, 17/04.
8  Q   And then, if we scroll on that document to
9  the next page, it looks like it's a fax transmittal
10 form that very clearly reads 3/18/04, correct?
11 A   One moment.  There is a facsimile form
12 dated 3/18/2004.
13 Q   And under comments, it says, per our
14 phone -- it says phonecon today, here is the
15 enclosed documents, correct?
16 A   It does state that.
17 Q   And then further down on that page, I see a
18 handwritten note by somebody named Michael, and he
19 has dated it 3/19 of '04, correct?
20 A   I will agree that the name Michael is on
21 there.  I don't know if this Michael is the one who
22 dated it.  But there is a date 3 -- and I'm not sure
23 if it's 9, 19, or something.  But it certainly looks
24 like a slash four, which I can presume or assume is
25 a 2004.

Weams, Jr. vs.
FCA USA, LLC

William J. Vigilante, Ph.D., CPE
May 23, 2018

Page 69

1    MR. HEBERT: As Exhibit 13, we're going to
2    identify, from the Other Incidents folder, that
3    EQ10051584-5461.
4        (EQ10051584-5461 was marked as
5        Exhibit Vigilante 13 for
6        identification, as of this
7        date.)
8        MR. HEBERT: So then as 14, we will have
9    the following document, which is dash 6750.
10       (EQ10051584-6750 was marked as
11       Exhibit Vigilante 14 for
12       identification, as of this
13       date.)
14       MR. HEBERT: And then as Exhibit 15, we
15   will have the next document, which just says
16   "NHTSA complaint.pdf."
17       (NHTSA complaint.pdf was marked
18       as Exhibit Vigilante 15 for
19       identification, as of this
20       date.)
21   Q   Let's go back to what we identified as
22   Exhibit 12, which is just page 12 of your report.
23   A   Okay.
24   Q   And as I read it, it says, "Airbag can
25   deploy without warning when ignition is turned on."

Page 70

1        Did I read that correctly?
2    A   I wasn't following.
3    Q   Okay. We're on the top of page 12 of your
4    report where you provide the exemplar warning label
5    identified as illustration one. This is identified
6    as Exhibit 12 because it's the colored version.
7        And I read it to say, "Airbag" -- it starts
8    with, "Warning." And then it says, "Inadvertent
9    airbag deployment," exclamation.
10       "Airbag can deploy without warning when
11   ignition is turned on."
12       Did I read that correctly?
13   A   Yes.
14   Q   "Only turn the ignition on when fully
15   seated with your back against the seat."
16       Did I read that correctly?
17   A   Yes.
18   Q   "Injury can occur if airbag deploys and you
19   are out of position."
20       Did I read that correctly?
21   A   Yes.
22   Q   Did Mr. Weams have the ignition on when the
23   accident occurred?
24   A   It's my understanding that he was turning
25   the ignition on when the accident occurred.

Page 71

1    Q   And your understanding, in that regard, is
2    based on his testimony?
3    A   Yes.
4    Q   What does it mean to have the ignition on?
5    A   Well, turning the key from an off position
6    to either a start position or an on position.
7    Q   So that would include an on position
8    irrespective whether you actually engage the vehicle
9    starter?
10   A   Yes.
11   Q   Let's go back to Exhibit 3, which is your
12   original report. I want to ask you some specific
13   questions about the report.
14       Page -- I'm sorry, page 2 of the report,
15   paragraph 4, so we're still in the introduction
16   portion. The last paragraph lists some items that
17   you -- the following materials that might be
18   exhibits to illustrate your testimony.
19       But what interests me is the portion that
20   says, "Examples of on-product warnings and indicator
21   lights used on other products."
22       Did I read that correctly?
23   A   Yes.
24   Q   What specific examples of on-product
25   warnings and indicator lights used on other products

Page 72

1    are you referring to there?
2    A   Well, I would look at the, for example,
3    airbag warnings on other vehicles and other
4    telltales on other vehicles.
5    Q   And other what?
6    A   The telltales, the dash lights.
7    Q   In preparing this report, did you review
8    other airbag -- airbag warnings on other vehicles?
9    A   Other than my own, I have not.
10   Q   And what about the telltale lights on other
11   vehicles for airbags, have you reviewed those in
12   preparing this report?
13   A   Other than my own vehicles, I have not.
14   Q   And what sort of vehicles do you own?
15   A   I have a Honda Ridgeline and an Acura MDX.
16   Q   What year is the Honda?
17   A   The Honda is a 2017.
18   Q   And the MDX?
19   A   2016.
20   Q   Do either of those contain a warning that
21   differs in any way from the warning that appears on
22   the 2004 Jeep Liberty with respect to airbag
23   labeling?
24   A   I don't think there's been any changes in
25   that timeframe, but I don't know offhand. I didn't

Weams, Jr. vs.
FCA USA, LLC

William J. Vigilante, Ph.D., CPE
May 23, 2018

Page 73

1  make a one-to-one comparison.
2  Q   As we sit here today, are you able to say
3  that the labeling for the airbag that appears on the
4  visor for the 2004 Jeep Liberty is any different
5  than what appears on your own Honda Ridgeline and
6  Acura MDX?
7  A   I did not make a one-to-one comparison, so
8  I can't say that they do differ or that they don't
9  differ.
10  Q   Moving on to page 3 of the report, section
11  C, the last paragraph of section -- I guess it's
12  not.  It's a subheading.  But I'm on page 3 just
13  above "Weams Ownership."
14  A   Okay.
15  Q   "Chrysler provided an operator's owner's
16  manual with the Jeep."
17      Did I read that correctly?
18  A   Yes.
19  Q   Did Mr. Weams or Mrs. Weams read the
20  owner's manual that came with the Jeep?
21  A   I don't believe that was asked in the
22  deposition, so I don't know.
23  Q   As we sit here today, what is your
24  understanding of whether they reviewed the owner's
25  manual that came with the vehicle?

Page 74

1  A   Again, I don't recall it being asked, so I
2  don't know.
3  Q   Was Mr. Weams asked if he had the owner's
4  manual?
5  A   I believe he was asked if he had the
6  owner's manual.
7  Q   And what did he say in response to that?
8  A   I believe his testimony is, he was not
9  certain if he received the owner's manual.
10  Q   Your testimony is that Mr. Weams was not
11  certain if he received the owner's manual?
12  A   If -- give me one second and I'll tell you.
13      Mr. Weams testified that he is not sure if
14  the owner's manual came with the Jeep when they
15  bought it.
16  Q   My question is a little different.
17      My question is whether Mr. Weams ever saw
18  the owner's manual?
19  A   I don't know that he was asked that
20  question.
21  Q   What is --
22  A   So, I'm sorry, I don't know.  I don't
23  believe he was ever asked that question.
24  Q   I understand that you don't believe that he
25  was ever asked that question.

Page 75

1      Did you ever speak with Mr. Weams?
2  A   I did not.
3  Q   Do you have any evidence, as we sit here
4  today, and when you prepared this report, to assert
5  that Mr. Weams ever read the owner's manual that was
6  provided with the email?
7      MR. SMITH: Object to the form.
8  A   I never assumed that he did or he didn't, I
9  didn't know.
10  Q   Does it matter to your analysis whether he
11  reviewed the owner's manual?
12  A   It depends.
13  Q   How so?
14  A   It depends on whether or not the warning is
15  in the vehicle or in the manual.
16      Quite frankly, it's not uncommon for
17  vehicle owners not to read the manual, and
18  particularly not to read all of the manual.  And
19  this is the reason why I suggested the warning be
20  placed in the vehicle as a decal in the vehicle, to
21  overcome that hurdle.
22  Q   And the hurdle is what?
23  A   That people don't -- particularly
24  secondhand and thirdhand vehicles don't always have
25  the manual.

Page 76

1      And even folks that do have the manuals,
2  don't always read them.  And if they do read them,
3  they don't always read them from front cover to back
4  cover.
5  Q   Does the owner have a duty to read the
6  owner's manual, in your view?
7  A   I don't know if they have a duty to read
8  the owner's manual.
9  Q   You don't?
10  A   I don't.
11  Q   You don't have an opinion on that?
12  A   I think that, if they have questions
13  regarding the operation of the vehicle, they should
14  consult the manual.  And if it doesn't answer the
15  questions, they should consult the dealer.
16  Q   You're familiar with the terms -- because
17  you've read the same reports that I have -- of,
18  alternatively referred to as, information overload,
19  overuse of warnings, and over-warning?  You've heard
20  of those concepts?
21  A   Sure.
22  Q   How do you, as part of your analysis,
23  determine which warnings should go on the vehicle in
24  the way of an on-the-vehicle label, or as you have
25  recommended here, and which ones do not?

Page 77

1  A  Well, it's a multifaceted analysis.
2     The first you start with is your hazardous
3  analysis in identifying the hazards associated with
4  the foreseeable uses and misuses of your product.
5  Once they're identified, you move through the safety
6  hierarchy to mitigate them.
7     So again, my opinion is that, if this was
8  fixed through design and manufacturing, there's no
9  need for a warning.
10    But if you're going to get to a point where
11 there's a hazard remaining with your vehicle that
12 you're not going to design out or guard against, you
13 have to inform the consumer.
14    So now you have to determine how best to
15 inform the consumer.  And to do that, you need to
16 look at the severity of the hazard, the frequency of
17 the hazard, the ability of the user to avoid the
18 hazard, and their likelihood of knowing that the
19 hazard exists and how to avoid it.
20    So in this particular case, there is a
21 significant injury potential.  Although it's not
22 very likely, there are a number of 2004 Jeep
23 Libertys out there that are used sometimes multiple
24 times a day, so the exposure rate is very high.
25    And then you have the fact that people

Page 78

1  generally are not aware that the airbag is going to
2  inadvertently deploy.  Therefore, they're not aware
3  of the hazard, and it would be something that needs
4  to be communicated to them by the manufacturer.
5     And of course, if they're not aware of the
6  hazard, they don't know what steps are necessary to
7  take to try to mitigate or alleviate the negative
8  consequences associated with that hazard.
9     So, for those reasons, I concluded that the
10 warning needed to be in the vehicle and not just in
11 the manual.
12    I skipped the reason, too.  The other
13 reason was that manuals, as I mentioned earlier, are
14 not often available for second or thirdhand or used
15 vehicles, are not often read.  And if they're read,
16 they're not often completely read.  And if they are
17 read or completely read, the information in them is
18 not often memorized for use at a later date and
19 time.
20 Q  So with respect to this multifaceted
21 analysis that I understand you believe is
22 appropriate to determine which warnings deserve
23 special on-the-vehicle treatment, I'll call it, are
24 these published criteria that are accepted in the
25 industry for the purposes?

Page 79

1  A  Yes.
2  Q  All right.
3  A  There are guidelines for determining when
4  and how to warn.
5  Q  And one of the things that you talked about
6  in the context of identifying hazards is possible
7  uses and misuses of the product.
8     Did I get that correct?
9  A  I'm not sure if you got it correct, but my
10 statement was that, it's the manufacturer's
11 responsibility to identify those hazards associated
12 with the reasonable and foreseeable uses and misuses
13 of the product.
14 Q  Is misuse involved in this situation at
15 all?
16 A  Not that I'm aware of.
17 Q  And is there some particular -- as we sit
18 here today, there has not been a particular hazard
19 or condition of the vehicle identified that, even
20 Chrysler, the manufacturer, could be made aware of,
21 correct?
22 A  Well, that's not correct, because the
23 hazard occurred.  So there's been a hazard
24 identified with the vehicle.
25    The hazard was -- resulted in Mr. Weams's

Page 80

1  injury.  The hazard was the inadvertent deployment
2  of the airbag.
3  Q  So the hazard is not the cause; the hazard
4  is the outcome?
5  A  The hazard is the event that is likely to
6  cause injury or property damage.
7  Q  And as we sit here today, one of the items
8  that I believe you also said is important is
9  frequency, correct?
10 A  Yes.
11 Q  And as we sit here today, you are not aware
12 of another instance, in the history of the world,
13 where a stationary vehicle experienced an
14 inadvertent deployment of an airbag; is that
15 correct?
16 A  Yeah.  I did not research any and all
17 manufacturers' vehicles through the history of
18 vehicle manufacturing to determine whether or not
19 there was another inadvertent airbag activation
20 while the vehicle was stationary.
21    I'm aware of only, for the 2004 model year,
22 of only one event that's been reported involving an
23 inadvertent deployment while the 2004 Jeep Liberty
24 was stationary.
25 Q  And that's the Weams incident?

Page 81

1  A   Correct.
2  Q   So that, as we sit here today, you have not
3  identified any other incident or allegation of
4  inadvertent deployment involving a frontal airbag on
5  a stationary vehicle of any kind; is that a fair
6  statement?
7  A   As we mentioned earlier in the deposition,
8  I'm only aware of two reported incidences where
9  there was an inadvertent airbag with a 2004 Jeep
10  Liberty.
11      One was the Weams, which was stationary.
12  The other one was the one we talked about a little
13  bit earlier involving the vehicle traveling at or
14  about 25 miles per hour.
15  Q   Okay. I'm going to ask the question again,
16  and I want to confine it in the hopes that we can
17  get a direct answer. I'm only asking about
18  stationary vehicles that experienced an inadvertent
19  deployment.
20      And my question to you -- of the frontal
21  airbag.
22      Are you aware of any other reported
23  incident, as we sit here today, other than the Weams
24  matter?
25  A   Again, for the 2004 Jeep Liberty, I'm only

Page 82

1  aware of the Weams matter being reported.
2      I did not look and research other vehicles,
3  model years, or other vehicle manufacturers.
4  Q   So the answer is, as we sit here today, you
5  can't identify any others, other than the Weams
6  incident, that involve a stationary vehicle, a
7  frontal airbag, and an inadvertent deployment,
8  right?
9  A   For the 2004 Jeep Liberty, the only
10  stationary, inadvertent deployment, that I'm aware
11  of is, the -- being reported is the Weams vehicle.
12  Q   List all of the others that you're aware
13  of, with any vehicle, involving an inadvertent
14  deployment of a stationary vehicle and a frontal
15  airbag. Let's list them all right now.
16  A   Again, I did not research other model years
17  and other manufacturers to determine if it occurs.
18      I'm not aware of it occurring.
19  Q   You're not aware.
20  A   The only two that I'm aware of for the 2004
21  being reported are the Weams vehicle and the other
22  vehicle that was traveling at about 25 miles an
23  hour.
24  Q   Do the published criteria related to this
25  multifaceted analysis concerning which warning

Page 83

1  should be on the vehicle, do those published
2  criteria call out any particular elements as being
3  more important than others or carrying extra weight?
4  A   I don't know that they Rank Order the
5  factors. They just provide the factors.
6  Q   So that if there is any literature out
7  there that characterizes one criterion as more
8  important than others in this context, you're not
9  aware of that?
10  A   I would say that -- I'm not aware if any
11  published criteria or standard that ranks them from
12  most important to least important. But I would
13  imagine that injury severity is a -- certainly, you
14  know, if not the most important, but important
15  factor. But I can't say that I've ever seen them
16  ranked.
17  Q   And I didn't ask about a ranking. And
18  I'm -- frankly, rather than finding out what it is
19  that you can imagine, I want to know what you know
20  about the literature and whether the literature
21  states whether any of these criteria are more
22  important in determining which warnings should be on
23  the vehicle or on the product as opposed to in the
24  manual.
25      Are you aware of any literature that

Page 84

1  discusses any of these criteria as being more
2  important than others? I'm not asking about
3  ranking.
4  A   Well, you are asking about ranking. And
5  I'm not aware of any literature that has ranked
6  these factors on importance when determining whether
7  the warning is in the manual or on the product or on
8  another source.
9  Q   Are you aware of any literature that speaks
10  to any of these criteria as being more important
11  than any others?
12  A   Same answer.
13      THE WITNESS: So we're going about another
14  hour, you want to take a break in, maybe, five
15  minutes?
16      MR. HEBERT: How are we?
17      THE VIDEOGRAPHER: We have over a half an
18  hour on the tape.
19      MR. HEBERT: Yeah, let's just keep going.
20      MR. SMITH: Well, if you need to take a
21  break, take a brief break.
22      THE WITNESS: Maybe two, three minutes. I
23  don't if he's got a transition point that he
24  can make.
25      MR. SMITH: Well, I don't want to interrupt

Weams, Jr. vs.
FCA USA, LLC

William J. Vigilante, Ph.D., CPE
May 23, 2018

Page 85

1  any pending questions.
2      MR. HEBERT: I guess we can break now, and
3  then I'll collect my thoughts, and hopefully it
4  will make our remaining time even shorter.
5      Let's go off the record.
6      THE VIDEOGRAPHER: We're now going off the
7  record.
8      (Recess taken.)
9      THE VIDEOGRAPHER: We're now back on the
10  record. This commences tape number 3.
11  Q   You would agree with me, sir, that the
12  airbags are not designed to deploy while the vehicle
13  is stationary and is not involved in a collision,
14  correct?
15  A   Yes. I'm sorry, did you say "designed"?
16  Q   The airbags are not designed to deploy
17  while the vehicle is stationary and is not involved
18  in a collision?
19  A   I would agree that it's not the intention.
20  I don't know how they designed it. So I'm not aware
21  of that being the intention.
22  Q   Let's go to page 5 of your report under
23  "Analysis," the first paragraph, the second
24  sentence. I read it to say, "The airbags are not
25  designed to deploy while the vehicle is stationary

Page 86

1  and is not involved in a collision."
2      Did I read that correctly?
3  A   Yes.
4  Q   Are you aware of any on-vehicle, on-product
5  warnings that are intended to alert users to the
6  possibility of a product malfunction?
7  A   Not offhand.
8  Q   Would you agree with me that this seems to
9  be an instance of a product malfunction?
10  A   I'm not rendering an opinion regarding
11  whether it's a product malfunction or not.
12  Q   What could Mr. Weams have done differently
13  to avoid injury in this instance?
14  A   It would be my understanding he could have
15  been seated squarely in the seat at arm's length
16  when he turned the ignition key, as opposed to
17  reaching through the window or door. I don't
18  remember offhand which he was doing.
19  Q   Moving on to page 9 of your report, sort of
20  toward the middle there's a paragraph, an excerpt
21  that reads, "Also the orc."
22      Do you see that? O-R-C.
23  A   Yes.
24  Q   And toward the end of that paragraph, it
25  reads, "If the orc detects a malfunction in any part

Page 87

1  of the system, it turns on the airbag warning light
2  either momentarily or continuously."
3      Did I read that correctly?
4  A   Yes.
5  Q   Did that occur?
6  A   Not that --
7  Q   -- in this instance?
8  A   I'm sorry. Not that I'm aware of.
9      But to -- an earlier question you asked me
10  about, you know, why the in-vehicle airbag warning
11  label for this vehicle.
12      Part of my analysis and process was exactly
13  what we're talking about now, is the fact that the
14  information provided by Chrysler was actually
15  contrary to -- contrary to what happened; that is,
16  the information from Chrysler FCA in the manual was
17  that, if there was a problem, the user would be
18  notified. And that's not consistent with what
19  happened.
20  Q   Because, to your understanding, the user
21  was not notified, correct?
22  A   That's my understanding.
23  Q   And it's your understanding that, if there
24  was a problem, the owner, the user, should have
25  notified by this system that we're describing here,

Page 88

1  correct?
2  A   Yes.
3  Q   Let's move to page 10 of your report, sort
4  of in the middle, the paragraph beginning, "Contrary
5  to contemporary safety standards and guidelines."
6      And I'll continue. It says, "Chrysler
7  failed to provide any warning with the subject Jeep
8  Liberty to alert owners and/or operators that the
9  airbag system can inadvertently deploy."
10      Did I read that correctly?
11  A   Yes.
12  Q   What contemporary safety standards are you
13  referring to there?
14  A   Everything from the National Safety Council
15  Accident Prevention Manual to the standards that I
16  cite above or below, including ANSI Z535.4.
17      The references cited in section F,
18  including Laughery and Hammond's textbook chapter
19  on -- in the book Warnings and Risk Reception [sic].
20  Matthew Seiden's textbook Product Safety
21  Engineering for Managers; Sanders and McCornick
22  textbook Human Factors in Engineering and Design;
23  George Peters, A challenge to the safety profession,
24  published in Professional Safety.
25      Those are the specific safety standards and

Page 89

1  guidelines I had in mind.
2  Q   You made reference there -- and in other
3  parts -- well, and in various parts of the report to
4  ANSI Z535.
5      Are you presently, or have you ever been, a
6  member of any ANSI committee?
7  A  I have not.
8  Q  In what way does ANSI Z535.4 -- let me say
9  it differently.
10     In what way do the warnings provided with
11  this vehicle not comply with ANSI Z535.4?
12  A  So, ANSI Z535.4 is a standard for the
13  design formatting, presentation of on-product
14  warnings. And it's intended for manufacturers who
15  have desire to alert users to hazards associated
16  with their product. So I would contend that
17  Chrysler FCA should have been a manufacturer that
18  was concerned about providing effective warnings to
19  the users of their product regarding this hazard.
20  Q  My long -- and I'm not an expert in your
21  field, but my long-term understanding of 535.4 is
22  that it is more of a convention for labeling rather
23  than a substantive standard dictating what should or
24  shouldn't be warned against.
25     Is my understanding wrong?

