# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**CURTIS RAY WEAMS, JR.**              **CIVIL ACTION**

**VERSUS**                                  **NO. 17-4-RLB**

**FCA US L.L.C.**                        **CONSENT**

## <u>ORDER</u>

Before the Court are Defendant's Motion for Summary Judgment (R. Doc. 40) and Plaintiff's Motion for Partial Summary Judgment (R. Doc. 41). The foregoing motions are opposed. (R. Doc. 57; R. Doc. 62). The parties have filed replies. (R. Doc. 80; R. Doc. 76).

Also before the Court are five motions seeking exclusion of expert testimony: Defendant's Motion to Exclude the Opinion Testimony of Robert J. Berriman, Jr. (R. Doc. 28); Defendant's Motion to Exclude the Opinion Testimony of Neil E. Hannemann (R. Doc. 29); Defendant's Motion to Exclude the Opinion Testimony of Richard Allen Hille as Untimely and Unreliable (R. Doc. 30); Defendant's Motion to Exclude the Opinion Testimony of Dr. William J. Vigilante, Jr. as Untimely and Unreliable (R. Doc. 31); and Plaintiff's Motion to Exclude Testimony of Defense Expert Elizabeth H. Raphael, M.D. (R. Doc. 33). The foregoing motions are opposed. (R. Doc. 47; R. Doc. 44; R. Doc. 45; R. Doc. 46; R. Doc. 49). The parties have filed replies. (R. Doc. 72; R. Doc. 73; R. Doc. 74; R. Doc. 82; R. Doc. 60).

The Court held oral argument on the foregoing motions on October 9, 2018. (R. Doc. 87). The Court will first address the parties' motions seeking to exclude expert testimony, and will then turn to the parties' motions for summary judgment.

## I.    Background

Curtis Ray Weams, Jr. ("Plaintiff" or "Mr. Weams") commenced this product liability action against FCA US L.L.C. ("Defendant" or "FCA") on January 4, 2017. (R. Doc. 1, "Compl."). Plaintiff alleges that on or about January 16, 2016, he suffered certain personal injuries when the air bag on the driver's side of his 2004 Jeep Liberty spontaneously deployed as he reached inside of the vehicle and started it. (Compl. ¶¶ 1, 19). Plaintiff alleges that the air bag struck him in the face, head, neck, chest, shoulders, and arms, and that he lost consciousness as a result of the impact. (Compl. ¶¶ 23-24).

The following facts are undisputed.[1]  The vehicle was designed and manufactured by Fiat Chrysler America, LLC, a predecessor of Defendant.  At the time of the incident, the vehicle had approximately 115,000 miles and was 14 years old.  There is no evidence that the air bag system was not properly maintained.  Plaintiff was not misusing the vehicle at the time of the airbag deployment.  Plaintiff's feet were outside of the driver's door when he reached in to start the vehicle.  The vehicle's transmission was in "park" and the vehicle was stationary at the time of the airbag deployment.  The vehicle was not involved in any accident, collision, crash or other event that would have caused deployment of the airbag.  The vehicle was equipped with a supplemental restraint system ("SRS") malfunction indicator lamp that was not illuminated at the time of the incident.  The parties agree that the airbag at issue should not have deployed under the circumstances.

Plaintiff testified at his deposition that the airbag contacted the right side of his face, that he had resulting bleeding from two cuts on his chin and from his nose, that he did not

---

[1] These facts are derived from the parties' statements of uncontested material facts in support of their motions for summary judgment (R. Doc. 41-2; R. Doc. 40-2) and statements of contested material facts in opposing those motions (R. Doc. 57-1; R. Doc. 88).

immediately seek emergency treatment after the incident, that he sought medical treatment four days following the incident for headaches, and that he was subsequently treated for pain in his neck, back, and shoulders. (R. Doc. 33-14 at 33-55). Plaintiff describes his post-incident medical symptoms, treatment, and diagnoses as follows:

> Mr. Weams immediately began to suffer a debilitating headache and when it did not resolve he went to St. Elizabeth Hospital and was diagnosed with a concussion and headache. When his symptoms did not resolve, Mr. Weams visited a family medicine physician, Dr. Perkins, complaining of migraines, neck pain, and low back pain. Dr. Perkins referred him to a specialist in neurology, Dr. Callerame of Our Lady of the Lake Physicians Group. Dr. Callerame diagnosed Mr. Weams with post-concussion syndrome and intractable chronic post-traumatic headache. Dr. Callerame referred Mr. Weams to an Orthopedic Spine Surgeon, Dr. McCarthy, to evaluate Mr. Weams' cervical and lumbar spine complaints. Within five months of the incident at issue, Mr. Weams underwent a left L5-S1 microdiscectomy. Plaintiff's treating neurologist, Dr. Callerame, opines that the post-concussion syndrome and post-traumatic headaches were caused by the incident at issue. Dr. McCarthy, Plaintiff's treating orthopedic spine surgeon, opines that the incident at issue caused Mr. Weams' neck and back complaints.

(R. Doc. 33-1 at 3). Dr. McCarthy also diagnosed Plaintiff with a medial meniscus tear. (*See* R. Doc. 33-2 at 4).

Plaintiff seeks recovery under the Louisiana Products Liability Act, La. R.S. 9:2800.51 *et seq*. (Compl. ¶¶ 3, 54). Plaintiff asserts that Defendant is liable for failing to warn users that the air bag was susceptible to spontaneous deployment, failing to design the vehicle in a manner that would prevent spontaneous deployment, failing to inspect the vehicle prior to placing it in the stream of commerce, failing to ensure that the vehicle conformed to manufacturing specifications, failing to design and manufacture the vehicle to preclude spontaneous deployment during its anticipated use, failing to adhere to its express and implied warranties of fitness and use, and failing to include the vehicle in prior recall campaigns. (Compl. ¶ 54). Plaintiff further

asserts that he "is entitled to the presumption that the principles of *res ipsa loquitor* apply under the circumstances of this specific and unique Incident." (Compl. ¶ 48).

## II.     Law and Analysis

### A.     Motions to Exclude Expert Testimony

#### i.     Legal Standards

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. Rule 702 states that a witness "qualified as an expert by knowledge, skill, experience, training, or education" is permitted to testify if:

> (a) the expert's scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based upon sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Rule 702 is effectively a codification of the United States Supreme Court's opinion in *Daubert*, in which the Supreme Court held that trial courts should serve as gatekeepers for expert testimony and should not admit such testimony without first determining that it is both "reliable" and "relevant." *Daubert v. Merrell Dowell Pharm., Inc.*, 509 U.S. 579, 589 (1993). This gatekeeping role extends to non-scientific expert testimony. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999).

The objective of the gatekeeping function "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id*. at 152. The *Daubert* court provided an illustrative list of factors that courts may use when evaluating the reliability of expert testimony. *See Daubert*, 509 U.S. 579, 592-594. These factors include whether the expert's theory or technique can be or has been tested, whether it has been

subjected to peer review, whether it has a known or potential rate of error or standards controlling its operation, and whether it is generally accepted in the relevant scientific community. *See id.* at 593-94.

The party offering the expert witness bears the burden of proving that his proposed expert testimony is admissible. *Sims v. Kia Motors of Am., Inc.*, 839 F.3d 393, 400 (5th Cir. 2016). The use of expert testimony is only proper if it will assist the trier of fact. *Peters v. Five Star Marine Serv.*, 898 F.2d 448, 449 (5th Cir. 1990). Under Rule 702, expert testimony should be excluded if the court finds that the trier of fact "could adeptly assess [the] situation using only their common experience and knowledge." *Id.* at 450. The *Daubert* factors should be applied with flexibility and the question of whether an expert's testimony is reliable is ultimately a fact-specific inquiry. *See Kumho Tire*, 526 U.S. at 138, 119; *Burleson v. Tex. Dep't of Criminal Justice*, 393 F.3d 577, 584 (5th Cir. 2004).

> **ii.     Defendant's Motion to Exclude the Opinion Testimony of Richard Allen Hille as Untimely and Unreliable (R. Doc. 30)**

Plaintiff retained Mr. Richard Allen Hille to conduct "an inspection of the vehicle at issue and downloading information from the EDR." (R. Doc. 45 at 2). Mr. Hille does not have a post-secondary degree but has over thirty-five years of experience in automotive accident investigation and reconstruction, including experience with Event Data Recorder ("EDR") download. (R. Doc. 45-2). Mr. Hille co-authored his report with Neil E. Hannemann, the owner of Forensic Automotive Consulting Team ("FACT").

Mr. Hille conducted an inspection of the vehicle at issue on December 19, 2017, which resulted in the following findings:

> A.     There was no indication of impact damage to the front structures of the vehicle that would have resulted in an air bag deployment.

B. The Jeep appeared not to be modified in any way that could contribute to an inadvertent air bag deployment.
C. The #1 driver's air bag "squib" or ignitor had fired.
D. The safety belt pretensioners had not deployed.
E. No other air bags had deployed[.]

(R. Doc. 45-1 at 5). These findings are not in dispute. Also not in dispute are Mr. Hille's qualifications or opinions with respect to the EDR download process and analysis, or his opinion that the vehicle did not experience a sufficient change in velocity to warrant deployment of the airbag.

Instead, Defendants challenge two opinions offered by Mr. Hille at his deposition, namely (1) that the airbag deployed "due to some defect in the system" caused by "either a spurious signal from the ORC [Occupant Restraint Controller][2] or wiring cross-talk of some sort" and (2) that the ORC should have been subject to recall. (R. Doc. 30-3 at 5-7). Defendant argues that Mr. Hille is not qualified to offer the foregoing opinions, and that his "recall" opinion is untimely as provided after the expert report deadline. (R. Doc. 30-1 at 6-9). In opposition,

---

[2] The 2004 Jeep Liberty Owner's Manual provides the following explanation of the ORC:

The **Occupant Restraint Controller (ORC)** determines if a frontal collision is severe enough to require the airbags to inflate. Based on the level of collision severity, the front control module determines the proper rate of inflation. The front airbag inflators are designed to provide different rates of airbag inflation from direction provided by the ORC. The ORC may modify the rate of inflation based on the occupant size provided by the Occupant Classification Module. The ORC will not detect roll over, or rear impacts.

The ORC monitors the readiness of the electronic parts of the system whenever the ignition switch is in the START or RUN positions. These include all of the [Airbag System Components] except the steering wheel and column, and knee bolsters. If the key is in the OFF position, in the ACC position, or not in the ignition, the airbags are not on and will not inflate.