Page 90

1  A  It doesn't tell you what particular hazard
2  needs to be warned about, but it states that the
3  standard provides guidance to manufacturers who have
4  a desire to alert persons to potential personal
5  injury hazards inherent with products.  It then
6  provides formatting and design guidelines for the
7  presentation or the design presentation of that
8  warning.
9  Q  Before drafting your initial report, did
10  you investigate the history of the NHTSA mandated
11  warning labels related to airbags?
12  A  Other than referring to Mr. Foley's
13  textbook chapter, I did not.
14  Q  Have you ever attended any ANSI meeting or
15  otherwise participated in the standards development
16  process?
17  A  I have not attended the meeting.  A number
18  of years ago, I submitted an annex for ANSI Z535.4.
19  Q  A what?
20  A  An annex.  Like, an addendum, annex.
21  Q  For which one?
22  A  I believe it was Z535.4.
23  Q  Related to what subject?
24  A  Using -- or the testing of the message text
25  for the --

Page 91

1  Q   The testing of the message text?
2  A   Correct.
3  Q   Can you explain that a little more?
4  A   It was a methodology that was -- that I and
5  my co-authors developed for evaluating the
6  effectiveness of the message text that would be
7  presented in an ANSI Z535.4 compliant warning.
8  Q   And was -- how was that addressed or
9  otherwise responded to by the ANSI committee?
10  A   It wasn't included.
11  Q   So you submitted it and it wasn't included.
12      Did you get any information or any feedback
13  as to, "We disagree and that's why we didn't include
14  it," or "This is not the right place"?  Anything at
15  all?
16  A   I don't recall the feedback --
17  Q   When was that?
18  A   -- or if there was any feedback.
19  Q   I'm sorry.
20      When was that submission?
21  A   That had to be around the year 2000.
22  Q   And you made that submission together with
23  colleagues, I think you said?
24  A   Yes.
25  Q   Who else?

Page 92

1  A   Michael Wogalter, and I don't recall if
2  there was a third.
3  Q   Can you spell that?
4  A   W-O-G-A-L-T-E-R.
5  Q   Just like it sounds.
6      I'm trying to better understand, as a
7  layperson, the nature of the submission that you
8  made relating to the testing of message text.
9      Can you articulate that for me again?
10  A   I can try.  So, Z535.3 is the standard
11  related to pictorials or symbols for warning labels
12  or warning signs.  Within Z535.3, starting in I
13  think either 2002 or maybe 2007, there was an
14  appendix with a method for evaluating the
15  comprehension, users' comprehension and
16  understanding of the pictorial.
17  Q   I see, I see.
18  A   So there was not a similar methodology
19  offered for Z535.4.  So we put together a
20  methodology based upon product usability
21  methodologies that I had been familiar with in using
22  in my work at IBM in developing and designing
23  warnings for consumer commercial products to the
24  standard to include, as a reference guide for
25  manufacturers and designers.  So that when they're

Page 93

1  developing the message text for their warning, that
2  they have a resource to reference to understand how
3  to do a more reasonable evaluation of the message
4  text to ensure comprehension and understanding of
5  what they intended to communicate.
6  Q   I think I get it a little better now.
7  Thank you.
8  A   Sure.
9  Q   I apologize if I've asked this before, but
10  in preparing your initial report in this matter, did
11  you review the text of FMVSS 208?
12  A   I did not review the entire text of it.  I
13  don't recall if I looked at the sections related to
14  the airbag or the warnings related to the airbag.  I
15  don't recall at this point.
16  Q   You don't recall whether you reviewed FMVSS
17  208 before you prepared your report or in preparing
18  your report in this matter?
19  A   Again, I know that I did not review the
20  entire section.  I don't recall if I reviewed parts
21  related to the airbag or airbag warning or not.
22  Q   Earlier we were discussing warnings for
23  product malfunctions, and I understood you to say
24  that you were not aware of any warnings, any
25  on-the-product warnings, related to product

Page 94

1  malfunction.
2      Am I recalling that correctly?
3  A   I think my testimony is I don't, I don't --
4  I don't recall any offhand.
5  Q   And related to that issue, are you aware of
6  any published literature that addresses the issue of
7  warnings provided for product malfunctions?
8  A   I'm not aware of any offhand that
9  specifically address warnings for product
10  malfunctions.  The literature that I'm familiar
11  with, again, goes back to what I talked about
12  earlier.
13      It's the manufacturer's responsibility to
14  identify the hazards associated with the reasonably
15  foreseeable uses and misuses of the product, and
16  then implementing the safety hierarchy to mitigate
17  those hazards.
18      And if the issue or the hazard cannot be
19  eliminated through design or guarding, that
20  manufacturer has a responsibility to provide
21  effective and adequate warning.
22  Q   Was Mr. Weams too close to the airbag when
23  it deployed?
24  A   Based upon my understanding he was, to not
25  be injured by it.

Page 95

1  Q   Is it your opinion that manufacturing
2  defects and the possibility of manufacturing defects
3  should be warned against on the product?
4  A   It depends.
5  Q   It depends on what?
6  A   It depends on the particular facts and the
7  scenarios that could exist.
8  Q   Are you aware of any on-the-product warning
9  that discusses or addresses the possibility of
10  manufacturing defect causing injury?
11  A   Offhand, I can't think of any.
12  Q   Just to round this out, on page 11 of 15 in
13  your report under the heading of effective warning,
14  the second paragraph.
15      Are you there?
16  A   Yes.
17  Q   I read the last sentence to say that,
18  "Although FMVSS does not allow vehicle
19  manufacturers" -- of course that should be
20  manufacturers -- "to place additional warnings on
21  the same side of the visor as the airbag and
22  rollover warnings, there are no restrictions from
23  providing additional warnings on the opposite side
24  of the sun visor."
25      Did I read that correctly?

Page 96

1  A   I believe so.
2  Q   You now know that to be an incorrect
3  statement; is that correct?
4  A   That's my understanding.
5  Q   Have you done any testing or analysis to
6  establish or confirm that a label on the headliner
7  of the type that you describe would be read,
8  understood, and heeded by vehicle users?
9  A   I'm sorry, yes.
10  Q   And tell me about that testing or analysis.
11  A   My analysis would be to test it against the
12  standard ANSI Z535.4 and the guidelines and the
13  warnings literature.
14  Q   Is any of that specifically related to
15  labeling that appears on a vehicle headliner?
16  A   I don't know that I looked at any
17  particular study or paper that dealt with that topic
18  exactly.  I looked at the research related to
19  product warnings, in general, and how to communicate
20  effective product warnings to consumers.
21  Q   Are you aware of any warning or label that
22  appears on any vehicle on the headliner?
23  A   As I mentioned earlier, I have seen labels
24  on the headliner of the sun visor.  I don't recall,
25  offhand, whether they were labels or whether they

Weams, Jr. vs.
FCA USA, LLC

William J. Vigilante, Ph.D., CPE
May 23, 2018

Page 97

1  were warning labels.
2  Q   As we sit here today, are you able to
3  identify, with any specificity, any type of label
4  that appears, or once appeared, on the headliner of
5  any vehicle?
6  A   I don't have a specific example I can point
7  to, as I sit here now.  As I mentioned, I have seen
8  them on vehicles.
9  Q   You believe that you've seen them, but you
10  can't recall having any specifics; is that fair?
11  A   Well, I know I've seen them, and I know
12  that they have been and are on vehicles, but I don't
13  have a specific example to point to today.
14  Q   And where specifically would you propose
15  that such a label appear on the headliner?  Let's
16  say -- I'm trying to figure out in relation to where
17  the driver is in relation to where the sun visor is.
18  A   As I mentioned earlier, my proposed example
19  is above the sun visor.
20  Q   So that when the sun visor is up, the label
21  would be hidden?
22  A   That's correct.
23  Q   And what would the size of the label be?
24  A   Again, I gave a minimum font size, a label
25  the size of the airbag warnings would be reasonable.

Page 98

1       If Chrysler decided that it needed to be
2  bigger, then, obviously, I wouldn't have a problem
3  with that.
4  Q   Going on to page 12 of your report, item 3,
5  again makes reference to contemporary safety
6  standards and guidelines.
7       Are you aware of any contemporary safety
8  standards and guidelines in this field that address
9  the, the issue of product malfunction as something
10  that warrants a warning?
11  A   Yeah, like I said before, I'm not -- I
12  don't recall anything specific offhand that
13  addresses malfunctions explicitly.  The guidelines
14  and standards address the foreseeable hazards
15  associated with -- or the hazards associated with
16  the foreseeable use and misuse of the product.
17  Q   Turning our attention to Vigilante 6, which
18  is your supplemental -- I think that's your
19  supplemental report.  I may not have that right,
20  wait a second.
21       No, I think that's the CV.
22       The supplemental report, I think, is 7.
23  You won't find a hard copy, because I didn't have
24  it.
25  A   I'm sorry.

Page 99

1  Q   No, no, no.
2  A   I have my copy.
3  Q   Okay.  In that -- I don't know if it's the
4  first or the second paragraph, it's really the only
5  paragraph, right?
6       But I see that it says, "Furthermore, it is
7  my opinion that there were multiple other options
8  available to Chrysler to present the on-product
9  warning I suggest, in my report, other than the sun
10  visor.  For example, the dash, headliner near the
11  visor, windshield, et cetera."
12       Did I read that correctly?
13  A   Yes.
14  Q   As we sit here today, are you -- do you
15  have a specific proposal in mind for Chrysler in
16  terms of -- or for the vehicle manufacturer, in
17  terms of where the label should have been?
18  A   As specific I can get is where it would
19  have been, where it would have been effective in
20  alerting and informing the operator and owner of the
21  vehicle.  So these are just different areas of the
22  vehicle that they had the opportunity to utilize.
23  Q   Do you have an opinion as to where such a
24  label would have been effective?
25  A   As I mentioned earlier, an example, I

Page 100

1  think, that is reasonable to conclude effective
2  would be on the headliner above the sun visor.
3  Q   But you also think that a label on the dash
4  would be a reasonable proposition?
5  A   Potentially.
6  Q   Are you aware of any vehicle that carries a
7  label, a warning label of any kind, on the dash
8  that's not related to the NHTSA-prescribed airbag
9  warnings?
10  A   Offhand, I don't recall a specific example.
11  Q   And what about a windshield-type label of
12  whatever type you're describing here?
13  A   I don't recall a specific example of a
14  warning related to a design defect or manufacturing
15  defect on a windshield.
16       But I do know that inspection stickers are
17  pasted on windshields.  Chrysler's old corporate
18  partner, Mercedes-Benz, actually put the signature
19  of their president on the windshield.  Dealers often
20  put tags on the windshield regarding maintenance
21  schedules.  So the windshields are frequently used
22  for a medium to present information to the operator
23  and owner of the vehicle.
24  Q   Are you aware of any vehicle manufacturer
25  that has ever used a warning label on a windshield?

Page 101

1  A  As I mentioned, I don't recall any specific
2  examples of a warning being placed on the
3  windshield.  As I mentioned, there are multiple
4  examples of other types of informational labels
5  placed on a windshield.
6  Q  And you told us about that, and I can
7  picture all of those that you've described.  But
8  I've never seen a warning label on a windshield.
9     And the question to you, sir, is whether
10  you have ever seen a warning label placed on a
11  vehicle's windshield by any manufacturer?
12  A  I don't -- I can't recall a specific
13  example to provide.
14  Q  Do you think that you have seen such a
15  thing?
16  A  I don't recall seeing one.  But, again,
17  I've never surveyed every manufacturers' vehicle
18  ever produced, and I'm not aware that the same sort
19  of circumstances are associated with the design
20  manufacturing of other vehicles that would warrant
21  such a label.
22  Q  Early in the deposition you indicated that
23  you had some additional opinions with respect to
24  Mr. -- Dr. Dorris's findings.
25     Do you recall that?

Page 102

1  A  I do.
2  Q  Tell me, if you would, the disagreements
3  that you have with Dr. Dorris's analysis.
4  A  So I have them kind of marked on his
5  report, so we can kind of step through them, if
6  that's --
7  Q  Just show me where you have a marked report
8  on your system and I'll be happy to look at it with
9  you.
10  A  Sure.  Under deposition -- defense -- "DEF
11  EXPT RPTS," that folder, there's three PDFs in
12  there.  The first one is the Dorris report.
13  Q  Uh-huh.
14  A  So I've made several notations and
15  highlights on that document.
16  Q  Okay.
17  A  So the first comment --
18     MR. HEBERT:  Before I forget, that brings
19  us to Exhibit 16, which will be the Dorris
20  report as contained in his file.
21     (Dorris Report was marked as
22     Exhibit Vigilante 16 for
23     identification, as of this
24     date.)
25  Q  Go ahead.

Page 103

1  A  So the first comment I have is on page 3 of
2  his, of Mr. Dorris's report, where he states that
3  receivers that are not seeking safety information
4  about a product are unlikely to attend to warnings
5  they observe.  And although he cites a study by
6  Ayres, et al., that is not consistent with research,
7  independent research that's been done on the
8  effectiveness of warnings, and it's also not
9  consistent with the purpose of a product warning.
10     If product warnings were only intended for
11  people seeking information, there wouldn't be a need
12  to ensure that they were readily conspicuous,
13  noticeable, and attention grabbing.
14     The next point I have a --
15  Q  Before we leave that, you made reference to
16  independent studies, I think you said.
17  A  Yes.
18  Q  Is it your assertion that the Ayres work is
19  anything other than independent?
20  A  Ayres and his co-authors are -- were
21  forensic experts from Exponent, who is a -- and you
22  probably well know this, is heavily skewed towards
23  working on behalf of defense manufacturing clients.
24  And their take on the purpose on the effectiveness
25  of warnings is inconsistent with the research that's

Page 104

1  been conducted at the university level without being
2  influenced, sponsored, or funded by defense
3  manufacturers.
4     It's also inconsistent with my own work for
5  the world's largest IT-related company in designing
6  and developing warnings.  And it's also inconsistent
7  with the historical purpose of warnings.  So that's
8  why I find that research he's citing questionable,
9  at best.
10  Q  And you, yourself, to my understanding,
11  do -- certainly in the forensic context -- work
12  exclusively for plaintiffs?
13  A  That's, that's not correct.
14  Q  That's not?  What about -- have you ever
15  been retained by any manufacturer in a forensic
16  matter?
17  A  I have.
18  Q  Tell me which ones.
19  A  Well, if you want to go through -- in my
20  testimony history, there might be a couple on there.
21  Q  What exhibit did we call that?  I can't
22  remember, I'm sorry.
23  A  Number 5.
24     The only defendant manufacturer I see is in
25  December 2017.  That was on behalf of the Warwood

Weams, Jr. vs.
FCA USA, LLC

William J. Vigilante, Ph.D., CPE
May 23, 2018

Page 105

1  Tool Company.
2  Q  What is it?
3  A  January 2017, bottom of page 6.
4  Q  I'm trying to catch the name.
5  A  Warwood Tool Company.
6  Q  All right.  And then the next item I
7  believe that you have here related to the Dorris
8  report is in the paragraph following?
9  A  Yes.  He states, "For a warning to change
10 an individual's behavior, that person must not only
11 notice and read the warning, but also agree with the
12 message or believe the precaution should be
13 followed."
14     And again, that's a misunderstanding of the
15 purpose of a warning.  Part of the purpose of the
16 warning is to communicate a message so that the user
17 understands what the intent of the warning is and
18 is, therefore, motivated to comply with the warning.
19     If the warning was only geared to people
20 who already agree with the message and believe that
21 the precaution should be followed, again, you
22 wouldn't have the need to ensure that you were
23 providing, and with the explicit and specific
24 information, so that you can get them to change
25 their mind and be motivated to comply.

Page 106

1  Q  Are you aware of studies that suggest or
2  that assess whether the efficacy of the warning is
3  not related to whether the reader agrees with the
4  message or believes that the precaution should be
5  followed?
6  A  Generally, the research shows that if you
7  have a target audience that has a contrary belief or
8  doesn't believe, you have to provide a stronger
9  message.  You have to provide a stronger warning
10 system to change the beliefs.
11     It would be a lot easier in creating
12 warnings if everyone believed what you were trying
13 to communicate in the warning, and that's often not
14 the case.  So it's the job of the warning designer
15 to design the warning in such a manner to persuade
16 the individual to believe the warning and be
17 motivated to comply with the warning.  You can't
18 rely upon them believing beforehand.
19     And, certainly, to make the statement that
20 if the target audience doesn't already believe it,
21 the warning's not going to be effective, again,
22 that's contrary to the purpose and use of the
23 warning to begin with.
24 Q  All right.  And what is your next criticism
25 with Dr. Dorris's work?

Page 107

1  A  So, on the next page, I believe it's
2  page 4, under number 1, the first paragraph after
3  the heading number 1, "Warning system is reasonable
4  and appropriate."
5     He states, "Precautionary information was
6  provided through warning labels affixed to the
7  vehicle as well as any associated owner's manual,"
8  but he doesn't state which relevant warning's
9  affixed to the vehicle or in the manual.  So I have
10 not seen Dorris indicate that there was any warning
11 either in the vehicle or on the -- or in the -- on
12 the vehicle or in the manual that was related to
13 this particular hazard.
14 Q  And "this particular hazard" would be the
15 possibility of inadvertent deployment from the
16 frontal airbag from a stationary vehicle?
17 A  The inadvertent deployment of the airbag.
18 I don't know that it matters whether it's stationary
19 or moving.  The airbag shouldn't deploy and it
20 should have been designed and manufactured to
21 preclude that.
22 Q  All right.
23 A  Page number 7, I note that Dorris omits
24 that the airbag was not properly manufactured.
25 Q  And I understand that that's your read of

Page 108

1  it.
2     Let me ask you this:  Do you agree that the
3  warning system appropriately focuses on risks
4  associated with a properly manufactured and
5  maintained airbag system?
6  A  I would add "design," but yes.
7     I also note, between the next two
8  paragraphs that, in his discussion of when warnings
9  are used and deciding when to include them, he fails
10 to note that warnings are not recommended when
11 hazards can be eliminated by design or adequately
12 guarded.  So I don't know why he conveniently left
13 that out of his report, particularly in that section
14 deciding -- describing when a warning designer
15 should make decisions about what to include or when
16 to include a warning.
17 Q  Okay.
18 A  Page 8, I note that I agree with the
19 statement that, to the extent that it is alleged in
20 this matter that a defect in the circuit board or
21 the airbag controller caused the inadvertent
22 deployment, that it is an alleged design or
23 manufacturing issue and would not be appropriately
24 addressed by warnings or other safety
25 communications.

Page 109

1    As I mentioned earlier in my deposition, it
2   should have been fixed through design or
3   manufacturing and not rely upon a warning. But if
4   you cannot or choose not to address them through
5   design or manufacturing, you need to inform the
6   user.
7    The next paragraph, he notes that it was
8   not helpful to provide a warning to consumers that,
9   despite the manufacturer's intentions and efforts
10  through designing a robust system, the product may
11  malfunction at some unknown time for unknown
12  reasons.
13   But, in this case, it was known and the
14  robustness of the system is in doubt. According to
15  the other expert witnesses, if they're using tin
16  soldering, that the potential for tin whiskers was
17  there and that should have been addressed in the
18  design and manufacturing process. So it's a known
19  issue with the manufacturing process.
20  Q   Before we leave that, your comment that it
21  was known, is "it" the potential problem related to
22  the use of the tin solder?
23  A   That's my understanding.
24  Q   Is there any other "it" that was known
25  other than potential problems related to the use of

Page 110

1   tin solder?
2   A   Well, from a hazard analysis perspective,
3   if you know there's an issue associated with the use
4   of tin solder, the failure effects and modes
5   analysis would help you determine, well, what does
6   that affect if that does, in fact, occur? And that
7   effect is foreseeable that there would be a problem
8   with the airbag.
9   Q   And I know this is not your field of
10  expertise, but my understanding and recollection of
11  the testimony that has been taken thus far is that
12  tin whiskers are no longer on the table because the
13  solder that was actually used has been analyzed, and
14  it turns out that it has lead, so that now the tin
15  whiskers theory is out the window.
16   If tin whiskers is out the window, what is
17  it that you are saying was known in this context
18  with respect to the possibility of inadvertent
19  deployment?
20   MR. SMITH: Object to form.
21  A   So a couple of things: I don't believe
22  that your qualification is correct. That was not my
23  understanding of reading the deposition of the other
24  plaintiff experts.
25   But if there was not a design issue or a

Page 111

1   design defect or a manufacturing defect -- and this
2   is just some unknown cause -- then I would agree a
3   warning would not be necessary. The issue -- the
4   need for a warning is, in part, related to what
5   should and should not be known by the manufacturer
6   based upon their design and manufacturing process.
7   Q   All right. And then next?
8   A   He states that, on the top of page 8, "It
9   is unclear if the alleged failure mode will result
10  in the readiness indicator becoming illuminated at
11  all or at the same time as the unanticipated
12  deployment."
13   And my point or my comment was that would
14  be a fault in the system, then. So the airbag
15  module and OCR were designed -- or Chrysler claims
16  they were designed to alert the user to the
17  potential fault, and here it didn't alert the user
18  to a potential fault.
19  Q   Okay.
20  A   The next paragraph he notes that, "When
21  defects were identified, those issues were addressed
22  through recall campaigns, not adding warning labels.
23  And in the circumstances where no defect was
24  identified, no warning label was added."
25   My statement or my comment is that the

Page 112

1   Weams vehicle was not included in the recall.
2   Therefore, he had no warning based upon any recall
3   process or procedure that Chrysler FCA implemented.
4    Next he notes that --
5   Q   Before we leave that, you do acknowledge
6   that the NHTSA is aware of instances of inadvertent
7   airbag deployment occurring across many different
8   manufacturers and models, correct?
9   A   I'm aware that NHTSA is aware of
10  inadvertent airbag deployments with other
11  manufacturers. I don't know that I would qualify it
12  as many or across manufacturers.
13  Q   And do you question the assertion that he
14  makes here that not all of these instances resulted
15  in a conclusion either that a defect was present in
16  the design or manufacturing of the vehicle?
17  A   I don't know that he makes that conclusion.
18  Q   Not all of these instances resulted in the
19  conclusion, by the NHTSA, that a defect was present
20  in the design or manufacturing of the vehicle is the
21  way I read his report.
22   Do you see that sentence?
23  A   Okay.
24  Q   Do you have any information, as we sit here
25  today, to permit you to make an informed criticism

Weams, Jr. vs.
FCA USA, LLC

William J. Vigilante, Ph.D., CPE
May 23, 2018

Page 113

1   of that statement?
2   A   I don't know which other manufacturers he's
3   referring to, so there's no way for me to
4   investigate that.
5   Q   There's no way for you to investigate what
6   the NHTSA knows about instances of inadvertent
7   airbag deployment; is that what you're testifying
8   to?
9   A   I'm testifying to is, I don't know what
10  other manufacturer of -- what other vehicle
11  manufacturers he's referring to.  If I don't know
12  what he's referring to, I can't investigate it.
13  Q   Well, you certainly can investigate, sir,
14  what the NHTSA knows about inadvertent airbag
15  deployment, can you not?
16  A   I can look up what NHTSA's knowledge is
17  with regard to inadvertent airbag deployment for
18  other manufacturers.
19  Q   Yes.  And you have not done so, correct?
20  A   I have not done so.
21  Q   All right.  What's next?
22  A   I make the note that the remainder of the
23  paragraph, he's shifting the responsibility for
24  product safety from Chrysler to NHTSA.  And again,
25  that's contrary to basic product safety practices.