Also, the ORC turns on the AIRBAG warning light and PAD indicator light in the instrument panel for 6 to 8 seconds for a self-check when the ignition is first turned on. After the self-check, the AIRBAG warning light will turn off. The PAD indicator light will function normally. . . . If the ORC detects a malfunction in any part of the system, it runs on the AIRBAG warning light either momentarily or continuously. A single chime will sound if the light comes on again after initial start up.

(R. Doc. 57-25 at 50-51).

Plaintiff argues that Mr. Hille is qualified to offer the foregoing opinions, focusing primarily on Mr. Hille's qualifications regarding the EDR downloading process and related analysis. (R. Doc. 45).

Mr. Hille testified that he is not qualified as an expert in electronics, automotive airbag system sensors, or recalls. (R. Doc. 30-3 at 11, 16, 22).  He further testified that he would "defer to Mr. Hannemann" when asked to identify the "type of engineering analysis . . . that FCA should have undertaken to identify [the] issue" of the inadvertent airbag deployment. (R. Doc. 30-3 at 20).  Finally, Mr. Hille testified that he had not "identified a specific defect in the system" and that other than a spurious signal or "wiring cross-talk," he could not understand any other possible causes for the inadvertent airbag deployment. (R. Doc. 30-3 at 19-20).

At oral argument, Plaintiff essentially withdrew his opposition to the instant motion with respect to Mr. Hille's opinions regarding a proposed recall.  Plaintiff has not met his burden of establishing that Mr. Hille is qualified as an expert on recalls, and Mr. Hille will be precluded from offering any testimony on potential recalls.  The Court also finds that Mr. Hille is not qualified to offer any expert testimony other than that related to his inspection of the subject vehicle, the EDR download process, and the results from the EDR download process.  Mr. Hille is admittedly not qualified to testify on electronics or automotive airbag system sensors.  Accordingly, the Court will also exclude his testimony regarding the alleged spurious signal or "wiring cross-talk" as the cause of the inadvertent airbag deployment.

**IT IS ORDERED** that Defendant's Motion to Exclude the Opinion Testimony of Richard Allen Hille as Untimely and Unreliable (R. Doc. 30) is **GRANTED.**  Mr. Hille is precluded from providing opinion testimony regarding defects in the airbag system or whether the airbag system should be subject to a recall.

### iii. Defendant's Motion to Exclude the Opinion Testimony of Neil E. Hannemann (R. Doc. 29)

Neil E. Hannemann is a mechanical engineer and owner of FACT. (R. Doc. 44-2; *see* R. Doc. 44 at 3). Mr. Hannemann has a B.S. in mechanical engineering and over thirty years of experience working in the automotive industry on vehicle design, testing, research, and development related to, among other things, engine systems, brake systems, and vehicle dynamics. (R. Doc. 44-2). Plaintiff retained Mr. Hannemann to provide "an opinion on the subject airbag system of the 2004 Jeep Liberty . . . and specifically why the supplemental restraint system (SRS) allowed the driver's steering wheel mounted air bag to deploy while the subject vehicle was parked." (R. Doc. 44 at 1).

Defendant seeks to exclude the opinion testimony of Mr. Hannemann because he is not an electrical engineer and has no experience in airbag design, he has not identified the cause of the deployment, and he has not offered any alternative design. (R. Doc. 29). In opposition, Plaintiff argues, among other things, that Mr. Hannemann's methodology is sound and that his opinions should be left for the jury's consideration. (R. Doc. 44).

Mr. Hannemann premised his opinions on the vehicle inspection conducted by Mr. Hille on December 19, 2017. Mr. Hannemann testified that the opinions presented in the "Conclusions" section of the FACT report co-authored with Mr. Hille are his own. (R. Doc. 29-4 at 2-3). These opinions are as follows:

A.   The driver's, steering wheel mounted air bag deployed without any collision occurring.

B.   The air bag Occupant Restraint Controller (ORC) did not record any kind of collision even that would have prompted an air bag deployment. No deployment of any type was commanded or recorded.

C.   Whatever caused the air bag to deploy in this incident, Mr. Weams did not cause the deployment by any action or misuse of the vehicle.

D.     The airbag deployment was an inadvertent deployment due to a defect in the vehicle. The subject vehicle is defective and unreasonably dangerous due to inadvertent airbag deployment.

E.     FCA was negligent for not conducting proper engineering analysis, target setting and testing to ensure there would be no inadvertent deployment. This negligence caused the subject vehicle to injure Mr. Weams.

F.     The driver or owner of a vehicle does not expect that an airbag will deploy on a vehicle that is sitting stationary and is not involved in any impact of any sort.

(R. Doc. 45-1 at 9-10).

It does not appear that Defendant challenges Opinions A, B, C, and F, which are premised on, or reiterations of, undisputed facts. These opinions are supported by Mr. Hille's investigation of the vehicle and EDR analysis as detailed in the FACT report.

Defendant challenges Mr. Hannemann's ultimate conclusions that the airbag deployment was the result of a "defect" and that Defendant was "negligent" for failing to prevent the inadvertent airbag deployment (i.e., Opinions D and E). The Court finds that these opinions must be excluded on the basis that they are a product of unreliable principles and methods. Mr. Hannemann provides no theory regarding the cause of the airbag deployment that can or has been tested. Indeed, Mr. Hannemann performed no testing on the vehicle or the airbag system at all. While Mr. Hanneman provides the conclusory opinion that the vehicle is defective, he was unable to provide any specific opinion pertaining to the alleged defect, much less whether the defect was one of design or manufacture. (R. Doc. 29-4 at 8).

Because Mr. Hannemann fails to provide any specific theory for the inadvertent airbag deployment, his conclusory statements regarding the existence of a defect or negligent act attributable to Defendant amounts to pure speculation, and must be excluded. *See Brown v. Parker-Hannifin Corp.*, 919 F.2d 308, 312 (5th Cir. 1990) ("Without some basis to establish that one of his theories is the most likely cause of the failure on this occasion, his testimony amounts

to speculation and is of no assistance to the jury."); *Sittig v. Louisville Ladder Grp. LLC*, 136 F. Supp. 2d 610, 617 (W.D. La. 2001) ("Without some scientific basis to establish that ladder separation was the most likely cause of [the plaintiff's] fall, the proffered expert testimony amounts to speculation and will be of no assistance to the jury."); *see also Crappell v. Boh Bros. Constr. Co., LLC*, No. 06-1315, 2011 WL 13213835, at *3-4 (E.D. La. Jan. 10, 2011) (excluding testimony by civil and structural engineering regarding failure of pre-cast concrete piles pile based solely on a visual inspection of the failed pile that was not supported by any measurements or calculations). The Court finds too great an analytical gap between the existing data and Mr. Hannemann's conclusory opinions. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").

**IT IS ORDERED** that Defendant's Motion to Exclude the Opinion Testimony of Neil E. Hannemann (R. Doc. 29) is **GRANTED.** Mr. Hannemann is precluded from providing opinion testimony regarding defects in the airbag system or Defendant's negligence.

### iv. Defendant's Motion to Exclude the Opinion Testimony of Robert J. Berriman, Jr. (R. Doc. 28)

Robert J. Berriman, Jr. obtained a Bachelor of Applied Science Electronic Engineering Technology from the ITT Technical Institute in 1996, and, while not a licensed professional engineer, has been employed with the title of electrical engineer for over 10 years. (R. Doc. 47-2). Plaintiff retained Mr. Berriman, who is also employed by FACT, to provide an opinion as to the cause of the electrical failure of the ORC.

Defendant argues that Mr. Berriman should be excluded as an expert, in part, because he is not a professional electrical engineer and, accordingly, lacks the scientific, technical, or other specialized knowledge necessary to assist the jury regarding the cause of the ORC's failure. (R. Doc. 28-1 at 8-9). Defendant also seeks to exclude the opinion testimony of Mr. Berriman on the basis that he has not identified the cause of the airbag deployment, he has not identified an alternative design, he failed to use a reliable methodology to form his opinions, and his alternative causation theories are presented without any evidence. (R. Docs. 28-1 at 9-17; R. Doc. 72). In opposition, Plaintiff argues that while nobody can ascertain why the airbag malfunctioned, there is no material disagreement that there were certain physical anomalies on the ORC, and it should be left to the jury to determine whether Mr. Berriman's opinions are viable. (R. Doc. 47).

Mr. Berriman premised his opinions on the vehicle inspection conducted by Mr. Hille on December 19, 2017. (R. Doc. 28-3 at 4). Mr. Berriman opined that a photograph of the ORC circuit board "shows what appear to be tin whiskers," noting that the "ORC had never been opened up to expose this circuit board since it was manufactured in November 2003." (R. Doc. 28-3 at 7). In pertinent part, Mr. Berriman proffered the following opinion in his report:

> Other potential causes of an inadvertent air [bag] deployment include voltage spikes in the system, spurious electronic signals, electronic cross-talk between wires or pc traces, [and] even static discharge (think wool carpeting and a metal door knob). These types of causes rarely leave evidence that they existed. Occasionally you will see some indication of electrical short in a wire harness or printed circuit board. If lead solder had been used we would not be discussing tin whiskers as a root cause mostly likely present in the subject ORC. The EPA is trying to eliminate lead solder from electronic manufacturing, but had granted an exemption to the automotive and aerospace industries at least until 2013. Therefore use of tin solder in the 2004 Jeep Liberty was apparently a voluntary choice on the part of FCA.
>
> For many years tin whiskers have plagued the electronics industry. Solutions of using lead solder or metal solder in place of [lead]-free solder are common. Other

> solutions including designing in physical distance to protective circuits from a tin whisker shorting two important signals together. Barriers are also used in some designs to deter whiskers from crossing signals. Potting has been used to contain whisker growth.

(R. Doc. 28-3 at 8) (emphasis added). Mr. Berriman concludes that the "ORC circuit board appears to have numerous 'tin whiskers' through the circuitry [, which] are known to cause all types of electronic failures in printed circuit boards, such as the type used in the subject ORC." (R. Doc. 28-3 at 9). Mr. Berriman offers no definitive opinion that the ORC actually contains tin whiskers or how they caused the incident at issue.