Page 114

1       NHTSA is a government organization that
2   produces regulations, but it's the manufacturer's
3   responsibility to address product safety, not rely
4   completely and totally on NHTSA.
5   Q   And do you see a statement here where he
6   absolves the manufacturer of responsibility for
7   issuing warnings?
8   A   In the paragraph, he keeps referring back
9   that NHTSA did not -- NHTSA was aware but NHTSA did
10  not require, NHTSA did not mandate.
11      I don't care what NHTSA required or
12  mandated with respect to whether or not Chrysler had
13  a responsibility to identify and mitigate hazards
14  associated with their product.  NHTSA is a resource
15  for them to both rely upon for meeting certain --
16  their regulations.  But Chrysler can't rely upon,
17  nor should they rely upon, NHTSA to ensure that they
18  have a safe vehicle.
19  Q   Do you doubt that NHTSA could mandate an
20  additional safety message about inadvertent airbag
21  deployment if the agent thought it was necessary or
22  appropriate?
23  A   I don't doubt that NHTSA can mandate it,
24  but I doubt that Chrysler -- I doubt that a
25  reasonable manufacturer would rely upon and wait for

Page 115

1   NHTSA to do that with an issue with their product.
2       Again, it's the manufacturer's
3   responsibility; it's not NHTSA's responsibility.
4   Q   All right.  What's next?
5   A   So he states, farther in that paragraph,
6   that, "Given the goal of standardizing airbag
7   warnings across makes and models of vehicles, the
8   decision of whether to include a warning about
9   inadvertent airbag deployment is one that should be
10  applied consistently throughout the automotive
11  industry."
12      And I make the note that he's conflating
13  two different subjects.  We're not talking about
14  providing a warning across the industry for all
15  vehicles.  We're talking about addressing a specific
16  issue with Chrysler's design and/or manufacturing of
17  this vehicle.
18  Q   As we sit here today, have you any
19  information to suggest that the NHTSA does not have,
20  as one of its goals, the standardization of airbag
21  warnings across makes and models of vehicles?
22  A   I'm not saying that I disagree with that.
23  What I'm saying is, that is a red herring.  That is
24  not what my report and my analysis was addressing.
25      My analysis and report addressed a specific

Page 116

1   hazard associated with the design and/or
2   manufacturing of the subject vehicle and subject
3   vehicle model year --
4   Q   Do you --
5   A   -- not airbags and what should and should
6   not be provided consistently across all
7   manufacturers.
8   Q   Do you accept that it is one of the NHTSA's
9   goals, to standardize airbag warnings across makes
10  and models of vehicles?
11  A   I do.  And again, that is not the issue
12  relevant to my analysis or report, so I don't know
13  why Mr. Dorris is bringing that up in his critique
14  of my report.
15  Q   All right.  What's next?
16  A   I note, at the bottom of page 8, I think in
17  response to the last sentence on this page, that I
18  am not aware of any standard designs that allow an
19  airbag to inadvertently deploy.
20  Q   Is it your understanding -- I'm sorry.
21  A   So there would be no reason for a
22  manufacturer -- other manufacturers to provide a
23  similar warning.
24  Q   Is --
25  A   Again, my analysis and report and my

Page 117

1  alternative warning is to address the specific
2  hazard associated with this vehicle, not the entire
3  universe of passenger vehicles.
4  Q  Is it your understanding that the standard
5  design for, as you understand it, for the 2004 Jeep
6  Liberty, allowed or contemplated an airbag that
7  deploys inadvertently?
8  A  I don't know that Chrysler contemplated it.
9  Certainly, if there was a design decision that
10  resulted in the inadvertent deployment being
11  foreseeable, then they should have identified it.
12  Q  Are you aware of a design decision that
13  contemplated the -- or allowed for the possibility
14  of inadvertent deployment?
15  A  The only one I was aware of was the issue
16  with the use of the tin solder and the tin whiskers.
17  Q  And you believe that's still to be a viable
18  theory, as we sit here today?
19  A  That's my understanding.
20  Q  Okay.  What's next?
21  A  The top of page 2 [sic], he states, "There
22  is insufficient evidence in this matter for one to
23  conclude that any different or additional warning
24  (including the warnings proposed by Dr. Vigilante)
25  provided by FCA would have been noticed, read, and

Page 118

1  changed the behavior of Mr. Weams as it relates to
2  this incident."
3      Again, this is Mr. Dorris's failure to
4  recognize the body of research that's related to the
5  effectiveness of warnings, of when you provide
6  warnings that are consistent with the ANSI Z535
7  standard to ensure that they are noticeable,
8  attention-getting, and that they communicate what
9  the hazard is, not avoid it, and those consequences.
10     So there is evidence to support my analysis
11  and conclusions that a warning that alerted users to
12  what they did not know -- that is that this airbag
13  can inadvertently deploy and that they needed to
14  take certain steps to ensure they weren't injured if
15  that occurred -- there is evidence to support that
16  that would have been seen, read, understood, and
17  complied with.
18  Q  Does your assessment in that regard relate
19  solely to the on-the-product warning?
20  A  Yes.
21     Next he states, "There is no testimony that
22  either Mr. or Mrs. Weams noticed or read the
23  available warning labels on the sun visors."
24     And I note that there is no evidence that
25  it would not.  And I also note that whether or not

Page 119

1  they comply with the label is a different story than
2  whether or not the warning provides informed
3  consent.
4      So a warning has multiple purposes, and
5  they include informing the user of the hazard, how
6  to avoid the consequences, to change behavior, have
7  people act in a safe manner, to remind them of
8  information that may not -- they may know, but may
9  not be thinking of at the time, and to provide
10  informed consent.
11     And Dorris seems to completely regard [sic]
12  this informed consent.  Again, we're talking about a
13  hazard --
14  Q  I'm sorry, he seems to what?  Completely?
15  A  Completely ignore the issue regarding
16  informed consent.
17     Mr. Weams had no idea that the vehicle
18  airbag could inadvertently deploy.  He had a right
19  to know that, and Chrysler had the responsibility to
20  inform them of that.
21  Q  Okay.
22  A  Bottom of page 9, I think I've already
23  corrected that.
24     Page 10 --
25  Q  When you say "Not correct," what does that

Page 120

1  mean?
2  A  When I went back and looked at my report
3  and looked at the standard, my report was not
4  correct.
5  Q  Okay.
6  A  Top of page 10, he states -- he states he
7  disagrees with my statement.  I'm not sure exactly
8  how he's trying to present this.  If he's trying to
9  present it that I made this statement or what, but
10  he seems to be inferring that I made this statement
11  and then saying he disagrees with it.
12     But it is not my statement, and I have
13  never stated in my report, that all conceivable
14  hazards must be warned against.  So I don't know why
15  he wrote that in there other than to be misleading,
16  but I never made that statement, nor did I infer
17  that statement.
18  Q  Do you accept that, from a human factors
19  perspective, excessive warnings are as bad as
20  insufficient warnings?
21  A  I don't know that I would accept that
22  they're as bad.  Certainly you want to avoid
23  excessive warnings.  The question is, why are there
24  excessive warnings?  Why aren't these hazards being
25  addressed in the design and guarding phase of the

Page 121

1  product.
2     But certainly having no warning for hazards
3  that remain after proper guarding and design have
4  been constituted is a problem.
5  Q   Well, putting aside the issue, I guess the
6  tushery issue that you just identified about
7  designing out hazards, do you accept that, from a
8  human factors perspective, the more warnings you
9  get, the less likely the user is to consume them?
10  A   It depends on how and -- how, how they're
11  presented and why they're presented.
12  Q   So you don't accept that, as a general
13  proposition, more warnings runs the risk of diluting
14  the warnings that are available?
15  A   As a general proposition, the more warnings
16  that are provided, it can dilute the other warnings
17  that are provided. But I can't make a general
18  statement that more warnings are bad in and of
19  itself.
20  Q   Okay.
21  A   The next paragraph he makes -- again,
22  infers a few more statements regarding whether or
23  not I'm suggesting that ANSI Z535 does certain
24  things or does not certain things.
25     So I can tell you that Z535.4 does provide

Page 122

1  guidance to manufacturers who have a desire to alert
2  users of hazards associated with their product. So
3  it does provide that guidance, even though he's
4  saying it does not.
5     But I will agree there's no specific
6  guidance in Z535.4 directly targeted specifically at
7  automobiles or inadvertent airbag deployment. So I
8  don't know -- again, I don't know why he's making
9  the inference that I'm suggesting that.
10  Q   Or any ANSI standard for that matter?
11  A   Well, there are ANSI standards that are
12  directly -- or directed to vehicle manufacturers
13  specifically, but I don't know of any ANSI standard
14  that specifically addresses inadvertent airbag
15  deployment.
16  Q   All right. What's next?
17  A   The next paragraph, he notes that I suggest
18  that the warnings should conform to ANSI Z535
19  standards to be considered adequate. Again, that's
20  a statement that I never made.
21     Certainly there are warning formats that
22  can be just as effective, but the ANSI Z535 standard
23  is based upon research that shows what makes a
24  warning conspicuous, or noticeable and
25  attention-getting in communicating important

Page 123

1  information.
2     The important part is, is that if you were
3  going to design a warning that is noncompliant with
4  ANSI Z535, you need to have testing and the research
5  to back that up. You just can't come up with your
6  own warning format, design format, and assume it's
7  going to be effective. The parts of Z535.4 have and
8  are based upon research that shows what is and is
9  not effective.
10  Q   Do you agree with his statement that Z535.4
11  does not attempt to provide a measure of
12  effectiveness?
13  A   Can you show me where you're reading that?
14  Q   Yeah. It's that paragraph that begins, "To
15  the extent," and it's the third sentence. "The
16  voluntary standard does not attempt to provide some
17  measure of effectiveness."
18  A   I disagree with that. The standard is
19  based upon research that shows what factors affect
20  the adequacy and effectiveness of warnings.
21     If the standard wasn't based upon the
22  things that were shown to provide for the
23  effectiveness of warnings, why are they including it
24  in a standard that they're propagating for
25  manufacturers to use to provide warnings. The fact

Page 124

1  that Mr. Dorris is on the executive committee of the
2  standard and has this belief is just completely
3  mind-boggling for me; how a person who can believe
4  that the standard is based upon things that don't
5  matter or don't have any positive effect, either he
6  needs to work harder to improve the standard or he
7  needs to step off that committee because what he's
8  doing is unethical.
9  Q   Oh, is that so?
10  A   That is so.
11  Q   And have you alerted anyone of that before
12  today?
13  A   I don't know that I have formally alerted
14  anyone to that.
15  Q   Do you --
16  A   Because I don't know what is his belief or
17  intent. All I can say is, if that is his belief or
18  intent, then there is a conflict of his presence on
19  the committee.
20  Q   But if you are misunderstanding his belief
21  and intent, then, perhaps, his views and his
22  opinions are entirely ethical?
23  A   If his intent and his understanding, that
24  would be correct. But the way he's expressing it in
25  this report, that's not what he is communicating.

Page 125

1 Q My understanding of this paragraph -- and
2 we may or may not agree on this -- is that what he's
3 speaking of specifically is what Z535.4 provides for
4 and intends.
5     Is your understanding different than that?
6 A He states that, "ANSI Z535.4 reflects
7 consensus for a uniform set of formatting
8 conventions."
9     It does do that. But those formatting
10 conventions are based upon research and experience
11 from parties that have shown that these formatting
12 conventions affect, or provide for the
13 effectiveness, of product warnings.
14     To make the next statement that he does
15 that, "The voluntary standard does not attempt to
16 provide some measure of effectiveness," is flat out
17 wrong. If the standard is based upon formatting
18 conventions that have been shown to provide for the
19 effectiveness of warnings, then the standard does,
20 in fact, attempt to provide some measure of
21 effectiveness.
22     If the standard did not mean to provide
23 some measure of effectiveness, why have a standard
24 that provides for formatting conventions that don't
25 matter?

Page 126

1 Q Do you disagree, then, with his assertion
2 that it is not the intent of this ANSI -- let me
3 start over.
4     Do you disagree with the following
5 sentence: "It is not the intent of this ANSI Z535.4
6 standard to replace existing standards or
7 regulations which are uniquely applicable to a
8 specific industry or use"? Did you disagree with
9 that statement?
10 A I would agree that, if there is a specific
11 ANSI or other industry standard and has a specific
12 warning format and design requirement for that
13 specific line or family of products, then ANSI
14 Z535.4 would not be applicable.
15 Q All right. What's next?
16 A The bottom paragraph he says, "To the
17 extent that Dr. Vigilante appears to apply ANSI Z535
18 standards to the owner's manual, that is
19 inappropriate," and that is an incorrect statement.
20     He states, "At the time the subject vehicle
21 was manufactured, there was no ANSI Z535 standard
22 applying to manuals." That is inaccurate.
23     He states that, "ANSI Z535.6 was first
24 published in 2006, after the 2004 Jeep Liberty was
25 manufactured and originally sold." That is correct.

Page 127

1     Prior to ANSI Z535.6, the .4 standard was
2 used for guidance for design presentation of
3 warnings and collateral material such as owner's
4 manuals.
5 Q So that it's your testimony that ANSI Z535
6 applied to owner's manuals before Z535.6 was
7 published?
8 A Z535.4 was applicable and was used for
9 warnings presented in manuals prior to the Z535.6
10 standard.
11 Q All right. What else?
12 A I think that's all of the comments I have
13 on his report.
14 Q As part of its review of airbag warnings,
15 have you investigated or studied, at all, the NHTSA
16 record?
17 A For this specific case, I did not study the
18 NHTSA record for airbag warnings. For other
19 projects in the past, I have studied NHTSA records
20 for airbag warnings.
21 Q Do you dispute that NHTSA specifically
22 sought to avoid overload by providing too many
23 messages in the context of its review of the airbag
24 warnings issue?
25 A I am aware that was an issue that NHTSA was

Page 128

1 concerned about and addressed when dealing with
2 airbag warnings.
3     THE WITNESS: So we need to take another
4 break because we've been going about an hour
5 and a half.
6     MR. HEBERT: I think I have like three or
7 four minutes left.
8     THE WITNESS: Three or four minutes left?
9     MR. HEBERT: Lawyers always say that,
10 but --
11     THE WITNESS: I know you do.
12     So do you want to go off the record to
13 discuss this?
14     MR. HEBERT: We can, all right.
15     THE VIDEOGRAPHER: We're now going off the
16 record.
17     (Recess taken.)
18     THE VIDEOGRAPHER: We're back on the
19 record.
20 Q We really -- that was really the last
21 subject matter that I had intended to cover on my
22 outline.
23     But tell me, sir, over these last several
24 hours, have we now identified and discussed all of
25 the opinions that you have formed in this matter?

| | Page 129 |
|---|---|

1 A   As I sit here, I can't think of any other.

2     MR. HEBERT: I have no further questions

3 for you at this time.

4     MR. SMITH: No questions.

5     THE WITNESS: Thank you.

6     THE VIDEOGRAPHER: This completes the

7 deposition.  We're now going off the record,

8     1:32.

9     (Time adjourned: 1:32 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | Page 131 |
|---|---|

1 Vigilante 12  Page 12 of initial expert report   61

2 Vigilante 13  EQ10051584-5461                     69

3 Vigilante 14  EQ10051584-6750                     69

4 Vigilante 15  NHTSA complaint.pdf                 69

5 Vigilante 16  Dorris Report                      102

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | Page 130 |
|---|---|

1               I N D E X

2 WITNESS

3 William J. Vigilante, Jr.

4

5          EXAMINATION BY        PAGE

6          Mr. Hebert              3

7

8             EXHIBITS

9 EXHIBIT                         PAGE

10 Vigilante 1   Notice of Deposition            10

11 Vigilante 2   Notice of Video Deposition      12

12 Vigilante 3   Expert Report of Vigilante      12
13              Forensic dated February 15, 2018

13 Vigilante 4   CV of William J. Vigilante, Jr.,  13
14              Ph.D., CPE, dated October 11,
15              2017

15 Vigilante 5   William J. Vigilante, Jr. Ph.D.,  14
16              CPE History of Expert Testimony
17              by Deposition or Trial

17 Vigilante 6   CV of William J. Vigilante, Jr.,  15
18              Ph.D., CPE, dated 2/25/18

19 Vigilante 7   Supplemental Report date March  15
20              15, 2018

20 Vigilante 8   Case Intake Form                16

21 Vigilante 9   Vigilante Forensic Invoice dated  17
22              2/17/18

23 Vigilante 10  Vigilante Forensic Invoice dated  17
24              3/30/18

25 Vigilante 11  DVD                             19

| | Page 132 |
|---|---|

1          C E R T I F I C A T E

2

3     I, AMANDA McCREDO, a Shorthand Reporter

4 and Notary Public of the Commonwealth of

5 Pennsylvania, do hereby certify:

6 That the witness whose examination is

7 hereinbefore set forth, was duly sworn, and

8 that such examination is a true record of the

9 testimony given by such witness.

10 I further certify that I am not related to any

11 of the parties to this action by blood or

12 marriage; and that I am in no way interested in

13 the outcome of this matter.