The Court need not determine whether Mr. Berriman has the requisite training or knowledge to provide expert opinions on the cause of the ORC's failure because his testimony fails the reliability requirement. Mr. Berriman's primary opinion that the ORC malfunctioned in light of the presence of "tin whiskers" is unsupported by testing of the solder used in the ORC circuit board. Mr. Berriman conceded at his deposition that the introduction of lead mitigates tin whisker formation. (R. Doc. 47-4 at 39-40). Mr. Berriman accepted as valid the materials testing undertaken by Defendant's expert, Dr. Thomas G. Livernois, which confirmed the presence of lead in the solder. (R. Doc. 47-4 at 46-47). When Mr. Berriman testified that Dr. Livernois only tested some of the solder, he suggested that tin whiskers remained possible because he had no information suggesting that the untested solder lacked sufficient lead. (R. Doc. 47-4 at 46-47). In other words, Mr. Berriman suggests that his own lack of testing supports his finding that the ORC circuit board "appears" to have tin whiskers. The Court finds this testimony to be unreliable.

While Mr. Berriman also suggests that tin whiskers may have developed if tin was introduced through the "tin-plating process," he conceded at his deposition that he had no

specific evidence to support a finding that tin whiskers actually developed during the "tin-plating process" other than speculation that an "industry problem" manifested in this particular instance:

> Q.    But you don't have any information as we sit here today concerning the tin-plating process or anything at all related to the manufacturing process for the ORC that was located in the Weams vehicle?
> A.    I do not have those documents.
> Q.    Would that information be relevant to you as you're trying to assess whether there were indeed tin whiskers on this ORC?
> A.    Yes.
> Q.    Have you requested those documents?
> A.    Me specifically, no.
>
> ***
>
> Q.    So with no information, why are we discussing tin whiskers?
> A.    Because we know it's an industry problem. We knew it happens on the circuit board alone. Not just the solder between them.
> Q.    We just don't know that it might ever have happened on the Weams ORC because we don't even know what that solder is made of, correct?
> A.    Correct.

(R. Doc. 28-4 at 5, 22). Given the record, the Court concludes that Mr. Berriman's opinions regarding the presence of tin whiskers on the ORC are based solely on speculation and untested presumptions.

Mr. Berriman's remaining alternative theories of causation are also premised on mere speculation. Mr. Berriman testified at his deposition that each of his other proffered potential causes of the inadvertent airbag deployment were just theories unsupported by any specific evidence:

> Q.    I want to break that down. Let's talk about voltage spikes. Do you have any information to suggest that a voltage spike occurred in this ORC on the date of this incident?
> A.    No.
> Q.    What about spurious electronic signals?
> A.    No.
> Q.    What about electronic cross-talk between wires?
> A.    Nope.
> Q.    PCB traces.

13

A.  Nope.
Q.  Static discharge.
A.  Nothing specific.
Q.  On this board in this ORC have you observed any indication of electrical short?
A.  Just the foreign objects identified in the photograph.
Q.  But that's just a possibility.
A.  Yes.

(R. Doc. 47-4 at 45-46).

The foregoing opinions are speculative and of no assistance to the jury because they are untested and fail to establish that any one of these theories was more likely than not the cause of the failure of the ORC. *See Brown*, 919 F.2d at 312; *Sittig*, 136 F. Supp. 2d at 617.  In addition to being unreliable, Mr. Berriman's equivocal opinions are irrelevant. "A perfectly equivocal opinion does not make any fact more or less probable and is irrelevant under the Federal Rules of Evidence." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 245 (5th Cir. 2002); *see* Fed. R. Evid. 401 ("'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.").

**IT IS ORDERED** that Defendant's Motion to Exclude the Opinion Testimony of Robert J. Berriman, Jr. (R. Doc. 28) is **GRANTED**.  Mr. Berriman is precluded from providing opinions regarding the cause of the airbag deployment.

     **v.**     **Defendant's Motion to Exclude the Opinion Testimony of Dr. William J. Vigilante, Jr. as Untimely and Unreliable (R. Doc. 31)**

William J. Vigilante, Jr., has a Ph.D. in psychology and ergonomics from North Carolina State University, is board certified in Professional Ergonomics, and has over 22 years of experience in the areas of driver performance, roadway safety, control-display design, consumer and commercial products and equipment, safety and hazard analyses, risk perception, and design

of warnings and instructional materials. (R. Doc. 46-1). Plaintiff retained Dr. Vigilante to provide an "opinion relative to the sufficiency of warnings related to the airbags in the 2004 Jeep Liberty . . . and specifically whether the manufacturer sufficiently warned users of the risk of inadvertent airbag deployment." (R. Doc. 46 at 1).

Defendant seeks to exclude the opinion testimony of Dr. Vigilante because he lacks qualifications to provide airbag warnings, he did not employ reliable methodologies, his opinions are preempted by federal law under the doctrines of express preemption and conflict preemption,[3] and his supplemental opinion was untimely. (R. Doc. 31). In opposition, Plaintiff argues that Dr. Vigilante is highly qualified in the area of vehicle safety and warnings, he properly informed himself and employed proper methodologies, and his addendum was a timely rebuttal report. (R. Doc. 46).

In his original report, Dr. Vigilante opines that in light of conflicting information in the vehicle's manual with respect to the airbag warning light, among other things, Defendant failed to provide an effective warning system regarding inadvertent airbag deployment. (R. Doc. 31-3 at 9-12). Dr. Vigilante also more specifically opined that as part of this effective warning system, Defendant should have included "a conspicuous, specific, and explicit on-product warning" on the sun visor that warned of inadvertent airbag deployment. (R. Doc. 31-3 at 11-12). Dr. Vigilante provides an exemplar on-product warning label in his report. (R. Doc. 31-3 at 12).

There is no dispute that Defendant sold the vehicle with a permanent warning label on the sun visor specifically addressing the vehicle's airbag system as approved by the appropriate federal motor vehicle safety standard. *See* 49 C.F.R. § 571.208 ("FMVSS 208").[4] Dr. Vigilante

---

[3] Defendant does not raise any argument with respect to field preemption.
[4] The specific language for the prescribed air bag warning label to be placed on the sun visor is found at 49 C.F.R. § 571.208.S4.5.1(b).

opines, however, that Defendant should have presented a warning regarding inadvertent airbag deployment "on the side of the sun visors opposite the required airbag and rollover warnings," having observed that "[a]lthough FMVSS [208] does not allow vehicle manufacturers to place additional warnings on the same side of the visor as the airbag and rollover warnings, there are no restrictions from providing additional warnings on the opposite side of the sun visor." (R. Doc. 31-3 at 11). Contrary to the foregoing opinion, FMVSS 208 specifically prohibits the placement of additional airbag warnings on the sun visor: "[N]o other information about air bags or the need to wear seat belts shall appear <u>anywhere</u> on the sun visor." 49 C.F.R. § 571.208.S4.5.1(b)(5)(ii) (emphasis added).

Defendant's expert, Nathan Dorris, Ph.D., pointed out the foregoing issue in an expert report dated March 13, 2018. (R. Doc. 31-6). After reviewing Dr. Dorris's report and other expert reports provided by Defendants, Dr. Vigilante provided a supplemental report dated March 15, 2018. (R. Doc. 31-4). The supplemental report states, in pertinent part, the following:

> After reviewing the above referenced reports, my opinions as stated in my February 15, 2018 report have not changed. Furthermore, it is my opinion that there were multiple other options available to [Defendant] to present the on-product warning I suggested in my report other than the sun visor (e.g., the dash, headliner near the visor, windshield, etc.). As the manufacturer of the vehicle, it was [Defendant's] responsibility to identify and mitigate the hazard associated with the inadvertent deployment of the airbag. If it chose to rely upon a warning to mitigate the hazard, it was [Defendant's] responsibility to develop and employ an effective method in which to communicate that safety information to users and passengers of its 2004 Jeep Liberty.

(R. Doc. 31-4). On May 23, 2018, Dr. Vigilante opined at his deposition that had he more thoroughly reviewed the pertinent materials, he would not have opined that an additional airbag warning should have been placed on the visor, and rather "would have picked another location in the vehicle as an example of where [Defendant] could have and should have provided it," again offering the headliner as a potential location for the proposed warning. (R. Doc. 31-5 at 4-6).

In light of the foregoing, the Court must address (1) whether Dr. Vigilante's supplemental report is timely; (2) if so, whether Dr. Vigilante's opinions, as supplemented, should be excluded on the basis of lack of qualifications or reliability, and (3) whether and to what extent Dr. Vigilante's opinions, as supplemented, must be excluded on the basis that Plaintiff's failure to warn theory is preempted by federal law.

First, the Court will not exclude Dr. Vigilante's supplemental report on the basis of untimeliness. Dr. Vigilante retracted his opinion regarding the placement of an additional warning on the sun visor within days after receiving Dr. Dorris's report. Accordingly, it would have been timely if Plaintiff had immediately provided it as a rebuttal report to Defendant pursuant to Rule 26(a)(2)(D). The record suggests, however, that Plaintiff's counsel did not provide the supplemental report to defense counsel until Dr. Vigilante's deposition on May 23, 2018. While Plaintiff's counsel should have timely provided Dr. Vigilante's supplemental report, the Court finds no prejudice to Defendant, as defense counsel has had an opportunity to elicit testimony from Dr. Vigilante regarding the opinions expressed in the supplemental report and Dr. Dorris has had the opportunity to provide any necessary rebuttal report. Accordingly, the Court will not exclude the supplemental report, whether more properly characterized as a Rule 26(a)(2)(D) rebuttal report or Rule 26(a)(2)(E) supplemental report, on the basis of untimeliness. *See* Fed. R. Civ. P. 37(c)(1) (evidence that party failed to disclose as required by Rule 26(a) must be excluded unless the failure was substantially justified or is harmless); *see also* Fed. R. Civ. P. 16(b)(4) (deadlines in scheduling order may be modified with finding of good cause);

Second, the Court will not exclude Dr. Vigilante's opinions, as modified by the supplemental report, on the basis that Dr. Vigilante lacks qualifications or has employed

unreliable methodologies. Defendant argues that Dr. Vigilante is unqualified to provide

warnings in the airbag context because he has no specific experience designing airbag warnings

as demonstrated by his original opinion with respect to placing an alternative warning on the sun

visor. (R. Doc. 31-1 at 7-8). The Court has reviewed Dr. Vigilante's experience and

qualifications, and find that he has the knowledge, skill, experience, training, and education to

testify as an expert in the field of human factors and warnings. While Dr. Vigilate may have no

specialized experience or knowledge with respect to airbag warnings, Defendant may address

this lack of specialized experience or knowledge in cross-examination. Defendants' narrow

definition of the required field of expertise is counter to the requirements of Rule 702. *See*

*Sandifer v. Hoyt Archery, Inc.*, No. 12-322, 2015 WL 4429189, at *3-4 (M.D. La. July 20, 2015)

(mechanical engineer qualified to testify in the fields of archery and compound bow design

despite never having worked for a compound bow manufacturer, designed a compound bow,

published in the area of bow design, investigated other compound bow related incidents,

formulated any prior opinions on compound bow design, or any life experience in archery or the

use and operation of compound bows); *Durkin v. Wabash Nat.*, No. 2013, 2013 WL 1314744, at

*14 (D.N.J. Mar. 28, 2013) (finding Dr. Vigilante qualified to testify as humans factors expert in

product liability action involving tractor-trailor despite his lack of knowledge of trucking

specifics). Dr. Vigilante's lack of experience with respect to airbag warnings, as well as the

extent to which his original opinion conflicts with FMVSS 208, can be explored through cross-

examination.