14

15

16

17            _____

17            AMANDA McCREDO

18

19

20

21

22

23

24

25

**[**

**[sic] (5)**
36:17;37:6;88:19;
117:21;119:11

**0**

**04 (2)**
68:5,19
**04-203-CP-354I (1)**
25:22
**04CR208KJCB3541 (1)**
25:24

**1**

**1 (4)**
9:24;10:1;107:2,3
**1:32 (2)**
129:8,9
**10 (7)**
8:20;17:5,12;67:9;
88:3;119:24;120:6
**1-03 (1)**
41:23
**11 (7)**
13:5;19:12,14,17;
46:10;52:18;95:12
**12 (16)**
27:22;60:2,19,21,23,
24,24;61:1,3,23;62:12;
69:22,22;70:3,6;98:4
**12.5 (1)**
61:25
**12/15/16 (1)**
39:9
**12-point (3)**
61:17;62:1,2
**13 (2)**
69:1,5
**14 (2)**
69:8,11
**141-page (1)**
27:22
**15 (12)**
11:16;12:19;13:1;
15:10,14,22;48:15;
52:18;54:23;69:14,18;
95:12
**15th (1)**
9:17
**16 (4)**
67:9,16;102:19,22
**17/04 (1)**
68:7
**17-4-SDD-RLB (1)**
3:7
**17th (2)**
16:7,8
**18 (1)**
67:9

**18th (3)**
9:6;16:7,8
**19 (1)**
68:23
**19460 (1)**
4:10
**1st (1)**
6:11

**2**

**2 (6)**
10:10;12:6,11;46:8;
71:14;117:21
**2/17 (1)**
16:22
**2/17/18 (1)**
16:24
**2/25/18 (3)**
14:22;15:1,3
**20 (1)**
24:11
**200 (1)**
4:9
**2000 (1)**
91:21
**2002 (4)**
42:1,2;59:7;92:13
**2002-2003 (1)**
43:24
**2003 (5)**
42:2;66:15,16,24;
67:16
**2004 (44)**
21:4,9,10,22;25:15,
20,23;26:2;29:22;
31:10,21;32:1,7,22;
34:23;36:17,17;42:1;
43:2,22;44:3,11;58:7;
62:17;63:2;64:20;65:3,
5;66:6,10,14;67:25;
68:25;72:22;73:4;
77:22;80:21,23;81:9,
25;82:9,20;117:5;
126:24
**2006 (1)**
126:24
**2007 (1)**
92:13
**2015 (1)**
6:11
**2016 (1)**
72:19
**2017 (6)**
13:5;14:13;24:11;
72:17;104:25;105:3
**2018 (12)**
3:13;11:16;12:19;
13:2,16;15:10,14,22;
16:22;17:8;44:17;54:23
**208 (3)**
21:21;93:11,17
**216 (1)**

**3:11**
**2192 (1)**
34:15
**23 (3)**
3:12;8:21;67:25
**23rd (1)**
67:8
**25 (3)**
13:16;81:14;82:22
**26th (1)**
9:2
**285880921-1 (1)**
40:21

**3**

**3 (13)**
12:21,24;45:8;48:14;
52:16;68:6,22;71:11;
73:10,12;85:10;98:4;
103:1
**3/15 (1)**
15:9
**3/17 (1)**
68:5
**3/18/04 (1)**
68:10
**3/18/2004 (1)**
68:12
**3/19 (1)**
68:19
**3/19/2005 (1)**
36:14
**3/20/2018 (1)**
17:6
**3/30/18 (1)**
17:11
**30th (1)**
17:8
**315 (1)**
17:4

**4**

**4 (5)**
13:6,9;71:15;107:2;
127:1
**4/1/2004 (2)**
67:3,7
**4/27/2017 (1)**
23:25
**433 (1)**
27:23
**434 (1)**
28:7

**5**

**5 (4)**
14:8,11;85:22;104:23
**5/17 (1)**
20:11
**5/22 (1)**

**20:11**
**535.4 (1)**
89:21
**5461 (1)**
67:13

**6**

**6 (7)**
14:17,17,24,25;15:5;
98:17;105:3
**63280 (3)**
29:2,6,7
**63312 (2)**
29:3,8
**6750 (2)**
67:19;69:9

**7**

**7 (8)**
15:7,15;45:19;48:15;
49:14,18;98:22;107:23
**7/12/17 (1)**
39:8

**8**

**8 (5)**
16:14,18;108:18;
111:8;116:16

**9**

**9 (6)**
16:21,25;44:17;
68:23;86:19;119:22

**A**

**ability (1)**
77:17
**able (8)**
32:12;35:14;36:21;
44:9;47:19,25;73:2;
97:2
**above (7)**
57:17;58:9;63:16;
73:13;88:16;97:19;
100:2
**above-referenced (1)**
54:21
**absolutely (2)**
26:15,15
**absolves (1)**
114:6
**accept (5)**
116:8;120:18,21;
121:7,12
**accepted (1)**
78:24
**accident (4)**
37:14;70:23,25;88:15

**According (1)**
109:14
**accurate (1)**
42:24
**acknowledge (1)**
112:5
**acknowledging (1)**
40:18
**across (9)**
67:22,24;112:7,12;
115:7,14,21;116:6,9
**act (1)**
119:7
**activation (2)**
29:19;80:19
**actual (2)**
62:20;67:7
**actually (8)**
36:6;38:4,20;51:19;
71:8;87:14;100:18;
110:13
**Acura (2)**
72:15;73:6
**add (1)**
108:6
**added (10)**
13:24;20:6,6,14,20;
25:8,10;28:1,11;111:24
**addendum (1)**
90:20
**adding (2)**
45:2;111:22
**addition (1)**
52:4
**additional (11)**
13:23;49:8,21;50:8,
13,22;95:20,23;101:23;
114:20;117:23
**address (10)**
4:8;37:20;51:6;
65:23;94:9;98:8,14;
109:4;114:3;117:1
**addressed (8)**
54:16;91:8;108:24;
109:17;111:21;115:25;
120:25;128:1
**addresses (4)**
94:6;95:9;98:13;
122:14
**addressing (2)**
115:15,24
**adequacy (1)**
123:20
**adequate (3)**
52:6;94:21;122:19
**adequately (1)**
108:11
**adjourned (1)**
129:9
**Admin (2)**
8:13;13:18
**Administration (1)**
64:14

**affect (3)**
110:6;123:19;125:12
**affixed (2)**
107:6,9
**again (30)**
10:16;31:16;34:3;
59:6,8;61:13;65:12;
74:1;77:7;81:15,25;
82:16;92:9;93:19;
94:11;97:24;98:5;
101:16;105:14,21;
106:21;113:24;115:2;
116:11,25;118:3;
119:12;121:21;122:8,
19
**against (6)**
70:15;77:12;89:24;
95:3;96:11;120:14
**agent (1)**
114:21
**ago (1)**
90:18
**agree (14)**
7:23;68:20;85:11,19;
86:8;105:11,20;108:2,
18;111:2;122:5;123:10;
125:2;126:10
**agreement (3)**
9:8,14,20
**agrees (1)**
106:3
**ahead (1)**
102:25
**airbag (89)**
22:6;24:24;30:1;
31:22;32:1,5,16;36:5,
12;41:22,25;44:5;47:9,
15;52:25;53:10,16,19;
56:4,16;57:9;61:11;
62:20,22;63:21;64:3,10,
15;65:11;66:14;69:24;
70:7,9,10,18;72:3,8,8,
22;73:3;78:1;80:2,14,
19;81:4,9,21;82:7,15;
87:1,10;88:9;93:14,14,
21,21;94:22;95:21;
97:25;100:8;107:16,17,
19,24;108:5,21;110:8;
111:14;112:7,10;113:7,
14,17;114:20;115:6,9,
20;116:9,19;117:6;
118:12;119:18;122:7,
14;127:14,18,20,23;
128:2
**airbags (9)**
29:20,22;41:17;
72:11;85:12,16,24;
90:11;116:5
**al (1)**
103:6
**alert (8)**
60:14;86:5;88:8;
89:15;90:4;111:16,17;

122:1
**alerted (3)**
118:11;124:11,13
**alerting (1)**
99:20
**allegation (1)**
81:3
**alleged (4)**
31:21;108:19,22;
111:9
**alleviate (1)**
78:7
**allow (5)**
50:12;52:3,5;95:18;
116:18
**allowed (2)**
117:6,13
**alluded (1)**
7:13
**alphabetical (3)**
27:7;34:4,7
**alternative (3)**
51:13;52:6;117:1
**alternatively (1)**
76:18
**although (4)**
14:15;77:21;95:18;
103:5
**always (4)**
75:24;76:2,3;128:9
**Amanda (1)**
3:15
**American (1)**
51:15
**amongst (2)**
13:17;24:20
**analysis (19)**
75:10;76:22;77:1,3;
78:21;82:25;85:23;
87:12;96:5,10,11;
102:3;110:2,5;115:24,
25;116:12,25;118:10
**analyzed (2)**
51:2;110:13
**and/occupant (1)**
36:13
**And/or (5)**
45:25;52:5;88:8;
115:16;116:1
**Angela (1)**
18:23
**annex (3)**
90:18,20,20
**ANSI (32)**
51:14;59:7;60:10;
88:16;89:4,6,8,11,12;
90:14,18;91:7,9;96:12;
118:6;121:23;122:10,
11,13,18,22;123:4;
125:6;126:2,5,11,13,17,
21,23;127:1,5
**answered (1)**
33:18

**Answerpdf (1)**
43:12
**anticipate (1)**
66:9
**apologize (5)**
5:25;31:2;45:6;60:5;
93:9
**appear (8)**
26:2,3,20;28:10;33:3;
38:9;39:1;97:15
**appeared (1)**
97:4
**appears (17)**
8:23;10:4,8;13:1;
27:21;28:1;34:25;36:2;
45:10;59:25;72:21;
73:3,5;96:15,22;97:4;
126:17
**appendix (1)**
92:14
**applicable (6)**
44:2;50:7;54:2;126:7,
14;127:8
**applied (3)**
51:24;115:10;127:6
**apply (1)**
126:17
**applying (2)**
7:17;126:22
**appropriate (13)**
7:11;51:8;57:6,12,21;
60:3;61:5,17;62:7,23;
78:22;107:4;114:22
**appropriately (2)**
108:3,23
**April (2)**
9:2;24:11
**areas (1)**
99:21
**arm's (1)**
86:15
**around (1)**
91:21
**arrows (1)**
28:6
**article (2)**
56:9,10
**articulate (2)**
49:2;92:9
**articulated (1)**
48:25
**aside (2)**
6:19;121:5
**assemble (1)**
8:4
**assert (1)**
75:4
**assertion (3)**
103:18;112:13;126:1
**assess (2)**
6:4;106:2
**assessment (1)**
118:18

**assignment (1)**
9:13
**assignments (1)**
6:7
**assistant (1)**
40:24
**associated (20)**
35:23;51:7;53:16;
58:2;66:2;77:3;78:8;
79:11;89:15;94:14;
98:15,15;101:19;107:7;
108:4;110:3;114:14;
116:1;117:2;122:2
**assume (4)**
24:10;26:9;68:24;
123:6
**assumed (1)**
75:8
**assuming (2)**
13:19;45:15
**assumption (1)**
21:14
**assumptions (1)**
48:3
**attempt (4)**
123:11,16;125:15,20
**attend (1)**
103:4
**attended (2)**
90:14,17
**attention (3)**
27:20;98:17;103:13
**attention-getting (2)**
118:8;122:25
**audience (2)**
106:7,20
**authored (1)**
48:17
**automobile (1)**
47:5
**automobiles (1)**
122:7
**automobile's (1)**
47:6
**automotive (4)**
46:15,18,20;115:10
**availability (1)**
66:3
**available (4)**
78:14;99:8;118:23;
121:14
**avoid (9)**
5:2;55:16;77:17,19;
86:13;118:9;119:6;
120:22;127:22
**aware (63)**
15:24;22:21;29:21,
24;31:7,8,13,19,25;
32:3,23;42:25;44:1;
47:7;54:10;64:4,7,9,12,
13,14,17;78:1,2,5;
79:16,20;80:11,21;81:8.
22;82:1,10,12,18,19,20,

83:9,10,25;84:5,9;
85:20;86:4;87:8;93:24;
94:5,8;95:8;96:21;98:7;
100:6,24;101:18;106:1;
112:6,9,9;114:9;
116:18;117:12,15;
127:25
**Ayres (3)**
103:6,18,20

## B

**back (26)**
11:21;13:19;16:11,
12;18:16;25:17;31:5;
33:9;37:23,25;42:21;
44:25;46:7,13;64:21;
66:25;69:21;70:15;
71:11;76:3;85:9;94:11;
114:8;120:2;123:5;
128:18
**background (5)**
29:18;35:4;36:24;
41:1;60:17
**bad (4)**
62:24;120:19,22;
121:18
**based (21)**
20:13;24:10;47:18;
50:13;51:7,14,20;59:6;
65:8;71:2;92:20;94:24;
111:6;112:2;122:23;
123:8,19,21;124:4;
125:10,17
**basic (1)**
113:25
**basically (1)**
60:8
**Bates (3)**
26:19,21;27:23
**Bates-numbered (1)**
27:17
**bear (1)**
26:3
**become (1)**
47:6
**becoming (1)**
111:10
**beforehand (1)**
106:18
**begin (1)**
106:23
**beginning (4)**
24:3;29:2;31:16;88:4
**begins (1)**
123:14
**begun (1)**
33:11
**behalf (3)**
24:11;46:20;103:23;
104:25
**behavior (3)**
105:10;118:1;119:6

belief (5)
106:7;124:2,16,17,20
beliefs (1)
106:10
believes (1)
106:4
believing (1)
106:18
below (1)
88:16
Berger (1)
3:14
Berrian (1)
19:4
B-E-R-R-I-A-N (1)
19:4
best (2)
77:14;104:9
better (2)
92:6;93:6
bibliography (1)
39:20
bigger (1)
98:2
bit (5)
6:11;23:19;67:15;
68:2;81:13
black (4)
60:6,13,14,17
blocked (1)
68:4
board (1)
108:20
body (1)
118:4
book (4)
51:19,21;56:11;88:19
Booklet (2)
37:4,12
bookmarks (1)
24:5
BOQ (1)
30:3
both (3)
39:7;51:24;114:15
bottom (4)
105:3;116:16;119:22;
126:16
bought (1)
74:15
break (7)
11:24;46:2;84:14,21,
21;85:2;128:4
brief (1)
84:21
briefly (1)
4:1
bring (3)
10:20;37:24;48:4
bringing (1)
116:13
brings (1)
102:18

Brochure (5)
34:21,23,25;35:9,16
brought (1)
10:11
bulletin (1)
36:12
bunch (1)
35:22
business (2)
4:16,20

C

cabin (1)
55:22
CAIR (1)
40:24
C-A-L-I-B-R-I (1)
62:10
Calibrie (1)
62:10
C-A-L-I-B-R-I-E (1)
62:10
call (6)
44:20,23,24;78:23;
83:2;104:21
called (11)
4:24;24:1;27:4;
28:20;29:10,13;30:15,
17;32:25;50:17;67:5
came (3)
21:18;51:13;73:20,
25;74:14
campaigns (1)
111:22
can (43)
6:18;8:9,18;9:3;
12:24;14:11;23:3,4;
24:10;26:9;52:13;
62:13;68:24;69:24;
70:10,18;81:16;83:19;
84:24;85:2;88:9;91:3;
92:3,9,10;97:6;99:18;
101:6;102:5;105:24;
108:11;113:13,15,16;
114:23;118:13;121:16,
25;122:22;123:13;
124:3,17;128:14
car (1)
6:15
care (2)
66:11;114:11
CarFax (1)
41:5
carries (1)
100:6
carrying (1)
83:3
case (21)
3:4,7;4:5;9:10,22;
16:15,17;17:23;18:5,
11;25:7;36:23;39:2;
45:22;46:9;51:2;65:25;

77:20;106:14;109:13;
127:17
cases (1)
17:22
catch (1)
105:4
cause (4)
65:17;80:3,6;111:2
caused (2)
47:15;108:21
causing (1)
95:10
CD (1)
19:1
ceiling (5)
58:25;59:1,2;62:16;
63:3
certain (6)
74:9,11;114:15;
118:14;121:23,24
certainly (14)
10:20;20:19;59:7;
61:19;62:13;68:23;
83:13;104:11;106:19;
113:13;117:9;120:22;
121:2;122:21
Certificate (2)
34:1,10
cetera (1)
99:11
challenge (1)
88:23
Change (8)
21:25;23:1,7,9;105:9,
24;106:10;119:6
changed (8)
44:22;45:3;47:20;
49:23;54:23;55:3,18;
118:1
changes (3)
13:22,25;72:24
chapter (8)
51:20,21;54:5,7;
56:11,18;88:18;90:13
characterizes (1)
83:7
Cherokee (1)
42:2
Cherokees (1)
42:2
choose (2)
55:23;109:4
chose (2)
58:3;65:14
chosen (1)
58:8
Chrysler (44)
21:12;23:12;29:20;
35:6;38:23;40:17;41:3;
43:19;50:21;51:9;52:5,
23;53:7,14,22;55:6,13,
19,23;56:2,15,21;57:7,
25;59:20;61:18;65:13;

73:15;79:20;87:14,16;
88:6;89:17;98:1;99:8,
15;111:15;112:3;
113:24;114:12,16,24;
117:8;119:19
Chrysler's (6)
38:14;41:19;42:12;
59:8;100:17;115:16
Circle (3)
4:9;28:1,4
circuit (1)
108:20
circumstances (2)
101:19;111:23
cite (2)
39:17;88:16
cited (5)
23:21;54:5,7;56:9;
88:17
cites (1)
103:5
citing (2)
39:23;104:8
Claim (2)
37:6,10
claims (1)
111:15
classification (1)
36:13
clause (1)
53:3
clear (3)
31:18;46:24;58:20
clearer (1)
67:16
clearly (1)
68:10
client (6)
9:12;29:1;33:15;42:9,
16,18
clients (2)
6:20;103:23
close (1)
94:22
co-authors (1)
91:5;103:20
collateral (1)
127:3
colleagues (1)
91:23
collect (1)
85:3
collected (1)
45:22
collided (1)
18:6
collision (5)
18:6,9;85:13,18;86:1
collisions (2)
41:7,9
color (3)
60:6,7,20
colored (1)

70:6
coloring (1)
60:3
Comm (1)
29:13
commences (2)
46:8;85:10
comment (5)
102:17;103:1;109:20;
111:13,25
comments (3)
12:14;68:13;127:12
commercial (1)
92:23
committee (5)
89:6;91:9;124:1,7,19
commonly (1)
63:13
Commonwealth (1)
3:20
communicate (6)
58:6;93:5;96:19;
105:16;106:13;118:8
communicated (1)
78:4
communicating (3)
57:12;122:25;124:25
communications (1)
108:25
companies (1)
7:1
company (5)
6:8,9;104:5;105:1,5
compare (1)
25:17
comparison (2)
73:1,7
complaint (3)
33:4;67:2,6
complaintpdf (4)
67:4,6;69:16,17
complete (2)
43:7;54:6
completely (9)
22:16,16;78:16,17;
114:4;119:11,14,15;
124:2
completes (1)
129:6
compliance (4)
21:8;22:11,15,23
compliance-related (1)
21:20
compliant (1)
91:7
complied (1)
118:17
comply (7)
22:19;38:13;89:11;
105:18,25;106:17;
119:1
complying (1)
22:21

comprehension (3)
92:15,15;93:4
computer (1)
60:7
conceivable (1)
120:13
concepts (1)
76:20
concerned (2)
89:18;128:1
concerning (1)
82:25
conclude (2)
100:1;117:23
concluded (1)
78:9
conclusion (3)
112:15,17,19
conclusions (1)
118:11
condition (2)
65:18;79:19
conducted (1)
104:1
Confidentiality (1)
7:4
confine (1)
81:16
confirm (4)
7:21;26:12;48:23;
96:6
confirmation (1)
7:10
conflating (1)
115:12
conflict (1)
124:18
conform (3)
37:19;38:22;122:18
conjunction (1)
5:2
connection (1)
48:17
consensus (1)
125:7
consent (4)
119:3,10,12,16
consequences (3)
78:8;118:9;119:6
consider (1)
23:16
considered (2)
63:7;122:19
consistent (6)
60:10;65:14;87:18;
103:6,9;118:6
consistently (2)
115:10;116:6
conspicuous (4)
55:7,12;103:12;
122:24
constituted (1)
121:4

consult (2)
76:14,15
Consulting (6)
4:15;5:11,12,17,21;
18:12
consume (1)
121:9
consumer (5)
17:23;33:5;77:13,15;
92:23
consumers (2)
96:20;109:8
contact (3)
9:12,12;41:2
contacted (2)
9:22;40:18
contain (1)
72:20
contained (8)
16:2;19:21,22;21:7;
32:23;40:8;49:13;
102:20
contains (4)
19:1,17;39:7;63:20
contemplated (3)
117:6,8,13
contemplating (1)
61:9
contemporaneously (1)
44:19
contemporary (5)
51:15;88:5,12;98:5,7
contend (1)
89:16
contents (2)
21:10;25:15
context (7)
5:7;6:18;79:6;83:8;
104:11;110:17;127:23
continue (1)
88:6
continuously (1)
87:2
contrary (6)
87:15,15;88:4;106:7,
22;113:25
control (2)
36:13;66:11
controller (1)
108:21
convenient (1)
51:17
conveniently (1)
108:12
convention (2)
9:3;89:22
conventions (5)
125:8,10,12,18,24
convey (1)
53:7
copy (17)
9:7,10;10:8;13:1,11,
12,14;14:15;16:16;

18:25;25:19;36:6;
39:17;46:12;60:21;
98:23;99:2
corporate (1)
100:17
corrected (1)
119:23
correctly (23)
5:16;17:7;21:5;24:4;
25:12;35:20;37:9;
39:10,14;53:2;54:24;
70:1,12,16,20;71:22;
73:17;86:2;87:3;88:10;
94:2;95:25;99:12
corresponding (1)
26:8
cost (1)
55:9
Council (1)
88:14
Counsel (3)
3:8;9:7:22
couple (2)
104:20;110:21
course (5)
46:3;63:11,24;78:5;
95:19
Court (4)
3:6,15,16;8:22
cover (4)
49:12;76:3,4;128:21
covered (1)
55:1
CPE (3)
13:4;14:5;15:3
create (1)
65:17
created (2)
38:6;51:5
creating (1)
106:11
criteria (7)
78:24;82:24;83:2,11,
21;84:1,10
criterion (1)
83:7
criticism (2)
106:24;112:25
criticizing (1)
47:2
critique (1)
116:13
currently (1)
6:20
Curtis (3)
3:4;18:24;55:16
custody (1)
66:11
customer (1)
40:24
CV (13)
9:7;10:13;13:3,11;
14:19,19,23;15:1,2;