   The Court also finds misplaced Defendants' arguments with respect to the reliability of

Dr. Vigilante's opinions, as they essentially attack his conclusions, not his methodologies. (R.

Doc. 3-1 at 9-13). Dr. Vigilante's report indicates that he reviewed the relevant appropriate

literature, including the owner's manual, concerning warnings associated with the use of a 2004 Jeep Liberty. Dr. Vigilante referenced seven professional resources in reaching his conclusions, including standards promulgated by the American National Standards Institute ("ANSI"). Defendant, in part, attacks the reliability of Dr. Vigilante's methodologies in light of the fact that Dr. Vigilante revised his original opinion after being shown contradictory language in FMVSS 208. This issue can be explored through cross-examination. Furthermore, the Court will not exclude Dr. Vigilante's supplemental opinion regarding the placement of the on-product warning elsewhere in the vehicle on the basis that he did not specify where in the vehicle the warning should have been placed. In fact, Dr. Vigilante suggested specific other locations on which the alternative warning could have been placed. Defendant can challenge his suggested locations through cross-examination.

The Court must now address the issue of whether and to what extent FMVSS 208, a regulation promulgated by the National Highway Traffic Safety Administration ("NHTSA") under the authority of the National Traffic and Motor Vehicle Safety Act of 1966 (the "Safety Act"), 15 U.S.C. § 1391 *et seq.*, recodified as amended, 49 U.S.C. § 30101 *et seq.*, preempts Plaintiff's inadequate warning claim and, therefore, renders Dr. Vigilante's opinions, as supplemented, irrelevant. Plaintiff offers no substantive arguments against a finding of preemption in opposing either the instant motion to exclude Dr. Vigilante's testimony or in opposition to Defendant's motion for summary judgment. Nevertheless, having considered the applicable law, the Court concludes that, based on the record in this case, Plaintiff's failure to warn claims are not preempted by the Safety Act or FMVSS 208.

The Safety Act was enacted to "reduce traffic accidents and death and injuries resulting from traffic accidents." 49 U.S.C. § 30101. FMVSS 208 "specifies performance requirements

for the protection of vehicle occupants in crashes" and its purpose "is to reduce the number of

deaths of vehicle occupants, and the severity of injuries, by specifying vehicle crashworthiness

requirements in terms of forces and accelerations measured on anthropomorphic dummies in test

crashes, and by specifying equipment requirements for active and passive restraint systems." 49

C.F.R. § 571.208.S1-S2.  The Safety Act contains the following express preemption provision:

> When a motor vehicle safety standard is in effect under this chapter, a State or a
> political subdivision of a State may prescribe or continue in effect a standard
> applicable to the same aspect of performance of a motor vehicle or motor vehicle
> equipment only if the standard is identical to the standard prescribed under this
> chapter.

49 U.S.C. § 30103(b)(1).  The same section contains a savings clause, which provides that

"[c]ompliance with a motor vehicle safety standard prescribed under this chapter does not

exempt a person from liability at common law." 49 U.S.C. § 30103(e).

The Supremacy Clause of the Constitution provides that the laws of the United States

"shall be the supreme Law of the Land; . . . anything in the Constitution or Laws of any State to

the Contrary notwithstanding." U.S. Const. art. VI.  State law that conflicts with federal law is

"without effect." *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992) (citing *Maryland v.*

*Louisiana*, 451 U.S. 725, 744-46 (1981)).  Preemption ultimately turns on congressional intent.

*Cipollone*, 505 U.S. at 516.  "[P]re-emption may be either express or implied, and is compelled

whether Congress' command is explicitly stated in the statute's language or implicitly contained

in its structure and purpose." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992)

(quoting *FMC Corp. v. Holliday*, 498 U.S. 52, 56-57 (1990)).  "Under the implied preemption

doctrines of field preemption and conflict preemption, a state claim is preempted where

'Congressional intent to preempt is inferred from the existence of a pervasive regulatory scheme'

or where 'state law conflicts with federal law or interferes with the achievement of federal

objectives.'" *Witty v. Delta Air Lines, Inc.*, 366 F.3d 380, 384 (5th Cir. 2004) (quoting *Hodges v. Delta Airlines, Inc.*, 44 F.3d 334, 336 n.1 (5th Cir. 1995)). The existence of an express preemption clause does not necessarily preclude the presence of implied preemption. *Freightliner Corp. v. Myrick*, 514 U.S. 280, 286-90 (1995).

The Fifth Circuit has addressed the issue of preemption under the Safety Act in the context of a design defect claim under the LPLA involving an airbag that failed to deploy when a vehicle ran into a ditch. *Perry v. Mercedes Benz of North America, Inc.*, 957 F.2d 1257 (5th Cir. 1992). The Fifth Circuit agreed with the district court that express or field preemption under the Safety Act and its regulations did not preclude the design defect claim, but reversed the district court's finding that conflict preemption was applicable. *Id.* at 1263-64. In so holding, the Fifth Circuit stated that it was "in agreement with the conclusion of the other circuits that the Savings Clause does not preserve common law actions that would *actually conflict with*, or 'subvert,' the objections of the federal scheme." *Id.* at 1265. At the time *Perry* was decided, several federal circuit courts had found conflict preemption applicable in failure-to-install airbag cases where the state tort claims sought to impose liability on manufacturers for choosing an option that the federal scheme expressly granted them.[5] In distinguishing the foregoing decisions, the Fifth Circuit held that once the manufacturer chose to include an airbag system, FMVSS 208 "merely set forth *minimum* performance requirements for that system" and it would not conflict with Congress' objections and methods if a manufacturer "were found *liable in tort* for failing to

---

[5] *See Pokorny v. Ford Motor Co.*, 902 F.2d 1116 (3rd Cir. 1990); *Taylor v. General Motors Corp.*, 875 F.2d 816 (11th Cir. 1989); *Kitts v. General Motors Corp.*, 875 F.2d 787 (10th Cir. 1989); *Wood v. General Motors Corp.*, 865 F.2d 395 (1st Cir.1988). Consistent with the foregoing decisions, the Supreme Court later held that a state tort action alleging that a vehicle manufacturer had a duty to equip an automobile with airbags is impliedly preempted by the Safety Act and FMVSS 208. *Geier v. American Honda Motor Co., Inc.*, 529 U.S. 861 (2000).

design its air bags to perform in a manner that effectively exceeds the federal minimum standards." *Id*. at 1264-65.

The Court rejects Defendant's express preemption arguments with respect to Plaintiff's failure to warn claims brought under the LPLA. The U.S. Supreme Court has held that the Safety Act's express preemption cause, which is to be read narrowly in light of the savings clause, cannot preempt a state tort action. *See Williamson v. Mazda Motor of America, Inc.*, 562 U.S. 323, 329 (2011) (citing *Geier v. American Honda Motor Co., Inc.*, 529 U.S. 861, 868 (2000)); *see also Perry*, 957 F.2d at 1263-64. Furthermore, Defendant seeks a finding of express preemption solely with respect to Dr. Vigilante's original opinion that Defendant should have placed an alternate warning on the sun visor. Dr. Vigilante has withdrawn that opinion. Accordingly, the Court will turn to Defendant's conflict preemption argument with respect to Dr. Vigilante's opinion, as supplemented, that an alternate warning should have been be placed elsewhere in the vehicle.

In support of a finding of conflict preemption, Defendants rely primarily on the Sixth Circuit decision *Fisher v. Ford Motor Company*, 224 F.3d 570 (6th Cir. 2000).[6] In *Fisher*, the plaintiff, a short-statured driver was seriously injured by an airbag deployment as a result of sitting too close to the steering wheel. *Id*. at 571-72. The district court granted partial summary judgment to the defendant manufacturer on the basis that the federal standard for airbag warnings on the visor found in FMVSS 208 impliedly preempted any duty under state law to post additional signs with alternative or more expansive language. *Id*. at 572-73. The Sixth Circuit affirmed, holding that any duty under state law to place written airbag warnings anywhere in a

---

[6] Defendants also cite *Kitts v. General Motors Corp.*, 875 F.2d 787, 789 (10th Cir. 1989) for the proposition that the "NTHSA and FMVSS 208 impliedly preempt airbag <u>warning</u> claims." (R. Doc. 31-1 at 15) (emphasis added). To be clear, the Tenth Circuit found implied preemption of a common law action for failure to install an airbag despite the option to do so provided by FMVSS 208. *Kitts*, 875 F.2d at 789.

vehicle that did not conform to the language of FMVSS 208 is impliedly preempted. *Id*. In doing

so, the Court recognized that "NHTSA policy indicated that NHTSA thought of its warning

language as not simply the minimum, but as the sole language it wanted on the subject." *Id*. at

574. The Court further recognized that "NHTSA feared 'information overload,' i.e., that

additional warnings would distract from the warnings it had determined were critical, leading

consumers not to focus properly on the latter" and that "[it] was also concerned that additional

warnings might simply lead people to pay no attention to any of them." *Id*. (citing Rules and

Regulations, Department of Transportation, National Highway Traffic Safety Administration:

Federal Motor Vehicle Safety Standards; Occupant Crash Protection, 58 FR 46551, 46554 (Sept.

2, 1993) ("additional statements . . . would contribute to an 'information overload,' thereby

diluting the impact of the most important information")).

      The Court finds conflict preemption to be inapplicable in this case. Foremost, Defendant

does not cite any controlling law by the Fifth Circuit finding conflict preemption of a failure to

warn claim under a state products liability law act in light of the Safety Act or FMVSS 208.