19:24,25;20:1;98:21

### D

D2 (3)
52:18;53:12,13
damage (1)
80:6
dash (5)
69:9;72:6;99:10;
100:3,7
dashes (1)
41:23
date (28)
9:1;10:3;12:8,22;
13:7;14:9,20,23;15:6,
13,16;16:20;17:2,14;
19:15;20:13;61:4;
66:17;67:2,6,16;68:4,
22;69:7,13,20;78:18;
102:24
dated (24)
9:17;11:15;12:19;
13:4,15;15:1,3,9;16:22,
24;17:6,8,11;20:11,11;
36:14;39:8,8;48:15;
66:23;67:7;68:12,19,22
dates (1)
20:10
day (1)
77:24
DC10699 (1)
41:23
deadlines (1)
8:22
dealer (1)
76:15
Dealers (1)
100:19
dealing (2)
40:18;128:1
dealt (1)
96:17
decal (1)
75:20
decals (3)
52:24;53:8;56:3
December (6)
66:15,16,23;67:8,16;
104:25
decided (2)
61:18;98:1
deciding (2)
108:9,14
decision (3)
115:8;117:9,12
decisions (1)
108:15
DEF (1)
102:10
defect (25)
47:13,19;48:1,7,8,11,
12;51:4,4,10;52:7;65:9,

10,13,16,20,23;95:10;
100:14,15;108:20;
111:1,1,23;112:15,19
defective (3)
37:18;52:10,19
defects (3)
95:2,2;111:21
defendant (3)
3:4,8;104:24
defense (7)
18:17;21:18;24:11;
27:18;102:10;103:23;
104:2
degrees (1)
13:20
depending (1)
50:10
depends (6)
75:12,14;95:4,5,6;
121:10
depict (1)
60:8
deploy (12)
47:15;69:25;70:10;
78:2;85:12,16,25;88:9;
107:19;116:19;118:13;
119:18
deployed (4)
24:25;30:2;47:9;
94:23
deployment (45)
31:9,23;32:1,5,15;
43:2,44:6;47:23;48:7;
50:23;52:12;53:16;
56:16;57:9;63:21;64:2,
10,15;65:11;66:10,21;
70:9;80:1,14,23;81:4,
19;82:7,10,14;107:15,
17;108:22;110:19;
111:12;112:7;113:7,15,
17;114:21;115:9;
117:10,14;122:7,15
deployments (3)
29:22;66:14;112:10
deploys (2)
70:18;117:7
Depo (1)
30:20
depos (1)
18:22
deposed (1)
18:14
deposition (24)
3:2,11;4:2;7:21;8:24;
9:4,14,25;10:5;12:5,12,
15;14:6,17;19:12;
20:12;45:20;73:22;
81:7;101:22;102:10;
109:1;110:23;129:7
depositions (7)
18:23;19:2,3,18;20:5,
14;47:18
describe (2)

53:13;96:7
**described (1)**
101:7
**describing (3)**
87:25;100:12;108:14
**deserve (1)**
78:22
**design (45)**
6:3;7:18;41:17,19,19;
46:22;47:5;48:7,11;
51:4,8,16;65:9;77:8,12;
88:22;89:13;90:6,7;
94:19;100:14;101:19;
106:15;108:6,11,22;
109:2,5,18;110:25;
111:1,6;112:16,20;
115:16;116:1;117:5,9,
12;120:25;121:3;123:3,
6;126:12;127:2
**designed (11)**
46:21;47:4,14;85:12,
15,16,20,25;107:20;
111:15,16
**designer (2)**
106:14;108:14
**designers (1)**
92:25
**designing (4)**
92:22;104:5;109:10;
121:7
**designs (1)**
116:18
**desire (3)**
89:15;90:4;122:1
**despite (1)**
109:9
**detects (1)**
86:25
**determine (7)**
4:25;76:23;77:14;
78:22;80:18;82:17;
110:5
**determining (3)**
79:3;83:22;84:6
**develop (1)**
58:5
**developed (1)**
91:5
**developing (3)**
92:22;93:1;104:6
**development (3)**
6:3;7:18;90:15
**diagnostic (1)**
24:14
**dictating (1)**
89:23
**differ (2)**
73:8,9
**different (18)**
6:5;19:9;25:24;26:18,
21,21;39:3;58:22,23;
61:13;73:4;74:16;
99:21;112:7;115:13;

117:23;119:1;125:5
**differently (2)**
86:12;89:9
**differs (2)**
8:10;72:21
**difficult (1)**
34:5
**digit (1)**
68:7
**dilute (1)**
121:16
**diluting (1)**
121:13
**direct (2)**
27:20;81:17
**directed (1)**
122:12
**directly (2)**
122:6,12
**directory (2)**
30:22;38:1
**disagree (6)**
91:13;115:22;123:18;
126:1,4,8
**disagreements (1)**
102:2
**disagrees (2)**
120:7,11
**disc (1)**
8:10
**disclose (1)**
7:5
**Discovery (6)**
20:22,22;21:16,19;
30:25;39:1
**Discovery' (1)**
20:15
**discuss (2)**
8:18;128:13
**discussed (4)**
19:19;45:3;66:22;
128:24
**discusses (2)**
84:1;95:9
**discussing (3)**
21:22;32:21;93:22
**discussion (1)**
108:8
**dismiss (1)**
22:16
**dispute (1)**
127:21
**District (2)**
3:5,6
**Docs (3)**
20:23;21:16;30:25
**document (31)**
9:5,11;10:9,23;25:22;
26:4;27:2,9,12,22;
36:22;40:12,16,21,23;
41:10,15;42:6,11,15,20,
23;44:14;45:4;67:3,5,
14;68:8;69:9,15;102:15

**documents (20)**
10:24;16:6;20:22;
21:16,19;23:3,22;25:18,
24;26:1,3,7,21,23;39:1,
4;40:9;43:6;67:10;
68:15
**done (18)**
5:1;6:14,15,17;7:12;
36:23;46:14,17;54:6;
56:8,12;63:17,18;
86:12;96:5;103:7;
113:19,20
**door (1)**
86:17
**Dorris (11)**
18:19;49:10;102:12,
19,21;105:7;107:10,23;
116:13;119:11;124:1
**Dorris's (11)**
48:19,22,24;49:5,5;
51:25;101:24;102:3;
103:2;106:25;118:3
**doubt (5)**
109:14;114:19,23,24,
24
**down (6)**
5:15,24;9:15;62:4;
68:2,17
**dozens (1)**
23:22
**Dr (8)**
3:3;49:5,10;101:24;
102:3;106:25;117:24;
126:17
**draft (2)**
19:7;49:15
**drafted (2)**
53:25;54:11
**drafting (2)**
49:21;90:9
**drafts (1)**
19:18
**drawing (2)**
24:24;36:7
**Drawings (2)**
24:17,20
**driver (1)**
97:17
**drop (1)**
46:12
**DropBox (6)**
16:2,4;19:1,23;20:2,3
**DSC0001 (1)**
34:17
**DSC0021 (1)**
34:17
**DSCN1973 (1)**
24:3
**DSCN2119 (1)**
24:3
**due (1)**
16:6
**duly (1)**

3:19
**during (1)**
7:5
**duty (2)**
76:5,7
**DVD (2)**
19:11,13,17,22;46:10

## E

**E2 (1)**
53:11
**earlier (12)**
6:12;9:16;78:13;81:7,
13;87:9;93:22;94:12;
96:23;97:18;99:25;
109:1
**Early (1)**
101:22
**easier (2)**
23:19;106:11
**edit (1)**
44:25
**edited (1)**
51:19
**editing (4)**
13:23;14:3,3;51:21
**effect (2)**
110:7;124:5
**effective (17)**
55:6,11;57:12;58:5;
65:24,25;89:18;94:21;
95:13;96:20;99:19,24;
100:1;106:21;122:22;
123:7,9
**effectiveness (13)**
91:6;103:8,24;118:5;
123:12,17,20,23;
125:13,16,19,21,23
**effects (1)**
110:4
**efficacy (1)**
106:2
**efficient (1)**
20:8
**effort (1)**
55:9
**efforts (1)**
109:9
**E-files (1)**
25:3
**either (10)**
47:14;63:25;71:6;
72:20;87:2;92:13;
107:11;112:15;118:22;
124:5
**electronically (1)**
8:9
**elements (1)**
83:2
**eliminated (3)**
51:10;94:19;108:11
**Elizabeth's (1)**

39:7
**else (5)**
19:21;20:19;67:23;
91:25;127:11
**email (1)**
75:6
**employ (1)**
58:5
**employed (2)**
4:11;65:15
**enclosed (1)**
68:15
**encountered (1)**
63:19
**end (1)**
86:24
**ended (1)**
44:25
**engage (1)**
71:8
**Engineering (1)**
88:21,22
**enough (1)**
8:5
**ensure (6)**
93:4;103:12;105:22;
114:17;118:7,14
**ensured (1)**
55:13
**entire (3)**
93:12,20;117:2
**entirely (1)**
124:22
**entitle (1)**
10:21
**entitled (22)**
8:20;20:21;21:25;
23:1,7,12;24:16;51:1;
27:2;32:24;34:16,20;
35:18;38:8;39:13,25;
40:5,21,23;42:11,15;
67:14
**entity (2)**
4:14,15
**entry (2)**
67:19,20
**environments (1)**
6:5
**EQ10051584-5461 (3)**
67:12;69:3,4
**EQ10051584-6750 (2)**
67:15;69:10
**Esquire (2)**
3:9,10
**essentially (1)**
39:19
**establish (1)**
96:6
**et (2)**
99:11;103:6
**ethical (1)**
124:22
**evaluating (2)**

91:5;92:14
evaluation (1)
   93:3
even (4)
   76:1;79:19;85:4;
   122:3
event (2)
   80:5,22
everyone (1)
   106:12
evidence (5)
   75:3;117:22;118:10,
   15,24
exact (1)
   25:19
exactly (6)
   8:12;58:21;67:8;
   87:12;96:18;120:7
EXAMINATION (1)
   3:23
examined (1)
   3:21
example (29)
   6:2;10:22;25:22;
   28:5;35:5;37:24;40:16;
   52:17;53:17;55:19;
   56:2,20;58:8;59:5,6,11,
   18;61:11,15;62:11;
   72:2;97:6,13,18;99:10,
   25;100:10,13;101:13
examples (6)
   57:16;58:15;71:20,
   24;101:2,4
except (1)
   7:24
excerpt (1)
   86:20
excessive (3)
   120:19,23,24
exclamation (2)
   60:15;70:9
exclusion (1)
   51:23
exclusively (1)
   104:12
excuse (1)
   51:18
executive (1)
   124:1
exemplar (1)
   70:4
exhibit (39)
   9:23;10:1;12:6,20;
   13:5,9;14:7,17,24,25;
   15:4,7,14;16:18,25;
   17:12;19:13;45:7,19;
   48:14,15;49:14,18;
   52:16;60:19,23,24;
   61:2;69:1,5,11,14,18,
   22;70:6;71:11;102:19,
   22;104:21
exhibits (2)
   12:10;71:18

exist (1)
   95:7
existing (1)
   126:6
exists (2)
   62:25;77:19
experience (1)
   125:10
experienced (5)
   31:22;32:15;64:10;
   80:13;81:18
expert (7)
   5:3;12:18;14:5;
   18:17;61:1;89:20;
   109:15
expertise (1)
   110:10
experts (6)
   47:13,24,25;65:9;
   103:21;110:24
explain (3)
   5:4,9;91:3
explanation (1)
   47:22
explicit (3)
   55:7,12;105:23
explicitly (1)
   98:13
explored (1)
   63:7
Exponent (1)
   103:21
exposure (1)
   77:24
express (1)
   37:19
expressing (1)
   124:24
EXPT (1)
   102:11
extent (4)
   48:4;108:19;123:15;
   126:17
extra (1)
   83:3

F

fabric (4)
   62:15;63:2,5,8
facsimile (1)
   68:11
fact (8)
   47:13;54:8;55:1;
   77:25;87:13;110:6;
   123:25;125:20
factor (1)
   83:15
factors (11)
   5:12,17,20,23;83:5,5;
   84:6;88:22;120:18;
   121:8;123:19
facts (3)

5:4;51:1;95:6
failed (2)
   38:13;88:7
fails (3)
   22:19;38:22;108:9
failure (6)
   17:24;37:18;52:7;
   110:4;111:9;118:3
fair (12)
   21:10;23:5;26:14;
   38:6,17;43:23;47:23;
   54:3;56:8,12;81:5;
   97:10
familiar (4)
   10:6;76:16;92:21;
   94:10
family (1)
   126:13
far (5)
   15:17;21:12;33:10;
   45:1;110:11
farther (1)
   115:5
fault (3)
   111:14,17,18
fax (1)
   68:9
FCA (18)
   3:5;4:2;26:5;27:17,
   23;28:15;29:20;35:5;
   38:10;51:9;52:5;57:20,
   21;65:13;87:16;89:17;
   112:3;117:25
FCA's (1)
   57:25
features (1)
   59:9
February (8)
   12:19;13:1,16;14:14,
   21;44:17;54:22,23
Federal (3)
   22:24;54:2,9
feedback (3)
   91:12,16,18
few (2)
   46:2;121:22
field (3)
   89:21;98:8;110:9
figure (3)
   14:18;31:3;97:16
file (25)
   8:5;10:5,9,11,18,21;
   15:8;16:13;18:16,17,
   22;19:22;20:6;23:8;
   24:18;30:11,12,14,19,
   20;33:9;38:1;45:13,21;
   102:20
filed (3)
   3:5;67:2,6
files (4)
   24:17;34:7;38:3;
   41:16
fill (1)

9:11
final (1)
   19:8
find (7)
   13:17;23:6;30:11;
   31:4;52:5;98:23;104:8
finding (3)
   83:18
findings (3)
   57:2,3;101:24
fine (2)
   61:20,23
first (30)
   3:19;8:13,14,20;9:11;
   19:16;21:3;29:4,7;34:7;
   40:16;52:8;53:21;
   54:11,20;56:1,2,14;
   60:3,22,25;66:14;77:2;
   85:23;99:4;102:12,17;
   103:1;107:2;126:23
five (1)
   84:14
fix (1)
   52:7;65:13
fixed (3)
   65:20;77:8;109:2
fixing (1)
   51:10
flat (1)
   125:16
FMVSS (7)
   22:20;25:11;26:3,22;
   93:11,16;95:18
FMVSSs (1)
   22:22
focuses (1)
   108:3
folder (59)
   8:14;13:18;20:15,21;
   21:1,3,7,15,25;22:25;
   23:7,12,15,24;24:16;
   25:4,9,11,15,20,23;
   26:8,8,22;27:2,4;28:19,
   22;29:10,12,14,15;
   30:17,18;32:24,25;
   33:20,23;34:8,11;38:8,
   25;39:6,12,16,19,20,25;
   40:4,5,8,11,12;45:13;
   46:13;67:1;69:2;102:11
folders (5)
   8:11;23:3;24:2;34:6;
   43:7
Foley (3)
   56:10,11,11
Foley's (1)
   90:12
folks (1)
   76:1
follow (1)
   29:4
followed (4)
   9:8;105:13,21;106:5
following (5)

69:9;70:2;71:17;
   105:8;126:4
follows (1)
   3:22
font (11)
   61:5,17,18,22;62:1,2,
   5,7,9,11;97:24
fonts (1)
   62:13
Forensic (13)
   4:16,17,20,21,21;
   6:10;12:19;16:23;
   17:10;46:17;103:21;
   104:11,15
foreseeable (7)
   77:4;79:12;94:15;
   98:14,16;110:7;117:11
forget (1)
   102:18
forgot (1)
   54:13
forgotten (1)
   51:22
form (10)
   6:9;7:24;9:10;16:15,
   17;49:1;68:10,11;75:7;
   110:20
formal (1)
   19:8
formally (1)
   124:13
format (3)
   123:6,6;126:12
formats (1)
   122:21
formatting (10)
   25:25;59:10,19;
   89:13;90:6;125:7,9,11,
   17,24
formed (5)
   4:14;6:11;38:21;
   58:14;128:25
forming (2)
   6:7;50:20
forth (2)
   39:5;41:8
found (3)
   47:13;57:11,21
four (5)
   24:17,20;68:24;
   128:7,8
four-year (1)
   14:12
frankly (2)
   75:16;83:18
frequency (2)
   77:16;80:9
frequently (1)
   100:21
Front (2)
   3:12;76:3
frontal (8)
   31:22;32:5,15;81:4,

20;82:7,14;107:16
fuel (3)
18:1,2,3
full (1)
4:6
fully (1)
70:14
funded (1)
104:2
further (2)
68:17;129:2
Furthermore (1)
99:6

**G**

Gary (2)
3:8;4:1
gave (1)
97:24
geared (1)
105:19
gel (3)
18:1,2,3
general (6)
14:3;23:4;96:19;
121:12,15,17
generally (4)
8:18;24:23;78:1;
106:6
generated (5)
9:18;11:6;15:20;
18:13;25:6
George (1)
88:23
given (3)
52:7;53:15;115:6
giving (1)
42:5
goal (1)
115:6
goals (2)
115:20;116:9
goes (1)
94:11
Good (3)
3:25;14:18;50:24
government (1)
114:1
grabbing (1)
103:13
grammar (1)
45:1
grammatical (1)
13:22
Grand (2)
42:1,2
guarantee (1)
44:24
guard (1)
77:12
guarded (1)
108:12

guarding (3)
94:19;120:25;121:3
guess (1)
19:23;27:7;41:8;
47:3;54:19;67:25;
73:11;85:2;121:5
guidance (5)
90:3;122:1,3,6;127:2
Guide (2)
29:13;92:24
guidelines (8)
79:3;88:5;89:1;90:6;
96:12;98:6,8,13
Guides (3)
27:5;28:20;33:12
guys (1)
46:1

**H**

half (2)
84:17;128:5
Hammond's (1)
88:18
hand (5)
6:22,24;9:23;12:23;
13:9
handed (2)
8:10;19:10
handwritten (1)
68:18
Hanneman (1)
19:5
happened (4)
4:25;5:1;87:15,19
happy (3)
23:1;30:21;102:8
hard (3)
10:8;14:15;98:23
harder (1)
124:6
hazard (33)
51:5,10;55:16;58:1,4;
65:19;77:11,16,17,18,
19;78:3,6,8;79:18,23,
23,25;80:1,3,3,5;89:19;
90:1;94:18;107:13,14;
110:2;116:1;117:2;
118:9;119:5,13
hazardous (2)
65:17;77:2
hazards (18)
51:6;53:15;77:3;79:6,
11;89:15;90:5;94:14,
17;98:14,15;108:11;
114:13;120:14,24;
121:2,7;122:2
heading (4)
26:3,9;95:13;107:3
headliner (18)
57:16;58:9,19,24;
62:17;63:3,9,14,16;
64:24;96:6,15,22,24;

97:4,15;99:10;100:2
heard (1)
76:19
heavily (1)
103:22
Hebert (29)
3:8,24;4:1;7:20;
11:11,17,23;14:25;15:7,
23;16:14,21;17:5;31:3;
46:3,9;60:18,24;69:1,8,
14;84:16,19;85:2;
102:18;128:6,9,14;
129:2
heeded (1)
96:8
held (1)
3:11
help (2)
6:2;110:5
helpful (1)
109:8
Helvetica (1)
62:7
herein (1)
3:19
herring (1)
115:23
hidden (2)
53:15;97:21
hierarchy (3)
51:8;77:6;94:16
high (1)
77:24
highlights (1)
102:15
Highway (1)
64:13
Hille (3)
19:4;34:11;44:17
H-I-L-L-E (1)
19:4
historical (1)
104:7
History (8)
14:5,13;41:6;42:5;
80:12,17;90:10;104:20
hold (1)
50:17
holding (1)
19:1
Honda (4)
72:15,16,17;73:5
hope (1)
5:15
hopefully (1)
85:3
hopes (1)
81:16
hoping (1)
8:11
Hospital (1)
39:8
hour (5)

81:14;82:23;84:14,
18;128:4
hours (1)
128:24
hub (1)
24:24
human (7)
5:12,17,20,22;88:22;
120:18;121:8
hurdle (2)
75:21,22

**I**

IBM (1)
92:22
icon (1)
60:14
idea (3)
16:9;50:24;119:17
identification (17)
10:2;12:7,21;13:6;
14:8;15:5,15;16:19;
17:1,13;19:14;33:5;
61:3;69:6,12,19;102:23
identified (23)
9:24;16:15;40:4;
44:14;45:6,19;47:22;
48:13;49:14,18;65:5;
69:21;70:5,5;77:5;
79:19,24;81:3;111:21,
24;117:11;121:6;
128:24
identify (22)
8:6;12:25;13:10;
14:11,16,18;16:14;
19:11;20:9;32:13;
44:10;47:19,25;48:1;
55:16;58:1;69:2;79:11;
82:5;94:14;97:3;114:13
identifying (3)
16:12;77:3;79:6
ignition (4)
47:16;69:25;70:11,
14,22,25;71:4;86:16
ignore (1)
119:15
illuminated (1)
111:10
illustrate (1)
71:18
illustration (1)
70:5
imagine (4)
27:18;64:17;83:13,19
IMG2158 (1)
34:15
immediately (1)
20:17
implemented (1)
112:3
implementing (1)
94:16

importance (1)
84:6
important (12)
80:8;83:3,8,12,12,14,
14,22;84:2,10;122:25;
123:2
improve (1)
124:6
inaccurate (1)
126:22
inadvertent (49)
29:19,21;30:1;31:9,
22,25;32:4,15;43:1;
44:5;50:22;52:12;
53:16;56:16;57:9;
63:21;64:2,10,15;
65:11;66:10,13,20;
70:8;80:1,14,19,23;
81:4,9,18;82:7,10,13;
107:15,17;108:21;
110:18;112:6,10;113:6,
14,17;114:20;115:9;
117:10,14;122:7,14
inadvertently (7)
47:15;78:2;88:9;
116:19;117:7;118:13;
119:18
inappropriate (1)
126:19
incidences (2)
42:17;81:8
incident (18)
4:25;5:5;31:8,9,20;
32:13;35:10,16;40:19;
41:3;42:10,14,25;
80:25;81:3,23;82:6;
118:2
Incidents (6)
30:15;32:10,21,25;
67:2;69:2
include (10)
49:8;56:15;71:7;
91:13;92:24;108:9,15,
16;115:8;119:5
included (8)
50:21;53:22;54:1;
57:24;59:16;91:10,11;
112:1
including (7)
52:11;55:7,12;88:16,
18;117:24;123:23
inconsistent (4)
50:4;103:25;104:4,6
incorrect (2)
11:8;9:96:2;126:19
incumbent (1)
65:18
indeed (5)
10:11;19:17;26:12;
28:14;47:6
independent (3)
103:7,16,19
indicate (1)