      Furthermore, the proposed warnings at issue in *Fischer* are distinguishable from those at

issue in this case. In *Fischer*, the Sixth Circuit addressed whether additional warning labels

placed elsewhere in the vehicle than the sun visor could contain language differing from FMVSS

208 "to warn drivers of short stature about added risks to them" where an airbag deploys in a

crash as intended. 224 F.3d at 574. Plaintiff's failure to warn claim in this action is considerably

different. Plaintiff asserts that a manufacturer has a duty to warn of potential inadvertent airbag

deployment even in the absence of a crash and, instead, involved an inadvertent deployment

while the vehicle was stationary. The Court is not convinced that conflict preemption applies to

the particular warning claim brought by Plaintiff in this action, which did not involve a crash.

*See* 49 U.S.C. § 30101 (purpose of the Safety Act is "reduce traffic accidents and death and injuries *resulting from traffic accidents*.") (emphasis added); 49 C.F.R. § 571.208.S1-S2 (scope of FMVSS 208 is to specify "performance requirements for the protection of vehicle occupants *in crashes*") (emphasis added).

Moreover, the applicability of *Fischer* is questionable in light of the addition of the following language to FMVSS 208:

> Additional labels placed elsewhere in the vehicle interior. The language on additional air bag warning labels placed elsewhere in the vehicle interior shall not cause confusion or contradiction of any of the statements required in the air bag sun visor label, and shall be expressed in symbols, words and abbreviations required by this standard.

49 C.F.R. § 571.208.S4.5.1(g). The foregoing language was added to FMVSS 208, after the *Fischer* decision, with an effective date of January 17, 2002. *See* Rules and Regulations, Department of Transportation, National Highway Traffic Safety Administration: Federal Motor Vehicle Safety Standards; Occupant Crash Protection, 66 FR 65376-01 (Dec. 18, 2001). The NHTSA stated that it was not its intent to preclude "additional, design-specific information on the sun visor" despite concerns with "information overload." *Id*. at 65399. The NHTSA went on to clarify that it had never prohibited the use of additional labels "that convey specific, accurate information about air bags" in other locations in the vehicle:

> No change has been made to the regulatory text regarding the permissibility of labels elsewhere in the vehicle because <u>we have never prohibited labels that convey specific, accurate information about air bags or seat belts in locations other than the sun visor</u>. However, any additional labels, regardless of where they are placed in the vehicle, cannot be confusing or misleading when read in conjunction with other labels required by this or other standards. The regulatory text has accordingly been amended at S 4.5.1 (g).

*Id*. (emphasis added). Defendants do not address the applicability of the foregoing language added to FMVSS 208 or the regulatory history. Defendants also do not establish that, as a matter

of law, the proposed alternate warning will cause confusion or contradict the required sun visor warning.

Based on the foregoing, the Court will not exclude Dr. Vigilante's opinions, as supplemented, that an additional airbag warning of inadvertent airbag deployment should have been placed within the vehicle in a location other than the sun visor. The Court will, however, exclude Dr. Vigilante's original opinion as withdrawn.

**IT IS ORDERED** that Defendant's Motion to Exclude the Opinion Testimony of Dr. William J. Vigilante, Jr. as Untimely and Unreliable (R. Doc. 31) is **GRANTED IN PART and DENIED IN PART.** Dr. Vigilante is precluded from providing opinions regarding the placement of any additional airbag warnings on the sun visor on the basis that this opinion has been withdrawn.

    **vi.**  **Plaintiff's Motion to Exclude Testimony of Defense Expert Elizabeth H. Raphael, M.D. (R. Doc. 33)**

Dr. Raphael holds a bachelor's degree in mechanical engineering from the Massachusetts Institute of Technology, holds a medical degree from Wayne State University, is board-certified in emergency medicine, serves as an attending emergency physician at Stanford University Hospital, is principal engineer at Delta V Biomechanics Inc., worked as a researcher in the Department of Orthopedic Surgery for Massachusetts General Hospital and as a research engineer in the Department of Neurosurgery for Henry Ford Hospital, and has taught at Stanford University Medical Center. (R. Doc. 49-2 at 1-2). Dr. Raphael has also published extensively in the field of biomechanics. (R. Doc. 49-2 at 3-39). Dr. Raphael has also testified as an expert at numerous depositions and trials. (R. Doc. 49-2 at 31-35). Defendant retained Dr. Raphael to determine whether the incident could have imparted forces sufficient to cause the injuries with which Plaintiff has been diagnosed. (R. Doc. 49 at 1).

On December 19, 2017, Emily Gu, an employee of Delta V Biomechanics Inc., performed a vehicle inspection. (R. Doc. 49-2 at 8, 18). Dr. Raphael represents, among other things, that Ms. Gu has a background in biomechanical engineering and bioengineering, has completed coursework in mammalian physiology and tissue engineering, was a research assistant in the Stanford Pathology Department, has been an Emergency Medical Technician, has a master's degree in mechanical engineering from Stanford University, and has worked for Delta V Biomechanics Inc. for over 10 years. (R. Doc. 49-2 at 8). According to Dr. Raphael's report, Ms. Gu's inspection indicated there "was no obvious impact- or collision-related damage to the vehicle exterior" and that "[n]o evidence of blood, body fluids, or tissue was found on any of the interior components, including but not limited to the steering wheel; instrument panel and knee bolster; driver's frontal airbag; roof liner; driver's seat bottom, seat back, and head restraint; center console; and floor." (R. Doc. 49-2 at 18).

On March 6, 2018, Dr. Raphael performed a static surrogate study in Palo Alto, California, involving a 2005 Jeep Liberty Limited as the exemplar vehicle and a surrogate male occupant six feet tall and approximately 215 pounds. (R. Doc. 49-2 at 18). According to Dr. Raphael, the surrogate male was the same height as Plaintiff and weighed only approximately 10-15 pounds more than Plaintiff. (R. Doc. 49-2 at 7). As part of the study, Dr. Raphael had the surrogate male reach in through the driver's door opening to insert the key into the ignition with a previously deployed airbag packed with polyester fiber fill. (R. Doc. 49 at 18-19).

Dr. Raphael also analyzed a series of six driver frontal airbag out-of-position ("OOP") tests conducted on May 20, 2003 involving a 5th percentile female dummy and a 2004 Jeep Liberty to verify design compliance with FMVSS 208. (R. Doc. 49-2 at 21). These tests

concluded that the measured accelerations resulted in less than 0.6% probability of moderate head injury to a 5th percentile female dummy. (R. Doc. 49-2 at 21).

Based on the vehicle inspection, static surrogate study, the OOP tests, and review of the testimony and medical records, Dr. Raphael reached the following conclusions:

1.    The forces in the subject airbag deployment more likely than not were insufficient to cause a traumatic brain injury or concussion to Mr. Curtis Weams.

2.    Mr. Weams' cervical spinal condition was a degenerative one that occurred over time and was not the result of the single airbag deployment event.

3.    Mr. Weams' thoracic spinal condition was a degenerative one that occurred over time and was not the result of the single airbag deployment event.

4.    Mr. Weams' lumbar spinal condition was a degenerative one that occurred over time and was not the result of the single airbag deployment event.

5.    The subject airbag deployment did not cause Mr. Weams' left knee meniscus tear, which was degenerative in nature.

(R. Doc. 49-2 at 25).

Plaintiff seeks to exclude Dr. Raphael's testimony on the basis that she has relied on unsubstantiated facts, employed unreliable methodologies, and has proffered duplicative medical causation opinions. (R. Doc. 33). In opposition, Defendant argues that Dr. Raphael is qualified to offer expert testimony in the field of biomechanics; her methodology, data, and results are reliable; and her testimony is not duplicative. (R. Doc. 49).

Plaintiff does not dispute that Dr. Raphael is qualified by education, skill, experience, and training to provide opinion testimony in the field of biomechanics. Instead, Plaintiff challenges Dr. Raphael's methodologies used in her biomechanical analysis of the impact forces involved in the incident and whether those forces were sufficient to cause Plaintiff's injuries. (R. Doc. 33-1

at 6-16).  Plaintiff argues that Dr. Raphael's methodologies are unreliable in light of her subjective placement of the male surrogate, failure to fully inflate the exemplar airbag or test the actual forces involved in airbag deployment, the 10-15-pound weight difference between the surrogate male and Plaintiff, the use of a 2005 Jeep Liberty in the testing, inadequate forensic testing for blood, lack of peer review, and improper use of the FMVSS 208 performance test.

There is no dispute that Dr. Raphael conducted testing in support of her opinions.  The Court finds no basis for excluding Dr. Raphael's opinions on the basis that she used unreliable methodologies with respect to her surrogate testing.  In an affidavit signed on July 21, 2018, Dr. Raphael explains that in conducting the testing "the seat and steering wheel were adjusted precisely as found in the Weams vehicle when it was made available for inspection by the plaintiff" and appear to be the same as those provided in Mr. Weams' own reenacted photographs. (R. Doc. 49-2 at 5).  Dr. Raphael further explains that the exemplar surrogate testing was not to demonstrate the forces of impact, but the relative geometry with males of similar stature. (R. Doc. 49-2 at 5).  Dr. Raphael also explains that the 2004 Jeep Liberty and 2005 Jeep Liberty have the same cabin measurements and are considered "clones" in the industry. (R. Doc. 49-2 at 6).  These explanations contradict the arguments raised by Plaintiff, and are more properly addressed in cross-examination.

The Court is also satisfied with Dr. Raphael's explanations with respect to why she relied upon the OPP tests and did not subject a live human being to an active airbag deployment.  Dr. Raphael acknowledges that she was unable to find "peer-reviewed literature concerning vehicle occupants leaning into a vehicle at the time of an inadvertent deployment in a stationary vehicle" and relied in part on the 2003 testing involving a 5th percentile female dummy to provide a "very conservative methodology" in light of the more powerful forces involved in the testing and the

smaller frame and stature of the test dummy. (R. Doc. 49-2 at 4). Dr. Raphael also notes that it is "potentially dangerous, and therefore, unethical for a scientist to test deployment forces on a living human subject as suggested by plaintiff." (R. Doc. 49-2 at 4). Plaintiff may challenge Dr. Raphael's reliance on the OPP tests and application of those tests with respect to the instant facts through cross-examination.

Plaintiff's challenge to the underlying inspection of the vehicle by Ms. Gu is also misplaced. Plaintiff's assertion that Ms. Gu has "no forensic training, experience or education" (R. Doc. 33-1 at 13) is unsupported by the record. The Court finds no basis for excluding Dr. Raphael's testimony based on her reliance on Ms. Gu's inspection of the vehicle. Plaintiff may challenge the methodology employed by Ms. Gu and ultimately relied upon by Dr. Raphael to demonstrate that Plaintiff was not rendered unconscious by the airbag, through cross-examination.