107:10
**indicated (2)**
12:2;101:22
**Indicating (1)**
60:12
**indicator (3)**
71:20,25;111:10
**individual (1)**
106:16
**individual's (1)**
105:10
**industry (5)**
78:25;115:11,14;
126:8,11
**infer (1)**
120:16
**inference (1)**
122:9
**inferring (1)**
120:10
**infers (1)**
121:22
**influenced (1)**
104:2
**inform (5)**
65:19;77:13,15;
109:5;119:20
**information (26)**
24:14;29:18;35:4,5;
36:24;41:2,17;55:15;
57:13;58:6;59:19;
61:12;76:18;78:17;
87:14,16;91:12;100:22;
103:3,11;105:24;107:5;
112:24;115:19;119:8;
123:1
**informational (1)**
101:4
**informed (5)**
112:25;119:2,10,12,
16
**informing (2)**
99:20;119:5
**inherent (1)**
90:5
**initial (9)**
48:13;49:21,24;
50:15;52:9;56:6;61:1;
90:9;93:10
**injured (3)**
55:17;94:25;118:14
**Injury (8)**
70:18;77:21;80:1,6;
83:13;86:13;90:5;95:10
**inquiry (2)**
9:10;40:24
**inside (1)**
21:22
**insignificant (1)**
55:10
**Inspection (4)**
27:2,10,21;100:16
**Install (3)**

27:4;28:20;33:12
**instance (4)**
80:12;86:9,13;87:7
**instances (4)**
112:6,14,18;113:6
**instead (1)**
54:4
**instrument (1)**
22:8
**insufficient (2)**
117:22;120:20
**Intake (2)**
16:15,17
**intend (1)**
28:23
**intended (5)**
86:5;89:14;93:5;
103:10;128:21
**intends (1)**
125:4
**intent (9)**
22:22;53:11;105:17;
124:17,18,21,23;126:2,
5
**intention (8)**
10:18,20;38:15,18;
45:12;53:6;85:19,21
**intentions (1)**
109:9
**interests (1)**
71:19
**interior (4)**
59:1,2;62:16;63:3
**Internal (1)**
38:8,14,22
**Interog (1)**
38:25
**interrogatories (1)**
39:3
**interrupt (1)**
84:25
**in-the-vehicle (1)**
66:1
**into (4)**
7:20;28:19;37:25;
67:1
**introduction (1)**
71:15
**in-vehicle (5)**
55:13;59:23,24;
61:14;87:10
**investigate (6)**
4:24;90:10;113:4,5,
12,13
**investigated (1)**
127:15
**investigative (2)**
4:22;42:13
**Invoice (5)**
16:22,23;17:4,6,10
**invoices (2)**
9:18;17:15
**involve (1)**

82:6
**involved (9)**
31:14;32:4,10;33:6;
41:7;79:14;85:13,17;
86:1
**involving (13)**
17:24;29:22;30:1;
31:9,12;32:1,14,22;
43:1;80:22;81:4,13;
82:13
**irrelevant (1)**
22:17
**irrespective (1)**
71:8
**issue (20)**
5:5;47:11;94:5,6,18;
98:9;108:23;109:19;
110:3,25;111:3;115:1,
16;116:11;117:15;
119:15;121:5,6;127:24,
25
**issued (5)**
12:1,2;17:16;47:2;
48:14
**issues (8)**
13:22;29:18,19;
48:18,21,24;49:12;
111:21
**issuing (1)**
114:7
**Item (12)**
11:4;27:1;33:25;
34:20;35:18;36:9;37:1;
39:12;43:15;45:16;
98:4;105:6
**items (8)**
8:19;16:12;18:18;
21:11;39:7,22;71:16;
80:7
**IT-related (1)**
104:5

**J**

**January (2)**
14:13;105:3
**Jeep (48)**
21:4,9,11,22;25:15,
20,23;26:2;29:23;
31:10,21;32:1,7,22;
34:23;35:6;41:21,25;
42:1,2,3;43:2,22,25;
44:3,11;55:8,14;58:7;
62:17;63:2;65:3,6;66,6,
10;72:22;73:4,16,20;
74:14;77:22;80:23;
81:9,25;82:9;88:7;
117:5;126:24
**Jim (1)**
56:11
**job (1)**
106:14
**John (3)**

3:9;4:7;44:18
**JPEG (2)**
38:3,5
**JPEGs (1)**
29:2
**Jr (6)**
3:3,4;4:7;13:4;14:4;
15:3

**K**

**keep (2)**
13:8;84:19
**keeps (1)**
114:8
**key (3)**
47:16;71:5;86:16
**kind (6)**
8:4;44:25;81:5;
100:7;102:4,5
**knew (2)**
51:20;54:13
**knowing (1)**
77:18
**knowledge (1)**
113:16
**known (6)**
109:13,18,21,24;
110:17;111:5
**knows (2)**
113:6,14

**L**

**Label (31)**
35:21;36:2;57:23;
61:6,8,9,10,11,14;70:4;
76:24;87:11;96:6,21;
97:3,15,20,23,24;99:17,
24;100:3,7,7,11,25;
101:8,10,21;111:24;
119:1
**labeling (6)**
50:8;59:3;72:23;
73:3;89:22;96:15
**labels (11)**
63:8,16;90:11;92:11;
96:23,25;97:1;101:4;
107:6;111:22;118:23
**larger (2)**
61:18,23
**largest (1)**
104:5
**last (13)**
13:20;22:2;29:5,8,10;
42:15;45:16;71:16;
73:11;95:17;116:17;
128:20,23
**latent (1)**
53:15
**later (1)**
78:18
**latest (1)**

16:8
**Laughery (1)**
88:18
**lawsuit (1)**
5:3
**Lawyers (1)**
128:9
**layperson (1)**
92:7
**laypersons (1)**
58:22
**lead (1)**
110:14
**learned (1)**
54:7
**least (8)**
17:21;21:12;25:25;
35:7;51:11;61:16;
65:23;83:12
**leave (3)**
103:15;109:20;112:5
**left (4)**
66:11;108:12;128:7,8
**legal (1)**
4:15
**length (1)**
86:15
**less (1)**
121:9
**letter (2)**
10:22;40:17
**level (1)**
104:1
**levels (2)**
6:5,19
**liberty (41)**
6:25;21:4,9,11,22;
25:15,20,23;26:2;31:10,
21;32:1,7,22;34:24;
36:17;41:21,25;43:2,22,
25;44:3,11;55:8,14;
58:7;62:17;63:2;65:3,6;
66:7,10;72:22;73:4;
80:23;81:10,25;82:9;
88:8;117:6;126:24
**Libertys (3)**
29:23;42:3;77:23
**lifting (1)**
6:21
**light (3)**
22:6,7;87:1
**lights (5)**
22:4;71:21,25;72:6,
10
**likelihood (1)**
77:18
**likely (4)**
27:18;77:22;80:5;
121:9
**limitations (1)**
66:2
**line (1)**
126:13

**list (5)**
10:13;42:16;56:1;
82:12,15
**lists (3)**
34:6;54:20;71:16
**literature (9)**
83:6,20,20,25;84:5,9;
94:6,10;96:13
**litigation (4)**
5:7;7:5;46:23;47:1
**litigation-related (1)**
4:18
**little (8)**
6:11;23:19;67:15;
68:2;74:16;81:12;91:3;
93:6
**Livernois (1)**
18:19
**LLC (5)**
3:5;4:2,16;6:11;26:5
**location (7)**
33:5;51:17;52:6;56:7,
20,25;58:19
**locations (2)**
57:5;58:15
**long (1)**
89:20
**longer (2)**
50:17;110:12
**long-term (1)**
89:21
**look (8)**
8:12;30:21;52:17;
72:2;77:16;82:2;102:8;
113:16
**looked (7)**
41:6;51:1;93:13;
96:16,18;120:2,3
**looking (10)**
10:10;20:10;25:18;
26:10;52:16,22;54:19;
67:3,10,18
**looks (21)**
8:21;10:6;13:11;
14:12;16:22;18:17,22;
24:13;25:5;26:1;27:16;
29:1;43:21,24;44:13;
45:4;67:16,24;68:6,9,23
**lost (1)**
66:19
**lot (1)**
106:11
**Louisiana (1)**
3:6
**low (1)**
30:2

**M**

**M35 (1)**
43:20
**M35pdf (2)**
43:10,16

**main (1)**
37:25
**maintained (1)**
108:5
**maintenance (1)**
100:20
**makes (8)**
98:5;112:14,17;
115:7,21;116:9;121:21;
122:23
**making (3)**
57:22;59:14;122:8
**malfunction (7)**
86:6,9,11,25;94:1;
98:9;109:11
**malfunctions (4)**
93:23;94:7,10;98:13
**Managers (1)**
88:21
**mandate (3)**
114:10,19,23
**mandated (2)**
90:10;114:12
**manner (2)**
106:15;119:7
**manual (5)**
42:6,7;56:24;58:13;
64:1;73:16,20,25;74:4,
6,9,11,14,18;75:5,11,15,
17,18,25;76:6,8,14;
78:11;83:24;84:7;
87:16;88:15;107:7,9,
12;126:18
**manuals (7)**
66:3;76:1;78:13;
126:22;127:4,6,9
**manufactured (7)**
47:14;63:12;107:20,
24;108:4;126:21,25
**manufacturer (24)**
6:23;46:15,18,20;
51:6;65:18;66:5,6,8,17;
78:4;79:20;89:17;
94:20;99:16;100:24;
101:11;104:15,24;
111:5;113:10;114:6,25;
116:22
**manufacturers (27)**
5:14;6:2,14,15,17;
7:13;64:5,9;82:3,17;
89:14;90:3;92:25;
95:19,20;104:3;112:8,
11,12;113:2,11,18;
116:7,22;122:1,12;
123:25
**manufacturers' (2)**
80:17;101:17
**manufacturer's (5)**
79:10;94:13;109:9;
114:2;115:2
**manufactures (2)**
6:21,22
**manufacturing (24)**

**48:8,12;51:4,16;**
65:10;77:8;80:18;95:1,
2,10;100:14;101:20;
103:23;108:23;109:3,5,
18,19;111:1,6;112:16,
20;115:16;116:2
**many (4)**
17:20;112:7,12;
127:22
**March (7)**
11:16;15:10,13,22;
17:8;48:15;67:25
**marked (22)**
9:25;12:6,10,20,24;
13:5,9;14:7,10;15:4,14;
16:17,24;17:11;19:13;
61:2;69:4,10,17;102:4,
7,21
**marking (1)**
46:10
**markings (1)**
28:10
**Marriottsville (1)**
33:6
**Maryland (1)**
33:6
**material (9)**
49:21;62:15,19,21,23,
25;63:13,14;127:3
**materials (14)**
8:5;10:12;16:2,4;
19:22;21:21,21;26:13;
33:10;38:1,9;45:22;
56:13;71:17
**matter (44)**
4:3;7:16;8:1,22;9:19;
10:12;11:6;12:1;13:2;
17:16;21:12,23;22:19;
23:17;24:22;26:13;
28:24;29:16,23;30:8;
33:21;35:3;36:11;
37:18;38:6,10;40:13;
45:5;48:8,14,17;75:10;
81:24;82:1;93:10,18;
104:16;108:20;117:22;
122:10;124:5;125:25;
128:21,25
**matters (4)**
4:18;7:6,23;107:18
**Matthiew (1)**
88:20
**May (12)**
3:12;9:6,17;20:12;
22:3;98:19;109:10;
119:8,8,8;125:2,2
**maybe (5)**
33:11;64:8;84:14,22;
92:13
**McCornick (1)**
88:21
**McCredo (1)**
3:16
**MDX (3)**

**72:15,18;73:6**
**mean (5)**
46:25;64:7;71:4;
120:1;125:22
**means (1)**
4:23
**measure (5)**
123:11,17;125:16,20,
23
**Med (1)**
39:6
**Media (2)**
3:12,16
**medium (1)**
100:22
**meeting (3)**
90:14,17;114:15
**member (1)**
89:6
**memorized (1)**
78:18
**mentioned (10)**
31:13;78:13;81:7;
96:23;97:7,18;99:25;
101:1,3;109:1
**Mercedes-Benz (1)**
100:18
**message (15)**
60:16;61:19,24;
90:24;91:1,6;92:8;93:1,
3;105:12,16,20;106:4,9;
114:20
**messages (1)**
127:23
**met (1)**
4:1
**method (3)**
51:1;58:5;92:14
**methodologies (1)**
92:21
**methodology (6)**
50:20,23,25;91:4;
92:18,20
**Michael (4)**
68:18,20,21;92:1
**Middle (3)**
3:6;86:20;88:4
**might (7)**
5:9;8:7;27:21;57:5;
58:22;71:17;104:20
**miles (2)**
81:14;82:22
**mind (5)**
13:25;46:1;89:1;
99:15;105:25
**mind-boggling (1)**
124:3
**minimal (1)**
55:10
**minimum (1)**
97:24
**minutes (5)**
46:2;84:15,22;128:7,

**8**
**misleading (1)**
120:15
**mistaken (1)**
20:12
**Misters (1)**
19:4
**misunderstanding (2)**
105:14;124:20
**misuse (2)**
79:14;98:16
**misuses (4)**
77:4;79:7,12;94:15
**Mitch (1)**
3:14
**mitigate (6)**
58:1;4;77:6;78:7;
94:16;114:13
**mode (1)**
111:9
**model (8)**
21:9;36:19;41:19;
65:4;80:21;82:3,16;
116:3
**models (5)**
64:5;112:8;115:7,21;
116:10
**modes (1)**
110:4
**Modified (1)**
20:13
**module (3)**
36:13,13;111:15
**moment (2)**
30:13;68:11
**momentarily (1)**
87:2
**money (1)**
55:9
**more (15)**
19:2;40:9;83:3,7,21;
84:1,10;89:22;91:3;
93:3;121:8,13,15,18,22
**morning (4)**
3:25;15:24;19:11;
46:11
**most (3)**
20:8;83:12,14
**motions (1)**
25:6
**motivated (3)**
105:18,25;106:17
**motor (5)**
18:5,8;22:24;54:2,9;
64:15
**mouth (1)**
48:3
**move (2)**
77:5;88:3
**moving (5)**
31:14;33:6;73:10;
86:19;107:19
**Mrs (4)**

35:15;40:17;73:19;
118:22
**much (1)**
23:2
**multifaceted (3)**
77:1;78:20;82:25
**multiple (7)**
41:23;55:22;61:13;
77:23;99:7;101:3;119:4
**multi-VIN (1)**
42:4
**must (2)**
105:10;120:14
**myself (1)**
62:9

## N

**name (8)**
3:14;4:1,6,14;34:6;
62:9;68:20;105:4
**named (1)**
68:18
**names (2)**
6:25;7:5
**National (3)**
51:15;64:13;88:14
**nature (2)**
18:7;92:7
**near (1)**
99:10
**necessarily (1)**
21:17
**necessary (3)**
78:6;111:3;114:21
**need (13)**
10:19;38:19;65:1,15;
77:9,15;84:20;103:11;
105:22;109:5;111:4;
123:4;128:3
**needed (6)**
8:19;55:15;65:21;
78:10;98:1;118:13
**needing (1)**
65:6
**needs (4)**
78:3;90:2;124:6,7
**negative (1)**
78:7
**new (1)**
63:1
**newer (1)**
13:14
**next (69)**
4:19;9:7,14;18:17,22;
20:15,21;21:1,25;23:12,
24;24:16;25:4,11;
26:16;27:1,6,9;28:5,19;
33:11,25;34:11,20;
35:18;36:9;37:1;38:8,
25;39:6,12,12,25;40:5,
19,23;41:5,10,15,25;
42:4,6,11;43:9,15;

44:13;45:4;46:19;68:9;
69:15;103:14;105:6;
106:24;107:1;108:7;
109:7;111:7,20;112:4;
113:21;115:4;116:15;
117:20;118:21;121:21;
122:16,17;125:14;
126:15
**NHTSA (40)**
33:3;42:17;50:1,5,7,
12;51:21;52:3;55:24;
64:16,19;67:4,5;69:16,
17;90:10;112:6,9,19;
113:6,14,24;114:1,4,9,
9,9,10,11,14,17,19,23;
115:1,19;127:15,18,19,
21,25
**NHTSA-prescribed (1)**
100:8
**NHTSA's (3)**
113:16;115:3;116:8
**Nikon (1)**
34:16
**noise (2)**
6:4,19
**noncompliant (1)**
123:3
**nondisclosure (1)**
7:3
**nor (2)**
114:17;120:16
**Notary (1)**
3:20
**notations (1)**
102:14
**note (11)**
52:2;68:18;107:23;
108:7,10,18;113:22;
115:12;116:16;118:24,
25
**noted (3)**
55:21,24;57:10
**notes (7)**
44:16,19,22;109:7;
111:20;112:4;122:17
**Notice (8)**
8:24;9:1,4,25;10:5;
12:5,11;105:11
**noticeable (1)**
103:13;118:7;122:24
**noticed (2)**
117:25;118:22
**notified (1)**
87:18,21,25
**number (15)**
3:7;10:23;29:5,5;
36:4;45:7;46:8;49:20;
77:22;85:10;90:17;
104:23;107:2,3,23
**numbered (2)**
29:2;43:19
**numbering (1)**
13:8

**numbers (4)**
26:19,21;35:22;68:1
**nylon (2)**
6:21;63:5

## O

**Object (2)**
75:7;110:20
**objections (2)**
7:24;49:3
**observe (1)**
103:5
**obviously (1)**
98:2
**occasions (1)**
17:20
**occupant (1)**
58:11
**occupants (1)**
58:12
**occur (3)**
70:18;87:5;110:6
**occurred (5)**
4:25;70:23,25;79:23;
118:15
**occurring (2)**
82:18;112:7
**occurs (1)**
82:17
**OCR (2)**
47:12;111:15
**October (2)**
6:11;13:4
**off (13)**
11:17,18;12:9;24:4;
35:25;46:4;71:5;85:5,6;
124:7;128:12,15;129:7
**offer (2)**
23:17;28:23
**offered (3)**
51:17;58:14;92:19
**offering (7)**
7:15;29:16;35:3
**Offhand (21)**
21:24;22:14;23:18,
23;26:10;27:16;32:11,
17;36:15;44:8,12;
66:12;72:25;86:7,18;
94:4,8;95:11;96:25;
98:12;100:10
**office (6)**
9:15,19,21;15:21;
16:9;42:19
**Officially (1)**
6:10
**often (6)**
78:14,15,16,18;
100:19;106:13
**Oftentimes (1)**
5:2
**old (1)**
100:17

**older (2)**
13:11,12
**omits (1)**
107:23
**Once (2)**
77:5;97:4
**One (66)**
6:21,22;8:13,20;9:16;
10:5;11:6,11;12:1;
17:23;20:6;22:14;
25:18;26:7,8;29:24,25;
30:13,25;31:11,12,13,
14;32:22,23;33:11,13,
19;34:8,8;35:1;36:6;
38:4;39:8;41:16;42:4;
49:20;50:9,10;60:19;
61:11,14;62:6;64:1;
66:15,21;67:15;68:11,
21;70:5;74:12;79:5;
80:7,22;81:11,12,12;
83:7;90:21;101:16;
102:12;115:9,20;116:8;
117:15,22
**ones (2)**
76:25;104:18
**one's (3)**
9:17;38:3,4
**one-to-one (2)**
73:1,7
**only (25)**
6:20;17:15;20:10,14;
24:10;31:11,13;32:22;
34:8;35:1,7;70:14;
80:21,22;81:8,17,25;
82:9,20;99:4;103:10;
104:24;105:10,19;
117:15
**on-product (8)**
52:6;53:14;62:14;
71:20,24;86:4;89:13;
99:8
**on-the-label (1)**
55:3
**on-the-product (8)**
55:8;57:23;58:16;
59:16;61:9;93:25;95:8;
118:19
**on-the-vehicle (5)**
56:25;57:8;63:25;
76:24;78:23
**on-the-visor (1)**
52:11;53:22;54:8;
56:15
**on-vehicle (1)**
86:4
**operating (1)**
65:4
**operation (1)**
76:13
**operator (2)**
99:20;100:22
**operators (2)**
55:14;57:13;88:8