In short, the Court finds it appropriate to apply the general rule that "questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987). Plaintiff may challenge Dr. Raphael's opinions with respect to her methodologies, including the choice and placement of the male surrogate, the choice of the vehicle surrogate, and the application of the 2003 OOP tests, through cross-examination. Similarly, to the extent Plaintiff argues that Dr. Raphael improperly addressed the application of a "startle response" and studies referenced in her report, Plaintiff may address those issues on cross-examination.

The Court also rejects Plaintiff's argument that Dr. Raphael's opinions regarding medical causation must be excluded on the basis that they are duplicative of the medical evaluation

conducted by Dr. Louis Eiserloh, III, an orthopedic surgeon, and Dr. Archie Melcher, who performed a neurological evaluation of Plaintiff. (R. Doc. 33-1 at 17-18). Dr. Raphael is offering medical causation opinions in the context of a biomechanical analysis based on physical modeling, physical forces, static and dynamic testing, and physical evidence. She is also a medical doctor capable of reviewing the evaluations and diagnoses of other physicians. In addition to reviewing Plaintiff's medical files and testimony, Dr. Raphael reviewed various publications with respect to spinal injuries (including disc herniation and degeneration), meniscus tears, and traumatic brain injuries that are relevant for her analysis. (R. Doc. 49-2 at 29-30). Based on the foregoing, the Court finds no basis for excluding Dr. Raphael's opinions as duplicative. Given the limited scope of her opinions, it is also of no event that Dr. Raphael did not conduct a Rule 35 examination of Plaintiff.

**IT IS ORDERED** that Plaintiff's Motion to Exclude Testimony of Defense Expert Elizabeth H. Raphael, M.D. (R. Doc. 33) is **DENIED**.

### B. Motions for Summary Judgment

#### i. Summary Judgment Standard

Summary judgment shall be granted when there are no genuine issues as to any material facts and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56. When a motion for summary judgment is properly made and supported under Rule 56(c), the opposing party may not rest on the mere allegations of their pleadings, but rather must come forward with "specific facts showing that there is a genuine issue for trial." *Matsushita Electric Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); Fed. R. Civ. P. 56(c)(1). The non-movant's evidence is to be believed for purposes of the motion and all justifiable inferences are to be drawn in the non-movant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255

(1986).  However, summary judgment must be entered against the plaintiff, if he or she fails to make an evidentiary showing sufficient to establish the existence of an element essential to his or her claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  Without a showing sufficient to establish the existence of an element essential to the plaintiff's claim, there can be "no genuine issue as to any material fact since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all facts immaterial." *Id*. at 323.

Furthermore, only evidence that is competent, or admissible, may be used to support summary judgment. *Bellard v. Gautreaux*, 675 F.3d 454, 460 (5th Cir. 2012).  "'[U]nsupported allegations or affidavits setting forth ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment." *Serna v. Law Office of Joseph Onwuteaka*, P.C., 614 F. App'x 146, 153 (5th Cir. 2015) (quoting *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985)).

### ii.        The Louisiana Products Liability Act

Because the Court is sitting in diversity, the Court applies the substantive law of the forum state. *See Holt v. State Farm Fire & Cas. Co.,* 627 F.3d 188, 191 (5th Cir. 2010) (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938)).  There is no dispute that Louisiana law governs this case.

The Louisiana Products Liability Act ("LPLA"), La. R.S. 9:2800.51 *et seq.*, contains an exclusive remedy provision limiting a plaintiff's theories of recovery against a manufacturer of an allegedly defective product to those established by the LPLA. *Stahl v. Novartis Pharmaceuticals Corp.*, 283 F.3d 254, 261 (5th Cir. 2002).  "To maintain a successful products liability action under the LPLA, a plaintiff must establish four elements: (1) that the defendant is a manufacturer of the product; (2) that the claimant's damage was proximately caused by a

characteristic of the product; (3) that this characteristic made the product 'unreasonably dangerous'; and (4) that the claimant's damage arose from a reasonably anticipated use of the product by the claimant or someone else." *Id.* (citing La. R.S. 9:2800.54(A)).

The Fifth Circuit has recognized that while "expert testimony is not required in every LPLA case" to establish causation, "courts consistently require expert testimony in products liability cases, even when the products in question are in common use." *Stewart v. Capital Safety USA*, 867 F.3d 517, 520-21 (5th Cir. 2017) (citations omitted). For expert testimony not to be required in a products liability case, "the product itself, or at least the . . . feature in question, must be relatively uncomplicated, and the implications . . . such that a layman could readily grasp them." *Id.* (citations omitted).

There appears to be no dispute that Defendant is the manufacturer of the vehicle for the purposes of the LPLA, or that the vehicle was within the reasonably anticipated use of the product (parked) at the time of the incident. The disputes at issue are whether the vehicle was unreasonably dangerous in some way at the time it left the manufacturer's control, and, if so, whether this dangerous condition proximately caused the inadvertent airbag deployment.

A product is "unreasonably dangerous" under the LPLA in one of four ways: (1) construction or composition; (2) design; (3) inadequate warning; or (4) failure to conform to an express warranty. La. R.S. 9:2800.54(B). The "unreasonably dangerous" characteristic must exist at the time the product left the manufacturer's control or result from a reasonably anticipated modification or alteration of the product. La. R.S. 9:2800.54(C). The plaintiff bears the burden of proving that a product is unreasonably dangerous. La. R.S. 9:2800.54(D); *see Stahl*, 283 F.3d at 261.

### iii.    Plaintiff's Partial Motion for Summary Judgment (R. Doc. 41)

Plaintiff seeks partial summary judgment on the basis that the doctrine of *res ipsa loquitur* shifts the burden of proof to Defendant, and Defendant cannot provide that the subject airbag was not defective at the time it left Defendant's control. (R. Doc. 41).

"The principle of res ipsa loquitur is a rule of circumstantial evidence that infers negligence on the part of defendants because the facts of the case indicate that the negligence of the defendants is the probable cause of the accident, in the absence of other equally probable explanations offered by credible witnesses." *Montgomery v. Opelousas Gen. Hosp.*, 540 So.2d 312, 319 (La. 1989) (citing *Boudreaux v. Am. Ins. Co.*, 264 So.2d 621, 636 (La. 1972)). "The doctrine allows an inference of negligence to arise from the common experience of the factfinder that such accidents normally do not occur in the absence of negligence." *Id.* The doctrine of *res ipsa loquitur* is reserved for those circumstances that "are of such an unusual character as to justify, in the absence of other evidence bearing on the subject, the inference that the accident was due to the negligence of the one having control of the thing which caused the injury." *Lawson v. Mitsubishi Motor Sales of Am., Inc.*, 938 So.2d 35, 49 (La. 2006) (quoting *Larkin v. State Farm Mut. Auto. Ins. Co.*, 97 So.2d 389, 391 (La. 1957)). "[A]s a qualification of the general rule that negligence is not to be presumed," the doctrine of *res ipsa loquitor* "must be sparingly applied." *Spott v. Otis Elevator Co.*, 601 So. 2d 1355, 1362 (La. 1992) (internal quotation marks omitted).

The Louisiana Supreme Court has recognized the applicability of *res ipsa loquitur* to an LPLA action and, if appropriate under the circumstances, will "shift the burden of proof to the defendant-manufacturer." *Lawson*, 938 So.2d at 49; *see Lyles v. Medtronic Sofamor Danek,*

*USA, Inc.*, 871 F.3d 305, 312 (5th Cir. 2017). Three requirements must be met for the doctrine of *res ipsa loquitur* to apply:

> 1) the facts must indicate that the plaintiff's injuries would not have occurred in the absence of negligence;
>
> 2) the plaintiff must establish that the defendant's negligence falls within his scope of duty to plaintiff; and
>
> 3) the evidence should sufficiently exclude inference of the plaintiff's own responsibility or the responsibility of others besides the defendant in causing the accident.

*Lawson*, 938 So.2d at 49 (emphasis and citation omitted). "Because the standard of proof is preponderance of the evidence, not proof beyond a reasonable doubt, the plaintiff's evidence need only exclude all other reasonable explanations for his injuries; it need not 'conclusively exclude all other possible explanations for his injuries.'" *Id.* (quoting *Cangelosi v. Our Lady of the Lake Reg'l Med. Ctr.*, 564 So.2d 654, 664 (La. 1989)).

Defendant concedes that it owes a duty to manufacture a safe vehicle, but argues that Plaintiff has not established the first and third elements for the application of the doctrine of *res ipsa loquitur* in this LPLA action. (R. Doc. 62 at 5). The Court agrees that Plaintiff has not met his burden.

The evidence in the record does not exclude all other reasonable explanations for the inadvertent airbag deployment. There is no dispute that at the time of the incident, the vehicle had approximately 115,000 miles and was 14 years old. Plaintiff testified that he purchased the vehicle used with approximately 64,000 miles, did not know the vehicle's maintenance and repair history, never had the vehicle serviced by an authorized dealership, and performed his own repairs on the vehicle despite having no prior automotive repair experience. (R. Doc. 41-3 at 50; R. Doc. 41-4 at 1-3, 18). Plaintiff also testified that he could not obtain an inspection sticker

because the power windows stopped functioning and that the vehicle sat idle for approximately six months under a tree prior to the incident. (R. Doc. 41-4 at 16-20).

Furthermore, Dr. Livernois observed post-production electrical tape used to bundle some wires on the vehicle's steering column and has testified that the vehicle may have had unidentified circuit leakage paths resulting from changes in environmental conditions or movement of wire harnesses. (R. Doc. 41-7 at 27-30, 43-44). While Dr. Livernois concedes that the cause of the inadvertent airbag deployment "is undetermined" and that "[i]t is possible that there is an unidentified anomaly in the ORC electronics that caused the deployment," he further opines that "[i]t is possible that there is an unidentified circuit leakage path that was not identified because of changes in environmental conditions and/or movement of wire harnesses as the subject vehicle was transported to different locations." (R. Doc. 41-13 at 16). Plaintiff has not moved to exclude any of Dr. Livernois' opinion testimony.