**operator's (1)**
73:15
**opine (2)**
22:22;53:13
**opining (1)**
51:8
**opinion (24)**
22:18;37:17;38:12,
17,21;48:11;50:18,21;
51:25;53:7,25;55:2;
57:15,18,20,25;65:12,
21;76:11;77:7;86:10;
95:1;99:7,23
**opinions (20)**
7:15;22:5;23:16,20;
24:21;28:23;29:16;
35:2;48:9,16,20;49:9,
23;54:22;55:4;65:8,22;
101:23;124:22;128:25
**opportunity (2)**
11:2;99:22
**opposed (3)**
36:16;83:23;86:16
**opposite (6)**
50:3;52:25;53:9,18;
56:4;95:23
**optional (3)**
50:10
**options (1)**
99:7
**orange (2)**
60:9,15
**orc (2)**
86:21,25
**O-R-C (1)**
86:22
**order (5)**
8:21,21;26:5;27:7;
83:4
**Orders (5)**
22:1;23:1,7,9;25:6
**organization (2)**
34:3;114:1
**original (3)**
9:20;45:7;71:12
**originally (1)**
126:25
**others (8)**
48:5;58:17;82:5,12;
83:3,8;84:2,11
**otherwise (3)**
12:12;90:15;91:9
**out (28)**
9:11,21;14:18;16:1;
31:3;32:20;41:16;
45:14,14;50:17;51:24;
67:8;68:4,6;70:19;
77:12,23;83:2,6,18;
95:12;97:16;108:13;
110:14,15,16;121:7;
125:16
**outcome (1)**
80:4

outline (1)
128:22
outside (3)
5:7;46:23,25
over (6)
31:24;43:13;52:15;
84:17;126:3;128:23
overcome (1)
75:21
overlap (1)
66:18
overload (2)
76:18;127:22
oversight (2)
54:15;56:17
overuse (1)
76:19
over-warning (1)
76:19
own (9)
4:14;6:8,9;72:9,13,
14;73:5;104:4;123:6
owner (6)
30:1;68:3;76:5;
87:24;99:20;100:23
owners (3)
55:14;75:17;88:8
owner's (21)
42:6,7;56:24;64:1;
73:15,20,24;74:3,6,9,
11,14,18;75:5,11;76:6,
8;107:7;126:18;127:3,6
Ownership (1)
73:13

**P**

page (36)
10:10;27:22;52:13,
18;59:25;60:21,24;
61:1;62:12;68:3,9,17;
69:22;70:3;71:14,14;
73:10,12;85:22;86:19;
88:3;95:12;98:4;103:1;
105:3;107:1,2,23;
108:18;111:8;116:16,
17;117:21;119:22,24;
120:6
panel (4)
22:8;60:9,16,17
paper (2)
10:8;96:17
paragraph (24)
52:22;54:19;71:15,
16;73:11;85:23;86:20,
24;88:4;95:14;99:4,5;
105:8;107:2;109:7;
111:20;113:23;114:8;
115:5;121:21;122:17;
123:14;125:1;126:16
paragraphs (1)
108:8
part (16)

22:14;35:22;36:4;
38:5;47:6;52:23;53:4;
54:15,16;76:22;86:25;
87:12;105:15;111:4;
123:2;127:14
partial (1)
54:4
participated (3)
46:21;47:4;90:15
particular (20)
9:1,13;21:15;33:23;
41:19;49:3;57:15;
59:10;63:5,22;65:19;
77:20;79:17,18;83:2;
90:1;95:6;96:17;
107:13,14
particularly (4)
58:12;75:18,23;
108:13
parties (1)
125:11
partly (1)
51:22
partner (1)
100:18
parts (4)
89:3,3;93:20;123:7
passed (1)
9:15
passenger (1)
117:3
passengers (1)
58:7
past (1)
127:19
pasted (1)
100:17
PDF (2)
27:22;40:21
PDFs (2)
8:20;102:11
Pembrooke (1)
4:9
pending (2)
31:6;85:1
Pennsylvania (3)
3:12,21;4:10
people (6)
58:22;75:23;77:25;
103:11;105:19;119:7
per (2)
68:13;81:14
perhaps (3)
8:9;58:22;124:21
permit (2)
50:7;112:25
person (3)
63:1;105:10;124:3
personal (1)
90:4
personally (1)
35:12
persons (1)

90:4
perspective (3)
110:2;120:19;121:8
persuade (1)
106:15
pertaining (1)
44:10
pertains (2)
43:21,24
Peters (1)
88:23
phase (1)
120:25
PhD (3)
13:4;14:5;15:3
Phoenixville (1)
4:9
phone (1)
68:14
phonecon (1)
68:14
photo (1)
28:5
photograph (1)
28:2
photographs (5)
24:6,8,12,13;42:9
Photos (11)
23:24;27:2,10,22;
28:10;29:1;33:14;
34:12,14,16;42:9
picked (1)
56:20
pictograph (1)
60:16
pictorial (1)
92:16
pictorials (1)
92:11
picture (1)
101:7
place (5)
51:17;52:8;58:9;
91:14;95:20
placed (11)
50:14,16;57:8,11,20;
63:16;64:23;75:20;
101:2,5,10
places (1)
55:22
plaintiff (7)
3:9;21:18;28:15;
47:12,24;65:9;110:24
plaintiffs (1)
104:12
plaintiff's (1)
7:22
pleadings (1)
25:6
please (2)
4:6;52:14
pm (1)
129:9

point (14)
36:18;37:16;42:18;
48:10;49:17;52:13;
60:15;77:10;84:23;
93:15;97:6,13;103:14;
111:13
pointed (2)
16:1;51:24
points (2)
45:2;49:19
portion (4)
22:11;32:19;71:16,19
position (5)
70:19;71:5,6,6,7
positive (1)
124:5
possibility (8)
57:9;63:20;86:6;95:2,
9;107:15;110:18;
117:13
possible (1)
79:6
potential (7)
77:21;90:4;109:16,
21,25;111:17,18
Potentially (1)
100:5
PowerPoint (1)
38:4
practices (1)
113:25
precaution (3)
105:12,21;106:4
Precautionary (1)
107:5
preclude (1)
107:21
precursor (1)
53:3
prefer (1)
62:9
preliminary (1)
42:12
prepare (1)
49:4
prepared (2)
75:4;93:17
preparing (3)
22:10;72:7,12;93:10,
17
presence (1)
124:18
present (8)
61:12,14;99:8;
100:22;112:15,19;
120:8,9
presentation (5)
59:20;89:13;90:7,7;
127:2
presented (8)
52:24;53:8;56:3,7;
91:7;121:11,11;127:9
presently (1)

89:5
president (1)
100:19
presume (1)
68:24
Prevention (1)
88:15
previously (5)
32:21;42:22;46:10;
48:25;66:22
principles (2)
5:4;7:18
print (3)
45:14;60:14,17
printed (1)
45:14
Prior (2)
127:1,9
probably (4)
6:6;14:13;62:4;
103:22
problem (6)
87:17,24;98:2;
109:21;110:7;121:4
problems (1)
109:25
procedure (1)
112:3
process (6)
87:12;90:16;109:18,
19;111:6;112:3
produce (1)
11:2
produced (9)
14:14;15:17;19:8;
21:11;26:13;30:7,9;
38:9;101:18
produces (1)
114:2
product (39)
7:18;17:23,25;27:18;
51:7;77:4;79:7,13;
83:23;84:7;86:6,9,11;
88:20;89:16,19;92:20;
93:23,25;94:7,9,15;
95:3;96:19,20;98:9,16;
103:4,9,10;109:10;
113:24,25;114:3,14;
115:1;121:1;122:2;
125:13
production (2)
9:5;39:4
products (5)
71:21,25;90:5;92:23;
126:13
profession (1)
88:23
professional (3)
4:8;46:14;88:24
projects (1)
127:19
propagating (1)
123:24

**proper (1)**
121:3
**properly (2)**
107:24;108:4
**property (1)**
80:6
**proposal (1)**
99:15
**propose (2)**
59:4;97:14
**proposed (3)**
64:23;97:18;117:24
**proposition (3)**
100:4;121:13,15
**prospect (1)**
66:9
**protective (1)**
26:4
**provid (1)**
65:24
**provide (33)**
5:3,6,11;6:25;8:5;
10:17,18;52:3;55:6,24;
60:20;70:4;83:5;88:7;
94:20;101:13;106:8,9;
109:8;116:22;118:5;
119:9;121:25;122:3;
123:11,16,22,25;
125:12,16,18,20,22
**provided (40)**
8:25;16:5,7,9,10;
18:8,12;19:23;21:16,
19;28:14,15,17;42:20;
45:24,25;46:11;49:20;
50:3;51:12;53:14,17;
55:4,11,15,20;56:22;
59:5;61:15;62:12;
73:15;75:6;87:14;
89:10;94:7;107:6;
116:6;117:25;121:16,
17
**provides (9)**
4:21;41:1;59:18;
62:16;90:3,6;119:2;
125:3,24
**providing (7)**
18:10;35:6;89:18;
95:23;105:23;115:14;
127:22
**Public (1)**
3:20
**publication (1)**
10:13
**published (8)**
78:24;82:24;83:1,11;
88:24;94:6;126:24;
127:7
**pull (1)**
24:14
**pulled (2)**
25:18;41:15
**purchased (2)**
35:9;63:1

**purpose (7)**
51:2;103:9,24;104:7;
105:15,15;106:22
**purposes (3)**
59:13;78:25;119:4
**put (9)**
6:18;11:25;33:19;
48:2;53:17;57:16;
92:19;100:18,20
**putting (1)**
121:5
**PVIR28588092 (1)**
42:11

**Q**

**qualification (1)**
110:22
**qualified (1)**
11:3
**qualifier (1)**
10:15
**qualify (1)**
112:11
**questionable (1)**
104:8
**Quite (1)**
75:16

**R**

**Rank (1)**
83:4
**ranked (2)**
83:16;84:5
**ranking (3)**
83:17;84:3,4
**ranks (1)**
83:11
**Raphael (1)**
18:20
**rate (1)**
77:24
**rather (2)**
83:18;89:22
**Ray (1)**
3:4
**reaching (1)**
86:17
**read (50)**
17:7;20:21;21:5;
24:4;25:12;35:20,24;
39:10,14;53:2,4;54:24;
58:13;69:24;70:1,7,12,
16,20;71:22;73:17,19;
75:5,17,18;76:2,2,3,5,7,
17;78:15,15,16,17,17;
85:24;86:2;87:3;88:10;
95:17,25;96:7;99:12;
105:11;107:25;112:21;
117:25;118:16,22
**reader (1)**
106:3

**readily (1)**
103:12
**readiness (1)**
111:10
**reading (3)**
52:13;110:23;123:13
**reads (5)**
52:23;67:22;68:10;
86:21,25
**really (4)**
46:24;99:4;128:20,20
**reason (6)**
11:3;54:16;75:19;
78:12,13;116:21
**reasonable (8)**
55:5;79:12;93:3;
97:25;100:1,4;107:3;
114:25
**reasonably (1)**
94:14
**reasons (2)**
78:9;109:12
**recall (44)**
17:22;18:10,13;
21:24;22:13;23:9,18,
23;29:13;30:9;32:9;
33:22;36:18;37:15;
41:25;42:18;43:19;
44:2,6,7,10;63:22;
66:12,15;74:1;91:16;
92:1;93:13,15,16,20;
94:4;96:24;97:10;
98:12;100:10,13;101:1,
12,16,25;111:22;112:1,
2
**recalling (1)**
94:2
**Recallpdf (1)**
41:22
**Recalls (5)**
29:10,14;33:16,17;
44:7
**received (5)**
8:8;67:7,17;74:9,11
**receivers (1)**
103:3
**receiving (1)**
66:13
**recently (1)**
54:1
**Reception (1)**
88:19
**Recess (4)**
11:20;46:6;85:8;
128:17
**recognize (1)**
118:4
**recollection (1)**
110:10
**recommendation (9)**
50:15;55:2;56:15;
57:1,22;59:14;61:21;
62:18;64:22

**recommended (2)**
76:25;108:10
**record (22)**
3:1;7:22;11:17,19,22;
15:24;30:3;31:18;
40:20,24;46:5,8;66:25;
85:5,7,10;127:16,18;
128:12,16,19;129:7
**recorded (2)**
42:17;66:15
**records (3)**
29:25;39:6;127:19
**red (1)**
115:23
**refer (1)**
10:25
**reference (9)**
22:5;33:5;42:7;
66:20;89:2;92:24;93:2;
98:5;103:15
**referenced (3)**
23:11;26:24;51:20
**References (3)**
39:13,17;88:17
**referred (1)**
76:18
**referring (8)**
67:20;72:1;88:13;
90:12;113:3,11,12;
114:8
**refers (1)**
42:19
**reflect (1)**
49:25
**reflects (1)**
125:6
**regard (7)**
29:18;35:5;61:16;
71:1;113:17;118:18;
119:11
**regarding (12)**
8:22;9:12,22;29:25;
40:19;41:3;76:13;
86:10;89:19;100:20;
119:15;121:22
**regards (1)**
4:17
**Registration (3)**
34:1,9,9
**regulation (3)**
50:5,13;55:24
**regulations (4)**
50:7;114:2,16;126:7
**relate (4)**
5:5;21:23;33:3;
118:18
**related (52)**
4:17;7:6,14,15,19;
10:12;13:22;21:8;23:6;
24:21;25:1,2,5;28:22;
29:19;36:16;39:2;
40:10;41:2,17,18;44:2,
5;48:7;49:9;50:22;

52:11;55:2;56:16;57:8;
63:20;64:2;82:24;
90:11,23;92:11;93:13,
14,21,25;94:5;96:14,18;
100:8,14;105:7;106:3;
107:12;109:21,25;
111:4;118:4
**relates (4)**
23:7;33:20;64:1;
118:1
**relating (1)**
92:8
**relation (2)**
97:16,17
**relationship (1)**
22:4
**relatively (1)**
30:2
**relevant (11)**
23:16;28:23;29:15;
35:2,7;36:10,19,22;
40:12;107:8;116:12
**relied (2)**
33:23;54:4
**rely (12)**
10:25;23:20;26:23;
48:5;58:3;106:18;
109:3;114:3,15,16,17,
25
**remain (2)**
58:10;121:3
**remainder (1)**
113:22
**remaining (2)**
77:11;85:4
**remember (4)**
20:7;45:6;86:18;
104:22
**remind (1)**
119:7
**rendering (7)**
22:18;24:22;37:17;
38:12,16;56:13;86:10
**rephrase (2)**
32:18;47:3
**replace (1)**
126:6
**report (123)**
10:25;11:6,11,15;
12:1,2,18;13:2;14:14;
15:8,9,13,25;18:13;
22:6,10,12;23:11,21;
33:24;37:7,10;39:18,
23;41:11;42:5,8,13;
45:5,7,7,17;47:11;
48:13,15,19,22,25;49:1,
2,3,4,5,9,13,16,18,22,
24;50:2,17;51:20,25;
52:1,2,9,15,18;53:21;
54:12,14,15,17,18,23;
55:5,18,21;56:1,2,6,14;
57:11;59:5;18;60:2,3,
21,22,25;61:2;62:12;

Weams, Jr. vs.
FCA USA, LLC

William J. Vigilante, Ph.D., CPE
May 23, 2018

69:22;70:4;71:12,13,
14;72:7,12;73:10;75:4;
85:22;86:19;88:3;89:3;
90:9;93:10,17,18;
95:13;98:4,19,22;99:9;
102:5,7,12,20,21;103:2;
105:8;108:13;112:21;
115:24,25;116:12,14,
25;120:2,3,13;124:25;
127:13

**reportable (4)**
41:8,9,12,13

**reported (10)**
31:8;32:10;42:17;
64:18;80:22;81:8,22;
82:1,11,21

**reporter (1)**
3:15

**Reporting (1)**
3:16

**reports (8)**
11:4;18:18;21:8;
22:15;26:24;54:22;
66:13;76:17

**represent (1)**
4:2

**request (1)**
9:5

**requests (2)**
11:4;39:4

**require (3)**
64:6;66:1;114:10

**required (7)**
23:2;50:10;51:22;
52:25;53:9;56:4;114:11

**requirement (2)**
50:1;126:12

**requirements (2)**
22:5;59:10

**requires (1)**
65:7

**reread (1)**
10:16

**Research (23)**
30:14,17,18,20;
32:24;40:1;42:16;67:1;
80:16;82:2,16;96:18;
103:6,7,25;104:8;
106:6;118:4;122:23;
123:4,8,19;125:10

**reserve (1)**
7:23

**resource (2)**
93:2;114:14

**respect (20)**
6:13;7:12;18:8;
21:20;25:16;28:9;
29:14;37:12;42:21;
48:22;50:6;51:2;58:19;
59:3;66:9;72:22;78:20;
101:23;110:18;114:12

**responded (1)**
91:9

**response (2)**
74:7;116:17

**responses (1)**
39:4

**responsibilities (1)**
51:5

**responsibility (13)**
58:1,4;59:8;79:11;
94:13,20;113:23;114:3,
6,13;115:3,3;119:19

**responsiveness (1)**
7:25

**rest (1)**
26:9

**restraint (2)**
44:2,11

**restrictions (1)**
95:22

**result (1)**
111:9

**resulted (5)**
65:10;79:25;112:14,
18;117:10

**résumé (1)**
10:13

**retained (2)**
46:19;104:15

**retention (2)**
9:8,20

**review (16)**
8:6;22:11;30:10;
33:9;49:5;54:5,6;56:9,
13,18;72:7;93:11,12,19;
127:14,23

**reviewed (12)**
10:23,24;39:22;
45:21;49:22;54:1,20;
72:11;73:24;75:11;
93:16,20

**reviewing (1)**
54:21

**Rich (2)**
34:11;44:17

**Ridgeline (2)**
72:15;73:5

**right (56)**
5:18;16:2,11;17:3,9;
18:16;19:5,24;20:4;
23:13,25;26:16,16;
29:3;30:6;31:1,15;33:1,
12,14,17;34:11,12;
35:24,25;36:8,8;38:1;
40:6;41:24;43:5,11,14,
14;44:13;45:16;57:5;
67:19;79:2;82:8,15;
91:14;98:19;99:5;
105:6;106:24;107:22;
111:7;113:21;115:4;
116:15;119:18;122:4;
126:15;127:11;128:14

**Risk (2)**
88:19;121:13

**risks (1)**

108:3

**road (2)**
64:24;65:7

**robust (1)**
109:10

**robustness (1)**
109:14

**rollover (5)**
53:1,10,19;56:5;
95:22

**roof (1)**
58:24

**root (1)**
30:19

**rough (2)**
19:7,18

**round (2)**
32:20;95:12

**RPD (1)**
38:25

**RPTS (1)**
102:11

**running (1)**
34:15

**runs (1)**
121:13

---

## S

**safe (2)**
114:18;119:7

**Safety (26)**
22:24;43:19;51:7;
54:2,9;58:6;60:9,14;
64:14;77:5;88:5,12,14,
20,23,24,25;94:16;98:5,
7;103:3;108:24;113:24,
25;114:3,20

**sake (1)**
33:4;40:20

**Sales (1)**
34:20;35:15

**same (16)**
7:17;8:12;10:4;
12:12;25:14;45:9;
62:19,20,20,21;63:14;
76:17;84:12;95:21;
101:18;111:11

**Sanders (1)**
88:21

**save (2)**
10:24;11:1

**saw (3)**
30:4,5;74:17

**saying (6)**
22:13;110:17;115:22,
23;120:11;122:4

**scenario (1)**
44:6

**scenarios (1)**
95:7

**schedules (1)**
100:21

scientific (2)
5:4;51:1

**scroll (3)**
8:16;68:2,8

**scrolling (1)**
25:21

**seat (2)**
70:15;86:15

**seated (2)**
70:15;86:15

**second (11)**
8:24;18:5;49:25;
54:19;66:19;74:12;
78:14;85:23;95:14;
98:20;99:4

**secondhand (1)**
75:24

**section (8)**
39:18;52:18;53:11;
73:10,11;88:17;93:20;
108:13

**sections (1)**
93:13

**seeing (2)**
63:22;101:16

**seeking (2)**
103:3,11

**seems (7)**
21:3;24:2,17;86:8;
119:11,14;120:10

**Seiden's (1)**
88:20

**self-employed (1)**
4:12

**sensory (1)**
62:7

**sent (3)**
9:15,21;15:21

**sentence (8)**
53:4,7;85:24;95:17;
112:22;116:17;123:15;
126:5

**sequential (3)**
24:2;34:14,17

**sequentially (1)**
29:3

**series (1)**
29:1

**service (2)**
36:12,14

**services (3)**
4:22;5:6,12

**set (1)**
125:7

**several (2)**
102:14;128:23

**severity (2)**
77:16;83:13

**shifting (1)**
113:23

**shorter (1)**
85:4

**shorthand (1)**

26:12

**show (7)**
12:10;36:9;60:7,8;
67:2;102:7;123:13

**shown (3)**
123:22;125:11,18

**shows (5)**
24:18;106:6;122:23;
123:8,19

**side (7)**
50:4;52:24;53:9,18;
56:4;95:21,23

**sides (1)**
51:24

**signa (1)**
60:11

**signal (2)**
60:9,13

**Signature (2)**
68:3;100:18

**signature's (1)**
68:4

**signed (1)**
9:9

**significant (1)**
77:21

**signs (1)**
92:12

**similar (5)**
26:20;59:9;61:10;
92:18;116:23

**sit (27)**
14:1;31:19;32:12,18;
35:14;36:21;42:24;
44:1,9;58:17;66:4;73:2,
23;75:3;79:17;80:7,11;
81:2,23;82:4;97:2,7;
99:14;112:24;115:18;
117:18;129:1