Plaintiff suggests that the doctrine of *res ipsa loquitur* applies in this action because "no one has been able to determine [the] cause" of the inadvertent airbag deployment. (R. Doc. 41-1 at 2). It is Plaintiff's burden, however, to "adduce evidence excluding" other reasonable explanations for the incident. *See Lyles*, 871 F.3d at 314. Consistent with Plaintiff's admission that "no one has been able to determine [the] cause" of the inadvertent airbag deployment, the opinions of Messrs. Hille, Hannemann, and Berriman positing various unsupported theories regarding electrical system and/or ORC malfunctions have been excluded. Even if these opinions were admissible, they would not exclude the reasonable explanations offered by Defendant for the inadvertent airbag deployment, including the possibility that the airbag system was altered prior to the incident by a third party.

Given Plaintiff's lack of evidence excluding other reasonable explanations for the inadvertent airbag deployment other than that the vehicle was defective when it left Defendant's control, the doctrine of *res ipsa loquitur* is inapplicable in this LPLA action. To apply the doctrine would be "grant recovery for simply experiencing a strange accident." *Edwards v. Ford Motor Co.*, 934 So.2d 221, 224 (La. App. 3rd Cir. 2006). The doctrine is inapplicable under the circumstances, particularly given the unknowns regarding the vehicle's maintenance history and previous owner(s) during tens of thousands of miles and years of use. *See Lawson*, 938 So. 2d at 51 (doctrine of *res ipsa loquitur* inapplicable where side air bag inadvertently deployed when driver honked the horn but neither party could establish the exact cause of the air bag's deployment, 21,000 miles were placed on the vehicle while owned by a rental car company, the plaintiffs drove the vehicle for an additional 26,000 miles before the accident occurred, and the record did not contain any service or maintenance records); *Centauri Specialty Ins. Co. v. Gen. Motors, LLC*, No. 16-226, 2017 WL 1015311, at *4-5 (M.D. La. Mar. 15, 2017) (doctrine of *res ipsa loquitur* inapplicable where fire originated from engine compartment while vehicle was parked and not running, vehicle was purchased with 124 miles and owned for seven years before the incident, and the plaintiff failed to rule out reasonable explanations for the fire, such as third-party fault or some intervening cause); *Dortch v. Jane Doe & Chrysler Grp., LLC*, 217 So. 3d 449, 454 (La. App. 1st Cir. 2017) (doctrine of *res ipsa loquitur* inapplicable where the plaintiff "presented no evidence to support his claim that the airbags should have deployed under the circumstances"); *see also Patton v. Bos. Sci. Corp.*, No. 15-1976, 2018 WL 4760846, at *4 (W.D. La. Oct. 2, 2018) (doctrine inapplicable where the plaintiffs offered "no evidence in support of their argument that *res ipsa loquitur* should be applied other than their contention" that the medical device failed in its "normal and intended use").

Based on the foregoing,

**IT IS ORDERED** Plaintiff's Partial Motion for Summary Judgment (R. Doc. 41)

is **DENIED**.

### iv. Defendant's Motion for Summary Judgment (R. Doc. 40)

#### a. Design Defect

Under the LPLA, "[a] product is unreasonably dangerous in design if, at the time the

product left its manufacturer's control:

> (1) There existed an alternative design for the product that was capable of preventing the claimant's damage; and
>
> (2) The likelihood that the product's design would cause the claimant's damage and the gravity of that damage outweighed the burden on the manufacturer of adopting such alternative design and the adverse effect, if any, of such alternative design on the utility of the product. An adequate warning about a product shall be considered in evaluating the likelihood of damage when the manufacturer has used reasonable care to provide the adequate warning to users and handlers of the product.

La. R.S. 9:2800.56. This test requires a plaintiff to prove both "that an alternative design

existed" at the time the product was manufactured and "that the risk avoided by using the

alternative design (magnitude of damage discounted by the likelihood of its occurrence) would

have exceeded the burden of switching to the alternative design (added construction costs and

loss of product utility)." *Roman v. W. Mfg., Inc.*, 691 F.3d 686, 700-01 (5th Cir. 2012) (citing

*Lawrence v. Gen. Motors Corp.*, 73 F.3d 587, 590 (5th Cir. 1996)). "An alternative design must

be reasonably specific and not based on mere speculation." *Gray v. Indus. Plant Maint.*, No. 01-

1167, 2004 WL 1661209, at *5 (E.D. La. July 23, 2004) (citing *Seither v. Winnebago Industries,*

*Inc.*, 853 So.2d 37, 41 (La. App. 4th Cir. 2003)).

Here, Plaintiff has failed to identify a feasible alternative design to the vehicle, the airbag

system, or its component parts, including the ORC. Messrs. Hille, Hannemann, and Berriman all

testified that they have not proposed or identified specific alternative designs for the ORC or the vehicle. (R. Doc. 57-4 at 34; R. Doc. 57-6 at 31; R. Doc. 47-5 at 5). Plaintiff admits that none of his experts "have identified a specific alternative design that would have prevented the airbag deployment." (R. Doc. 40-2 at 4; R. Doc. 57-1 at 2). Plaintiff does not identify any alternative designs in opposing summary judgment on his design defect claim. Instead, Plaintiff argues that he need not present an alternative design in light of a decision applying the doctrine of *res ipsa loquitor* to prove a design-defect claim under the New Jersey Product Liability Act. *See Estate of Knoster v. Ford Motor Co.*, 200 Fed. App'x 106 (3d Cir. Sept. 6, 2006). This action is brought under the LPLA and, as discussed above, the doctrine of *res ipsa loquitor* does not apply. Accordingly, Plaintiff's design defect claim must be dismissed for failure to show an alternative design existed at the time the vehicle was manufactured and left Defendant's control. *See Reynolds v. Bordelon*, 172 So. 3d 607, 614 (La. 2015) (dismissing design defect claim under the LPLA where the plaintiff proposed no alternative design and admitted to not developing an alternative design); *McCarthy v. Danek Med., Inc.*, 65 F. Supp. 2d 410, 411-12 (E.D. La. 1999) (granting summary judgment on design defect claim where the plaintiff "presented no expert evidence to support a claim that an alternative design exists or to identify an alternative design," leaving no issue of fact to be tried).

Furthermore, even if Plaintiff had identified an alternative design, his design defect claim fails as a matter of law because Plaintiff did not identify any specific product defect that caused the inadvertent airbag deployment. "Louisiana law does not allow a fact finder to presume an unreasonably dangerous design solely from the fact that injury occurred." *Id*. (citing *Ashley v. GMC*, 666 So.2d 1320, 1322 (La. App. 2nd Cir. 1996)). A design defect claim fails as a matter of law where the plaintiff does not "present sufficient evidence to enable a jury to find that either

a defect in the product or the defendant's negligence was the most probable cause of the failure" of the product at issue. *Brown*, 919 F.2d at 312. Because the causation theories proffered by Messers. Hille, Hannemann, and Berriman have been excluded as speculative and of no assistance to the jury, Plaintiff is unable to meet his burden of establishing any specific design defect. *See Brown*, 919 F.2d at 312; *see also McCarthy*, 65 F. Supp. 2d at 412.

Accordingly, the Court will grant summary judgment to the Defendant on Plaintiff's design defect claim.

### b. Construction or Composition (Manufacturing Defect)

Under the LPLA, "[a] product is unreasonably dangerous in construction or composition if, at the time the product left its manufacturer's control, the product deviated in a material way from the manufacturer's specifications or performance standards for the product or from otherwise identical products manufactured by the same manufacturer." La. R.S. 9:2800.55. "The 'unreasonably dangerous in construction or composition' provision of the LPLA provides a remedy for damages caused by a product that is defective due to a mistake in the manufacturing process." *Stahl*, 283 F.3d at 262. The focus of the inquiry on a manufacturing defect claim "is the specific product that was in hand at the time of use, as opposed to the product in general." *Allgood v. GlaxoSmithKline PLC*, No. 06-3506, 2008 WL 483574, at *7 (E.D. La. Feb. 20, 2008), *aff'd sub nom. Allgood v. SmithKline Beecham Corp.*, 314 F. App'x 701 (5th Cir. 2009). "Because LPLA liability for a defect in construction or composition is strict liability, the plaintiff need not show that the manufacturer knew or should have known of the product deviation and could have prevented it, *i.e.,* negligence." *Roman*, 691 F.3d at 697 (citations and internal punctuation omitted). "The defect under Section 9:2800.55 may be established by circumstantial evidence." *Id*. at 698.

Defendant asserts that "Plaintiff's experts have not reviewed any technical drawings or manufacturing specifications to support a claim that the Vehicle deviated in a material way [from] the technical drawings or manufacturing specifications." (R. Doc. 40-2 at 5). Plaintiff provides no evidence that he or his experts reviewed such documents. Instead, Plaintiff asserts that "[m]anufacturing specifications were not provided" and that Defendant's expert is unaware of the "manufacturing specifications because the information is proprietary." (R. Doc. 57-1 at 3).[7] Furthermore, two of Plaintiff's experts, Messrs. Hille and Hannemann, testified that they did not review any pertinent manufacturing specifications. (R. Doc. 57-7 at 14; R. Doc. 57-4 at 35).

Plaintiff nevertheless offers portions of the vehicle's owner's manual to establish performance standards with respect to the failure of the SRS warning lamp:

> "If the ORC detects a malfunction in any part of the system, it turns on the AIRBAG warning light either momentarily or continuously. A single chime will sound if the light comes on again after initial start up.
>
> . . .
>
> If there is a fault present in the system, the AIRBAG warning light will light indicating that you should take the vehicle to an authorized dealer.
>
> . . .
>
> The **Driver and Passenger Airbag/Inflator Units** are located in the center of the steering wheel and the right side of the instrument panel. When the ORC detects a collision requiring the airbags, it signals the inflator units.
>
> . . .
>
> **Airbag Warning Light**
> You will want to have the airbag system ready to inflate for your protection in an impact. The airbag system is designed to be maintenance free. If any of the following occurs, have an authorized dealer service the system promptly:

---

[7] Plaintiff does not indicate whether he sought the production of any technical drawings or manufacturing specifications in the discovery process. Plaintiff certainly did not file any appropriate motions seeking the production of such information prior to the close of discovery. That the information may be proprietary does not necessarily shield it from discovery given the entry of a protective order governing the exchange of confidential information in this action. (*See* R. Doc. 15).

• Does not come on during the 6 to 8 seconds after the ignition switch is first turned on.
• Remains on after the 6 to 8 second interval.
• Comes on for any period of time while driving.