**situation (1)**
79:14

**size (8)**
61:5,16,22;62:20,23;
97:23,24,25

**skewed (1)**
103:22

**skipped (2)**
43:13;78:12

**slash (1)**
68:24

**sleeve (1)**
46:13

**slings (1)**
6:21

**Smith (14)**
3:10;8:2;9:9;11:13;
14:21,24;17:18;44:18;
60:23;75:7;84:20,25;
110:20;129:4

**Smith's (6)**
9:15,19,21;15:21;
16:9;42:19

**sold (1)**

---

Media Court Reporting
610.566.0805  fax 610.566.0318

126:25
**solder (5)**
109:22;110:1,4,13;
117:16
**soldering (1)**
109:16
**solely (1)**
118:19
**somebody (1)**
68:18
**sometimes (1)**
77:23
**somewhat (1)**
26:20
**sorry (17)**
19:23;26:17;30:6;
41:11;53:13;62:1,24;
71:14;74:22;85:15;
87:8;91:19;96:9;98:25;
104:22;116:20;119:14
**sort (7)**
7:2;23:3;37:25;
72:14;86:19;88:3;
101:18
**sought (1)**
127:22
**sounds (1)**
92:5
**source (3)**
24:7;27:11;84:8
**spanning (1)**
14:13
**speak (1)**
75:1
**speaking (2)**
33:12;125:3
**speaks (1)**
84:9
**special (1)**
78:23
**specialist (1)**
3:15
**specialty (2)**
6:22,23
**specific (42)**
8:18;22:11;23:20;
36:19;40:10;47:19,22;
48:1,18,21,24;55:7,12;
57:22;59:3,14,15;
61:21;62:18;65:3;
71:12,24;88:25;97:6,
13;98:12;99:15,18;
100:10,13;101:1,12;
105:23;115:15,25;
117:1;122:5;126:8,10,
11,13;127:17
**specifically (24)**
10:25;22:14;23:10;
24:23;25:1;26:23;
28:17,25;29:17;33:20,
22;40:15;42:7;56:19;
57:7;64:16;94:9;96:14;
97:14;122:6,13,14;

125:3;127:21
**specificity (1)**
97:3
**specifics (1)**
97:10
**speed (1)**
30:2
**spell (1)**
92:3
**spelling (1)**
45:1
**spoke (1)**
9:10
**sponsored (1)**
104:2
**squarely (1)**
86:15
**St (1)**
39:7
**stamp (2)**
67:22,24
**standard (38)**
38:14;51:14,15,18;
59:7,10;60:10;83:11;
89:12,23;90:3;92:10,
24;96:12;116:18;117:4;
118:7;120:3;122:10,13,
22;123:16,18,21,24;
124:2,4,6;125:15,17,19,
22,23;126:6,11,21;
127:1,10
**standardization (1)**
115:20
**standardize (1)**
116:9
**standardizing (1)**
115:6
**Standards (17)**
22:24;38:9,23;54:2,9;
88:5,12,15,25;90:15;
98:6,8,14;122:11,19;
126:6,18
**star (1)**
28:6
**start (6)**
8:8;31:24;66:13;
71:6;77:2;126:3
**started (1)**
6:10
**starter (1)**
71:9
**starting (2)**
34:14;92:12
**starts (1)**
70:7
**state (6)**
15:23;49:22;56:6;
57:2;68:16;107:8
**stated (4)**
49:23;54:22;56:19;
120:13
**statement (21)**
50:2;79:10;81:6;

96:3;106:19;108:19;
111:25;113:1;114:5;
120:7,9,10,12,16,17;
121:18;122:20;123:10;
125:14;126:9,19
**statements (1)**
121:22
**states (15)**
52:9;83:21;90:2;
103:2;105:9;107:5;
111:8;115:5;117:21;
118:21;120:6,6;125:6;
126:20,23
**stationary (24)**
29:22,24;31:10,12,
21;32:2,6,10,14;43:2;
80:13,20,24;81:5,11,18;
82:6,10,14;85:13,17,25;
107:16,18
**steering (1)**
24:24
**step (2)**
102:5;124:7
**steps (3)**
51:8;78:6;118:14
**stick (1)**
63:8
**stickers (1)**
100:16
**still (5)**
42:24;47:17;59:24;
71:15;117:17
**story (1)**
119:1
**straight (1)**
13:8
**Street (1)**
3:12
**stronger (2)**
106:8,9
**studied (1)**
127:15,19
**studies (2)**
103:16;106:1
**study (3)**
96:17;103:5;127:17
**style (4)**
62:5,9,21;64:5
**subfolder (2)**
30:15;34:16
**subheading (1)**
73:12
**subject (10)**
26:4;42:10,13;55:8;
88:7;90:23;116:2,2;
126:20;128:21
**subjects (1)**
115:13
**submission (3)**
91:20,22;92:7
**submitted (3)**
11:4;90:18;91:11
**subpoena (1)**

16:6
**substance (1)**
7:21
**substantive (2)**
13:25;89:23
**subtracting (1)**
45:2
**suggest (4)**
99:9;106:1;115:19;
122:17
**suggested (5)**
50:3;52:24;53:8;
56:3;75:19
**suggesting (4)**
53:20,24;121:23;
122:9
**suggestions (1)**
58:15
**sum (1)**
49:17
**Summary (2)**
37:10;42:4
**Summer (1)**
37:6
**Sun (21)**
35:18,21;36:1;50:1,4,
8;51:23;52:25;53:9;
56:4;63:10,12,13;
95:24;96:24;97:17,19,
20;99:9;100:2;118:23
**Supp (2)**
15:9;45:17
**supplemental (23)**
11:14,15;12:2;15:8,
13,25;19:24,25;44:10;
48:15;49:9,13,16,18;
52:1,2;54:17,18;55:21;
57:10;98:18,19,22
**support (2)**
118:10,15
**suppose (1)**
10:19
**sure (15)**
10:16;27:19;31:17;
39:21;52:15;57:18;
58:20;67:18;68:22;
74:13;76:21;79:9;93:8;
102:10;120:7
**surveyed (2)**
63:11;101:17
**SUV (1)**
50:11
**swear (1)**
3:17
**sworn (1)**
3:19
**symbols (1)**
92:11
**system (16)**
13:14;44:2,11;55:6,
11;87:1,25;88:9;102:8;
106:10;107:3;108:3,5;
109:10,14;111:14

systems (4)
6:3,13,18;7:14

## T

**table (2)**
48:4;110:12
**tags (1)**
100:20
**talk (1)**
48:21
**talked (3)**
79:5;81:12;94:11
**talking (13)**
22:7;30:3;41:21;
47:1;56:23;58:21;
59:24;62:25;66:6;
87:13;115:13,15;
119:12
**tangential (1)**
22:3
**tangentially (2)**
25:1;29:17
**tape (3)**
46:8;84:18;85:10
**target (2)**
106:7,20
**targeted (1)**
122:6
**tasked (1)**
6:7
**technically (3)**
19:6;41:8;54:13
**technology (1)**
58:23
**teleconference (1)**
44:16
**teleconfpdf (1)**
44:14
**telltale (2)**
22:4;72:10
**telltales (2)**
72:4,6
**term (1)**
41:9
**terms (5)**
12:9;32:21;55:9;
76:16;99:16,17
**test (1)**
96:11
**testified (2)**
3:21;74:13
**testify (1)**
18:15
**testifying (2)**
113:7,9
**testimony (14)**
5:4;14:6,12;18:7,10;
71:2,18;74:8,10;94:3;
104:20;110:11;118:21;
127:5
**testing (6)**
90:24;91:1;92:8;96:5,

10;123:4
**textbook (4)**
88:18,20,22;90:13
**theory (2)**
110:15;117:18
**Therefore (3)**
78:2;105:18;112:2
**thinking (3)**
26:11;50:24;119:9
**third (3)**
52:22;92:2;123:15
**thirdhand (2)**
75:24;78:14
**thorough (2)**
56:9,13
**though (3)**
31:6;48:23;122:3
**thought (3)**
33:13;55:1;114:21
**thoughts (1)**
85:3
**three (9)**
18:18;19:2;20:5,14;
38:3;84:22;102:11;
128:6,8
**throughout (1)**
115:10
**thus (1)**
110:11
**timeframe (1)**
72:25
**times (1)**
77:24
**tin (11)**
47:11;109:15,16,22;
110:1,4,12,14,16;
117:16,16
**title (1)**
24:10
**titled (1)**
25:23
**titles (1)**
26:20
**today (40)**
4:4;7:16;8:4;10:11,
20;12:16;14:16;30:7;
31:19;32:12,18;35:14;
36:21;38:21;42:25;
44:1,9;47:21;48:4;
53:20;57:22;59:13;
66:4;68:14;73:2,23;
75:4;79:18;80:7,11;
81:2,23;82:4;97:2,13;
99:14;112:25;115:18;
117:18;124:12
**together (2)**
91:22;92:19
**told (1)**
101:6
**took (6)**
24:8,9;27:13,15,16;
28:16
**tool (3)**

24:14;105:1,5
**tools (2)**
6:22,24
**top (4)**
70:3;111:8;117:21;
120:6
**topic (1)**
96:17
**totally (1)**
114:4
**toward (2)**
86:20,24
**towards (1)**
103:22
**track (1)**
12:9
**traditional (3)**
5:12,22,24
**Traffic (1)**
64:14
**train (1)**
18:6
**transcript (1)**
46:13
**transcripts (1)**
19:7
**transition (1)**
84:23
**transmittal (1)**
68:9
**traveling (3)**
30:2;81:13;82:22
**treatment (1)**
78:23
**trial (4)**
8:1;14:6;18:15;38:20
**triangle (1)**
60:15
**true (1)**
42:24
**try (3)**
23:18;78:7;92:10
**trying (10)**
14:18;31:3;48:2,3;
92:6;97:16;105:4;
106:12;120:8,8
**TSB (1)**
36:10
**turn (1)**
70:14
**turned (4)**
47:16;69:25;70:11;
86:16
**turning (3)**
70:24;71:5;98:17
**turns (2)**
87:1;110:14
**tushery (1)**
121:6
**Twelve (1)**
60:1
**two (16)**
6:6,20;9:18;17:15,21;

26:7;39:7;49:19;50:12;
52:4;67:11;81:8;82:20;
84:22;108:7;115:13
**type (9)**
41:6;50:16;59:9,19;
63:8;64:23;96:7;97:3;
100:12
**types (4)**
6:6;7:17;17:22;101:4
**Typical (3)**
5:17,20,25
**Typically (7)**
4:24;5:14;7:23;62:6,
8;63:12;64:18

## U

**unanticipated (1)**
111:11
**unclear (1)**
111:9
**uncommon (1)**
75:16
**under (10)**
4:13;5:11;21:15;
30:14;67:1;68:13;
85:22;95:13;102:10;
107:2
**understands (1)**
105:17
**understood (4)**
61:25;93:23;96:8;
118:16
**unequivocally (1)**
52:9
**unethical (1)**
124:8
**uniform (1)**
125:7
**unique (1)**
64:20
**uniquely (1)**
126:7
**universe (1)**
117:3
**university (1)**
104:1
**unknown (3)**
109:11,11;111:2
**unlikely (1)**
103:4
**unrelated (1)**
52:4
**unwanted (1)**
43:1
**up (15)**
25:19;30:25;33:11;
43:9;51:13;52:5;58:17;
60:7,18;64:21;97:20;
113:16;116:13;123:5,5
**updated (4)**
14:19;20:1;44:22;
51:25

**upon (33)**
9:21;10:25;20:13;
23:20;24:10;33:23;
47:18;50:10,13;51:7,14,
21;58:3;59:6;65:8,18;
92:20;94:24;106:18;
109:3;111:6;112:2;
114:15,16,17,25;
122:23;123:8,19,21;
124:4;125:10,17
**usability (1)**
92:20
**use (14)**
58:22;59:8;61:18;
62:8;66:2;78:18;98:16;
106:22;109:22,25;
110:3;117:16;123:25;
126:8
**used (17)**
6:4;24:14;59:4,20;
62:11,13,14;71:21,25;
77:23;78:14;100:21,25;
108:9;110:13;127:2,8
**user (9)**
77:17;87:17,20,24;
105:16;109:6;111:16,
17;119:5;121:9
**users (9)**
57:13;58:6;65:19;
86:5;89:15,19;96:8;
118:11;122:2
**users' (1)**
92:15
**uses (4)**
77:4;79:7,12;94:15
**using (6)**
61:8,14;62:21;90:24;
92:21;109:15
**utilize (1)**
99:22

## V

**various (4)**
16:12;23:2;25:5;89:3
**Veh (1)**
40:6
**vehicle (124)**
18:5,6;22:19,24;
24:12,15;31:14;32:2,4,
5,11,14;33:7;35:9;36:2,
5,6,16,19;37:18;38:13,
22;40:10;41:5,20;42:5,
10,10,13,13;44:7;46:22;
51:4,16;52:10;54:2,9;
55:20,23;56:20;57:14;
58:10,11,12,24,25;59:1,
2,17,21;62:22;63:1,3,9,
12,19,23;64:2,5,24;
65:7,16;66:5,16;71:8;
73:25;75:15,17,20,20;
76:13,23;77:11;78:10;
79:19,24;80:13,18,20;

81:5,13;82:3,6,11,13,
14,21,22;83:1,23;85:12,
17,25;87:11;89:11;
95:18;96:8,15,22;97:5;
99:16,21,22;100:6,23,
24;101:17;107:7,9,11,
12,16;112:1,16,20;
113:10;114:18;115:17;
116:2,3;117:2;119:17;
122:12;126:20
**vehicles (25)**
29:20;43:22;63:15;
64:11,15;65:1;72:3,4,8,
11,13,14;75:24;78:15;
80:17;81:18;82:2;97:8,
12;101:20;115:7,15,21;
116:10;117:3
**vehicle's (1)**
101:11
**vehicle-train (1)**
18:9
**verbiage (2)**
28:6,9
**version (4)**
19:8;59:7;60:5;70:6
**versus (2)**
3:5;26:5
**VF (1)**
16:21
**VFCIF (1)**
16:16
**viable (1)**
117:17
**video (4)**
3:14;12:5,11,13
**VIDEOGRAPHER (11)**
3:1;11:18,21;46:4,7;
84:17;85:6,9;128:15,
18;129:6
**videotaped (1)**
3:2
**VIDRpdf (1)**
37:1
**view (1)**
76:6
**viewed (1)**
35:15
**views (1)**
124:21
**Vigilante (45)**
3:3;4:7,15,16,20,21;
5:11;6:10;9:24;10:1;
12:6,11,18,20,24;13:3,
6;14:4,7,11,17;15:2,4,
15;16:14,18,21,23,25;
17:5,10,12;19:12,14,17;
45:8;46:10;61:3;69:5,
11,18;98:17;102:22;
117:24;126:17
**violates (1)**
54:8
**visible (1)**
58:11

**Visor (30)**
35:18,21;36:1;50:4,8,
14,16,23;51:23;53:18,
18;55:3,25;56:19;
57:17;58:9;63:10,13,13,
17;73:4;95:21,24;
96:24;97:17,19,20;
99:10,11;100:2

**visors (5)**
50:1;52:25;53:9;
56:4;118:23

**voluntary (2)**
123:16;125:15

**VOQ (1)**
67:7

---

## W

**wait (2)**
98:20;114:25

**walked (1)**
19:10

**warn (2)**
17:24;79:4

**warned (4)**
89:24;90:2;95:3;
120:14

**warning (149)**
6:3,13,18;7:14;35:19,
21;36:2,5;37:24;46:22;
47:2,5,6;50:2,13,16,22;
51:12,13,18,23;52:4,7,
11,19,24;53:8,15,19,23;
54:8;55:6,8,11,13,20;
56:3,16;57:8,23;58:3,
16;59:9,12,15,16,18,21,
23,25;60:11,13;61:14;
62:11,20,22,23;63:20,
23,25;64:22;65:2,6,7,
15,21,24,25;66:1;69:25;
70:4,8,10;72:20,21;
75:14,19;77:9;78:10;
82:25;84:7;87:1,10;
88:7;90:8,11;91:7;
92:11,12;93:1,21;
94:21;95:8,13;96:21;
97:1;98:10;99:9;100:7,
14,25;101:2,8,10;103:9;
105:9,11,15,16,17,18,
19;106:2,9,13,14,15,16,
17,23;107:3,6,10;108:3,
14,16;109:3,8;111:3,4,
22,24;112:2;115:8,14;
116:23;117:1,23;
118:11,19,23;119:2,4;
121:2;122:21,24;123:3,
6;126:12

**warnings (74)**
7:19;53:1,10;56:5;
62:14;63:16;71:20,25;
72:3,8;76:19,23;78:22;
83:22;86:5;88:19;
89:10,14,18;92:23;
93:14,22,24,25;94:7,9;
95:20,22,23;96:13,19,
20;97:25;100:9;103:4,
8,10,25;104:6,7;106:12;
108:8,10,24;114:7;
115:7,21;116:9;117:24;
118:5,6;120:19,20,23,
24;121:8,13,14,15,16,
18;122:18;123:20,23,
25;125:13,19;127:3,9,
14,18,20,24;128:2

**warning's (2)**
106:21;107:8

**warrant (1)**
101:20

**warrants (1)**
98:10

**Warranty (5)**
37:4,6,10,12,19

**Warwood (2)**
104:25;105:5

**way (18)**
14:18;15:19;20:8;
23:4;26:12;31:4;35:7;
47:13;61:11,15;72:21;
76:24;89:8,10;112:21;
113:3,5;124:24

**ways (1)**
61:13

**Weams (50)**
3:4;18:23,24;24:12,
15;26:5;27:23;31:7,11,
20;32:13;35:8,15;
36:16,19;37:13;38:13,
22;40:5,17;42:19;43:1;
45:9;47:16;55:17;63:1;
65:4;70:22;73:13,19,
19;74:3,10,13,17;75:1,
5;80:25;81:11,23;82:1,
5,11,21;86:12;94:22;
112:1;118:1,22;119:17

**Weams' (2)**
40:10;41:2

**Weams's (2)**
66:16;79:25

**website (1)**
10:24

**weight (1)**
83:3

**weren't (3)**
51:11;54:11;118:14

**West (1)**
3:11

**what's (14)**
8:17;21:7;23:23;
25:3;40:8;45:14;49:17;
64:20;113:21;115:4;
116:15;117:20;122:16;
126:15

**wheel (1)**
24:24

**whiskers (6)**
47:12;109:16;110:12,

15,16;117:16

**white (2)**
60:6,17

**whole (2)**
35:22,24

**wife (1)**
35:8

**William (5)**
3:3;4:7;13:3;14:4;
15:2

**window (3)**
86:17;110:15,16

**windshield (9)**
99:11;100:15,19,20,
25;101:3,5,8,11

**windshields (2)**
100:17,21

**windshield-type (1)**
100:11

**within (6)**
21:3;27:21;29:12;
30:18;32:24;92:12

**without (5)**
26:10;54:1;69:25;
70:10;104:1

**witness (11)**
3:17,18;1:11:2,15;
46:1;84:13,22;128:3,8,
11;129:5

**witnesses (1)**
109:15

**WJV (3)**
15:9;30:19;45:16

**wjvrptweamspdf (1)**
45:10

**Wogalter (1)**
92:1

**W-O-G-A-L-T-E-R (1)**
92:4

**word (3)**
60:9,11;61:8

**words (1)**
48:2

**work (23)**
4:5,13;6:14,17;7:12,
14;18:12;21:23;23:8;
33:21;36:10,22;38:5;
40:13;41:18;46:14,17;
92:22;103:18;104:4,11;
106:25;124:6

**worked (1)**
17:18

**working (1)**
103:23

**world (1)**
80:12

**world's (1)**
104:5

**write (2)**
5:24;49:2

**wrong (3)**
62:4;89:25;125:17

**wrote (7)**

5:15;47:11;54:14,15;
55:18;62:4;120:15

---

## Y

**year (6)**
21:9;41:20;72:16;
80:21;91:21;116:3

**years (3)**
82:3,16;90:18

---

## Z

**Z535 (9)**
89:4;118:6;121:23;
122:18,22;123:4;
126:17,21;127:5

**Z535.2 (1)**
51:14

**Z535.3 (2)**
92:10,12

**Z535.4 (20)**
59:7;60:10;88:16;
89:8,11,12;90:18,22;
91:7;92:19;96:12;
121:25;122:6;123:7,10;
125:3,6;126:5,14;127:8

**Z535.6 (4)**
126:23;127:1,6,9

**zero (1)**
68:7