(R. Doc. 57-15 at 51-53, 58). An operating or instruction manual can establish the requisite manufacturer's specifications or performance standards. *See Reynolds*, 172 So. 3d at 613 (vehicle's owner manual established specifications or performance standards regarding non-deployment of airbag); *Roman*, 691 F.3d at 699-700 (performance standard established by manual). While the foregoing excerpts from the vehicle's operating manual may establish relevant specifications and performance standards, Defendant is nevertheless entitled to summary judgment on Plaintiff's manufacturing defect claim for the following reasons.

As with a design defect, the Court "will not infer a manufacturing defect merely because an accident occurred." *McFarlin v. New Hampshire Ins. Co.*, No. 12-3033, 2016 WL 3645200, at *3 (W.D. La. June 30, 2016) (citing *Broussard v. Proctor & Gamble Co.*, 463 F. Supp. 2d 596, 610 (E.D. La. 2006)); *Brown v. Stenograph Corp.*, No. 99-342, 2001 WL 648966, at *3 (M.D. La. June 6, 2001). "At the summary judgment stage, the plaintiff must rise above speculation and offer evidence to raise a genuine issue of fact as to exactly how the product deviated from its intended design." *McFarlin*, 2016 WL 4645200, at *3.

Plaintiff has not presented any competent evidence in support of a finding that a manufacturing defect existed at the time the vehicle left Defendant's control. As discussed above, the Court has excluded Plaintiff's expert testimony with respect to alleged manufacturing defects as conclusory and speculative. Considering the complexities of the airbag system involved, the Court finds it appropriate to require expert testimony to demonstrate a manufacturing defect with respect to the airbag system. While not always required to prove a defect under the LPLA, expert testimony is required where the alleged defect concerns "highly

technical aspects of automobile engineering" that is "not part of the everyday experience of the average finder of fact." *Underwood v. Gen. Motors LLC*, No. 14-188, 2015 WL 5475610, at *3-4 (M.D. La. Sept. 17, 2015) (citations omitted), *aff'd,* 642 F. App'x 468 (5th Cir. 2016). Plaintiff has offered no other competent evidence to demonstrate that a manufacturing defect in the airbag system, as opposed to some intervening cause, "is substantially more likely to have caused the accident than other causes." *McFarlin*, 2016 WL 4645200, at *4 (granting summary judgment where reasonable jury would not be able to determine that the plaintiff's injuries were more probably than not caused by manufacturing defect in tow bars or safety cables that failed where semi-tractor truck was towing a car); *see also Underwood*, 2015 WL 5475610, at *3-4 (granting summary judgment on manufacturing defect claim where plaintiff did not offer timely expert testimony and otherwise failed to offer competent evidence of defects in the construction of a vehicle's fuel tank and electrical system at the time the vehicle left the manufacturer's control where the vehicle was six-years old at the time of the automobile collision).[8]

Accordingly, the Court will grant summary judgment to the Defendant on Plaintiff's construction or composition claim.

### c.    Express Warranty

Under the LPLA, "[a] product is unreasonably dangerous when it does not conform to an express warranty made at any time by the manufacturer about the product if the express warranty

---

[8] Plaintiff's reliance on *Thibodeaux v. Ford Motor Co.*, 54 Fed. App'x 591 (5th Cir. 2002) is misplaced. In that case, the Fifth Circuit affirmed the denial of the defendant's motion for judgment as a matter of law on the issue of liability where the parties stipulated that an airbag should have deployed under the circumstances, and three eyewitnesses testified that the airbag did not deploy, even though it was unclear why the airbag failed. The *Thibodeaux* decision is distinguishable because it relies on a Louisiana state court decision holding that a manufacturing defect may be established by circumstantial evidence under the doctrine of *res ipsa loquitur*. *See McFarlin*, 2016 WL 4645200, at *4 (distinguishing *Thibodeaux*). Furthermore, the district court's opinion denying summary judgment in *Thibodeaux* makes it clear that the plaintiff purchased the truck from an authorized dealer "approximately five days before the date of the accident." *Thibodeaux v. Ford Motor Co.*, No. 00-785, ECF No. 43 at 1 n.1 (E.D. La. May 4, 2001). As discussed above, the doctrine of *res ipsa loquitur* is inapplicable in this action in light of the unknowns regarding the vehicle's maintenance history and previous owner(s)

has induced the claimant or another person or entity to use the product and the claimant's damage was proximately caused because the express warranty was untrue." La. R.S. 9:2800.58. The LPLA defines " 'express warranty' as a representation, statement of alleged fact or a promise about a product or its nature, material or workmanship that represents, affirms or promises that the product or its nature, material or workmanship possesses specified characteristics or qualities or will meet a specified level of performance." La. R.S. 9:2800.53(6). The LPLA "makes it very clear that in order of the manufacturer to be liable, there must be a specified stated warranty." *Reynolds*, 172 So.3d at 615.

Plaintiff concedes that he "has not identified a specific express warranty applicable to the issues raised in this case" and that his "experts offered no opinion regarding the Vehicle's conformity, or lack thereof, to any express warranty." (R. Doc. 40-2 at 5; R. Doc. 57-1 at 3). Furthermore, Plaintiff testified that he did not remember having ever read the owner's manual for the vehicle or otherwise have any information or recollection about what the owner's manual says about the airbags in the vehicle. (R. Doc. 57-18 at 15-16). Finally, Plaintiff makes no attempt to oppose Defendant's motion for summary judgment on his alleged express warranty claims.

Accordingly, the Court will grant summary judgment to the Defendant on Plaintiff's express warranty claim.

### d. Inadequate Warning

Under the LPLA, "[a] product is unreasonably dangerous because an adequate warning about the product has not been provided if, at the time the product left its manufacturer's control, the product possessed a characteristic that may cause damage and the manufacturer failed to use reasonable care to provide an adequate warning of such characteristic and its danger to users and

handlers of the product." La. R.S. 9:2800.57(A). To establish LPLA liability for inadequate warning, the plaintiff "has the burden of producing evidence and persuading the jury to find by a preponderance of the evidence that her injury arose from a reasonably anticipated use of the product and that her damage was proximately caused by the lack of an adequate warning." *Calvit v. Procter & Gamble Mfg. Co.*, 207 F. Supp. 2d 527, 530 (M.D. La. 2002) (citing *Ellis v. Weasler Eng'g Inc.*, 258 F.3d 326, 331-32 (5th Cir. 2001)).

Defendant argues that summary judgment should be granted on Plaintiff's inadequate warning claims because (1) Dr. Vigilante's expert testimony must be excluded and (2) Plaintiff's warning claims are preempted by federal law. As discussed in detail above, the Court will not exclude Dr. Vigilante's expert testimony and does not find that Plaintiff's claims regarding inadequate on-product warnings must be dismissed as a matter of law on the basis that they are preempted. Accordingly, the Court denies summary judgment on this issue.

The Court's analysis does not stop there in light of the two arguments raised by Plaintiff's opposition. First, Plaintiff again raises the issue of prior recall campaigns involving the inadvertent deployment of airbags with respect to the 2002-2003 Jeep Liberty and 2002-2004 Jeep Grand Cherokee. (R. Doc. 57 at 4; *see* Compl. ¶ 54(g)). There is no dispute, however, that the 2002-2003 Jeep Liberty and 2002-2004 Jeep Grand Cherokee were subject to recalls for inadvertent airbag deployment. (R. Doc. 57-16). The Court has excluded Mr. Hille's "recall" opinion. Plaintiff concedes that failure to recall is not a theory of liability under the LPLA. (R. Doc. 40-2 at 2; R. Doc. 57-1 at 2). Finally, Plaintiff's own expert, Mr. Hille, testified that the 2004 Jeep Liberty ORC of the vehicle at issue was substantially different from the design of the 2002-2003 Jeep Liberty ORC. (R. Doc. 57-7 at 8-9). Accordingly, to the extent Plaintiff is attempting to raise an independent claim that Defendant had a duty to warn of previous recalls,

or otherwise include the 2004 Jeep Liberty in the previous recall campaigns, those claims are dismissed.

Second, Plaintiff argues that his inadequate warning claim survives because it is uncontested that the SRS malfunction indicator lamp was not illuminated at the time of the incident. (R. Doc. 57 at 4-5). "The purpose of the SRS warning light is to indicate to the driver that there is a problem with the supplemental restraint system." *Lawson*, 938 So. 2d at 43 n. 17. Defendant correctly notes that the "SRS warning system is . . . one part of a complex airbag design." (R. Doc. 80 at 4). To the extent Plaintiff is attempting to raise an independent design defect or manufacturing defect claim with respect to the failure of the SRS warning light, those claims are also dismissed. Plaintiff's complaint does not identify the failure of the SRS warning light as a design or manufacturing defect, and the Court finds no basis for allowing Plaintiff to add such a claim at this point of the litigation.

Plaintiff may have raised the two foregoing arguments simply in support of his claim that Defendant failed to provide an on-product warning of inadvertent airbag deployment. The Court reaches no conclusion at this time with respect to whether, and to what extent, any evidence of prior recalls or the failure of the SRS indicator lamp is admissible with respect to this surviving claim.

## III. Conclusion

Consistent with the foregoing,

**IT IS ORDERED** that Defendant's Motion to Exclude the Opinion Testimony of Richard Allen Hille as Untimely and Unreliable (R. Doc. 30) is **GRANTED.**

**IT IS FURTHER ORDERED** that Defendant's Motion to Exclude the Opinion Testimony of Neil E. Hannemann (R. Doc. 29) is **GRANTED.**

**IT IS FURTHER ORDERED** that Defendant's Motion to Exclude the Opinion Testimony of Robert J. Berriman, Jr. (R. Doc. 28) is **GRANTED.**

**IT IS FURTHER ORDERED** that Defendant's Motion to Exclude the Opinion Testimony of Dr. William J. Vigilante, Jr. as Untimely and Unreliable (R. Doc. 31) is **GRANTED IN PART AND DENIED IN PART.**

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Exclude Testimony of Defense Expert Elizabeth H. Raphael, M.D. (R. Doc. 33) is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff's Partial Motion for Summary Judgment (R. Doc. 41) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment (R. Doc. 40) is **GRANTED IN PART and DENIED IN PART.** Plaintiff's claims under the LPLA based upon design defect, construction or composition, or express warranty are **DISMISSED WITH PREJUDICE**.

Signed in Baton Rouge, Louisiana, on February 27, 2019.

 

**RICHARD L. BOURGEOIS, JR.**
**UNITED STATES MAGISTRATE JUDGE**